# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

Mr. Nagy Zaky Abdalla, a.k.a.. John Nagy Hanna, pro se
Mrs. Paulette Ruth Hanna, pro se
Mr. Nathan Tamer Hanna, pro se
Mr. Shannon Kareem Hanna, pro se
Mr. Jasen Emad Hanna, minor
<u>complainants/petitioners/plaintiffs    /</u>
1101 54th Street North
Saint Petersburg, Florida 33710

     v.

Case no. 99-1388 CiV-T-26 A

Mr. Lucifer, a.k.a. Satan, a.k.a. The Devil, in his individual and official capacity as God of the
    Jewish people
And his children the Jewish people by and through the state of Israel
Mr. Benjamin Netanyahu, in his individual and official capacity as Prime Minister of Israel
Mr. Ahud Barak, in his individual and official capacity as Prime Minister of Israel
Mr. George Herbert Walker Bush, in his individual and official capacity as President of the
    United States of America
The United States Department of Justice
Mr. Richard Thornburg, in his individual and official capacity as U.S. Attorney General
Ms. Janet Reno, in her individual and official capacity as U.S. Attorney General
Mr. Robert A. Strader, in his individual and official capacity as an Assistant Director of the
    United States Justice Department
Ms. Pamela A. Spraker, in her individual and official capacity as an executive officer of the
    Office of the U.S. Attorney General
Ms. Diane C. Roberts, in her individual and official capacity as an employee of the United
    States Justice Department, Civil Rights Division
Ms. Paula Wood, in her individual and official capacity as an Administrative Assistant of the
    United States Department of Justice
Mr. Richard Riley, in his individual and official capacity as U.S. Secretary of Education
The United States Department of Education
*continued on page 2*

Page 1 of 152

T 000487
# 150.00

*continued from page 1*

Mr. William J. Ryan, in his individual and official capacity as Director of the training and program information division of the United States Department of Education

The Federal Bureau of Investigation

Mr. Louis Freeh, in his individual and official capacity as Director of the Federal Bureau of Investigation

The Department of Health and Human Services

Ms. Donna Shalala, in her individual and official capacity as Secretary of the Department of Health and Human Services

The Social Security Administration

Mr. C.F. Coulter, in his individual and official capacity as Operations Supervisor for the Social Security Administration

Mr. Charles H. Mullen, in his individual and official capacity as Associate Commissioner of the Office of Public Inquiry of the Social Security Administration

The United States Postal Service

Mr. Marvin Runyou, in his individual and official capacity as Postmaster General of the United States Postal Service

Crossroads Station Post Office, St. Petersburg, Florida

Mr. Arthur Pelletier, in his individual and official capacity as manager of Crossroads Station Post Office

Ms. Carol Jones, in her individual and official capacity as an employee of Crossroads Station Post Office

The State of Florida

Mr. Lawton Chiles, in his official capacity as Governor of Florida

Mr. Jeb Bush, in his individual and official capacity as Governor of Florida

Mr. Buddy McCay, in his individual and official capacity as Lt. Governor of Florida

Mr. Frank Brogan, in his individual and official capacity as Lt. Governor of Florida and as Commissioner of the Florida Department of Education

Mr. Robert Butterworth, in his individual and official capacity as Florida Attorney General

Ms. Ann E. Sheer, in her individual and official capacity as Florida Assistant Attorney General

The Florida Department of Education

Mr. Tom Gallagher, in his individual and official capacity as Commissioner of the  Florida Department of Education

The Florida Judicial Qualifications Commission

Ms. Brooke S. Kennerly, in her individual and official capacity as Executive Director of the Florida Judicial Qualifications Commission

Mr. James Wolf, in his individual and official capacity as a member of the Florida Judicial Qualifications Commission

Mr. Dale Sanders, in his individual and official capacity as a member of the Florida Judicial Qualifications Commission

*continued on page 3*

*continued from page 2*

Mr. Curtis Richardson, in his individual and official capacity as a member of the Florida
    Judicial Qualifications Commission

Mr. Michael Nachwalter, in his individual and official capacity as a member of the Florida
    Judicial Qualifications Commission

Mr. Frank Kayney, in his individual and official capacity as a member of the Florida Judicial
    Qualifications Commission

Ms. Patricia Heffner, in her individual and official capacity as a member of the Florida Judicial
    Qualifications Commission

Mr. Lenard Haber, in his individual and official capacity as a member of the Florida Judicial
    Qualifications Commission

Mr. Thomas Freeman, in his individual and official capacity as a member of the Florida
    Judicial Qualifications Commission

Ms. Miet Bernstein, in her individual and official capacity as a member of the Florida Judicial
    Qualifications Commission

The Florida Bar

Mr. Howard Coker, in his individual and official capacity as President of the Florida Bar

Ms. Lindy Boggs,  in her individual and official capacity as assistant to the President of the
    Florida Bar

The Florida Department of Highway Safety and Motor Vehicles

Mr. Fred Dickenson, in his individual and official capacity as Executive Director of the Florida
    Department of Highway Safety and Motor Vehicles

Mr. Joe McCaskill, in his individual and official capacity as Assistant Deputy Director of the
    Florida Department of Highway Safety and Motor Vehicles

Mr. Larry Pulstor, in his individual and official capacity as an employee of the Florida
    Department of Highway Safety and Motor Vehicles

Mr. John G. Bradford, in his individual and official capacity as an employee of the Florida
    Department of Highway Safety and Motor Vehicles

Ms. Debra Barker, in her individual and official capacity as an employee of the Florida
    Department of Highway Safety and Motor Vehicles

Ms. Kathy Wick, in her individual and official capacity as an employee of the Florida
    Department of Highway Safety and Motor Vehicles

Mr. Ross Wilcox, in his individual and official capacity as an employee of the Florida
    Department of Highway Safety and Motor Vehicles

The Florida Department of Corrections

Mr. Harry K. Singletary, in his individual and official capacity as Secretary of the Florida
    Department of Corrections

Mr.  Michael W. Moore, in his individual and official capacity as Secretary of the Florida
    Department of Corrections

*continued on page 4*

*continued from page 3*

Mr. Jerry Rabion,  in his individual and official capacity as Superintendent of Jackson
    Correctional Institution

Mr. Al Solomon,  in his individual and official capacity as Superintendent  Jackson
    Correctional Institution

Mr. Jerry Lewis, in his individual and official capacity as Assistant Superintendent of Jackson
    Correctional Institution

Kerry Flack, in his/her individual and official capacity as an employee of the Florida
    Department of Corrections

Mr. Bill Thurber, in his individual and official capacity as an employee of the Florida
    Department of Corrections

Mr. Ron Kronenberger, in his individual and official capacity as an employee of the Florida
    Department of Corrections

Ms. Janet Hebenthal, in her individual and official capacity as an employee of the Florida
    Department of Corrections

Ms. Ernetta Roberts, in her individual and official capacity as an employee of the Florida
    Department of Corrections

Mr. Matt Crockett, in his individual and official capacity as an employee of the Florida
    Department of Corrections

Ms. Ellen B. Roberts, in her individual and official capacity as an employee of the Florida
    Department of Corrections

Mr. Stevens Moore, in his individual and official capacity as an employee of the Florida
    Department of Corrections

Mr. Donovan Hamilton, in his individual and official capacity as an employee of the Florida
    Department of Corrections

Lieutenant Ham, in his individual and official capacity as an employee of the Florida
    Department of Corrections

Lieutenant Felicia Noble, in her individual and official capacity as an employee of the Florida
    Department of Corrections

Officer Marjorie Stewart, in her individual and official capacity as an employee of the Florida
    Department of Corrections

Ms. D. Garrison, in her individual and official capacity as an employee of the Florida
    Department of Corrections

Mr. Les Ryder, in his individual and official capacity as Superintendent of the Central Florida
    Reception Center

Mr. Gransbury, in his individual and official capacity as Classification Officer for the Florida
    Department of Corrections at the Central Florida Reception Center

Ms. Wedel, in her individual and official capacity as Law Librarian for the Florida
    Department of Corrections at the Central Florida Reception Center

*continued on page 5*

Page 4 of  152

*continued from page 4*

Ms. Cherrita McBride, in her individual and official capacity as a probation officer for the
   Florida Department of Corrections

Mr. William F. Elliott, in his individual and official capacity as a Probation Officer Supervisor
   for the Florida Department of Corrections

Mr. Mark Van Cott, in his individual and official capacity as a Florida Correctional Probation
   Officer for the Florida Department of Corrections

Mr. B. J. Brown, in his individual and official capacity as a Florida Correctional Probation
   Officer for the Florida Department of Corrections

Ms. Mary E. Robinson, in her individual and official capacity as a Florida Correctional
   Probation Supervisor for the Florida Department of Corrections

The Florida Department of Juvenile Justice

Mr. William Bankhead, in his individual and official capacity as Secretary of the Florida
   Department of Juvenile Justice

Mr. Francisco Alarcon, in his individual and official capacity as Assistant Secretary of the
   Florida Department of Juvenile Justice

Ms. Florita Weems, in her individual and official capacity as an employee of the Florida
   Department of Juvenile Justice

The Second District Court of Appeals

Mr. William A. Haddad,  in his individual and official capacity as Clerk of the Second District
   Court of Appeals

Mr. James Birkhold, in his individual and official capacity as Clerk of the Second District
   Court of Appeals

Mr. Jerry R. Parker, in his individual and official capacity as Chief Judge of the Second
   District Court of Appeals

Mr. Paul W. Danahy Jr., in his individual and official capacity as a Judge of the Second
   District Court of Appeals

Mr. Richard H. Frank, in his individual and official capacity as a Judge of the Second
   District Court of Appeals

Mr. David F. Patterson, in his individual and official capacity as a Judge of the Second
   District Court of Appeals

Mr. Chris W. Altenberd, in his individual and official capacity as a Judge of the Second
   District Court of Appeals

Mr. Richard A. Lazzara, in his individual and official capacity as a Judge of the Second
   District Court of Appeals

Mr. James W. Whatley, in his individual and official capacity as a Judge of the Second
   District Court of Appeals

Mr. Montery A. Campbell, in his individual and official capacity as a Judge of the Second
   District Court of Appeals

*continued on page 6*

*continued from page 5*

Mr. Jack R. Schoonover, in his individual and official capacity as a Judge of the Second
District Court of Appeals

Mr. Edward F. Threadgill, in his individual and official capacity as a Judge of the Second
District Court of Appeals

Mr. John R. Blue, in his individual and official capacity as a Judge of the Second
District Court of Appeals

Ms. Carolyn K. Fulmer, in her individual and official capacity as a Judge of the Second
District Court of Appeals

Ms. Peggy A. Quincy, in her individual and official capacity as a Judge of the Second
District Court of Appeals

Mr. Steven T. Northcutt, in his individual and official capacity as a Judge of the Second
District Court of Appeals

The Florida Department of Children and Families

Mr. Donald Policella, in his individual and official capacity as an employee of the Florida
Department of Children and Families

Ms. Wanda Goodridge, in her individual and official capacity as an employee of the Florida
Department of Children and Families

The County of Pinellas County, in the State of Florida

Mr. Robert B. Stewart, in his individual and official capacity as a member of the Pinellas
County Commission

Ms. Barbara Sheen Todd, in her individual and official capacity as a member of the Pinellas
County Commission

Mr. Calvin D. Harris, in his individual and official capacity as a member of the Pinellas County
Commission

Ms. Sallie Parks, in her individual and official capacity as a member of the Pinellas County
Commission

Mr. Steve Seibert, in his individual and official capacity as a member of the Pinellas County
Commission

Mr. Fred Eschweiler, in his individual and official capacity as Director of the Pinellas County
branch of the Federal Bureau of Investigation

Ms. Vivian Brush, in her individual and official capacity as Pinellas County Court
Administrator

Mr. William J. Lockhart, in his individual and official capacity as Pinellas County Court
Administrator

Ms. Kathy Harrington, in her individual and official capacity as an Administrative Assistant in
the Sixth Judicial Circuit of Pinellas County, FL

Ms. Susan F. Schaeffer, in her individual and official capacity as Chief Judge of the Sixth
Judicial Circuit Court of Florida

*continued on page 7*

*continued from page 6*

Mr. Paul Levine, in his individual and official capacity as a Judge of the Sixth Judicial
Circuit Court of Florida

Mr. R. Timothy Peters, in his individual and official capacity as a Judge of the Sixth Judicial
Circuit Court of Florida

Mr. Philip J. Federico, in his individual and official capacity as a Judge of the Sixth Judicial
Circuit Court of Florida

Mr. Mark I. Shames, in his individual and official capacity as a Judge of the Sixth Judicial
Circuit Court of Florida

Mr. Patrick Caddell, in his individual and official capacity as a Judge of the Sixth Judicial
Circuit Court of Florida

Mr. Douglas W. Baird, in his individual and official capacity as a Judge of the Sixth Judicial
Circuit Court of Florida

Mr. Peter Ramsberger, in his individual and official capacity as a Judge of the Sixth Judicial
Circuit Court of Florida

Mr. William Overton, in his individual and official capacity as a Judge of the Sixth Judicial
Circuit Court of Florida

Mr. Walter Fullerton, in his individual and official capacity as a Judge of the Sixth Judicial
Circuit Court of Florida

Ms. Nelly M. Khouzam, in her individual and official capacity as a Judge of the Sixth Judicial
Circuit Court of Florida

Mr. Thomas Freeman, in his individual and official capacity as a Judge of the Sixth Judicial
Circuit Court of Florida

Mr. Owen S. Albriton, in his individual and official capacity as a Judge of the Sixth Judicial
Circuit Court of Florida

Mr. Thomas Penick, in his individual and official capacity as a Judge of the Sixth Judicial
Circuit Court of Florida

Ms. Dee Anna Farnell, in her individual and official capacity as a Judge of the Sixth Judicial
Circuit Court of Florida

Mr. Robert Morris, in his individual and official capacity as a Judge of the Sixth Judicial
Circuit Court of Florida

Ms. Myra Scott McNavy, in her individual and official capacity as a Judge of the Sixth Judicial
Circuit Court of Florida

Ms. Jackie Jackson, in her individual and official capacity as a Judicial Assistant to Judge R.
Timothy Peters

Ms. "Melinda", in her individual and official capacity as a Judicial Assistant to Judge Paul
Levine

Mr. Bernie McCabe, in his individual and official capacity as State Attorney for the Sixth
Judicial Circuit Court of Florida

*continued on page 8*

Page 7 of  152

*continued from page 7*

Ms. Mary Handsel, in her individual and official capacity as Assistant State Attorney for the
    Sixth Judicial Circuit Court of Florida

Mr. Evan Brodsky, in his individual and official capacity as Assistant State Attorney for the
    Sixth Judicial Circuit Court of Florida

Ms. Lydia Wardell, in her individual and official capacity as Assistant State Attorney for the
    Sixth Judicial Circuit Court of Florida

Ms. Michelle Mason, in her individual and official capacity as Assistant State Attorney for the
    Sixth Judicial Circuit Court of Florida

Ms. Melissa Cardy, in her individual and official capacity as Assistant State Attorney for the
    Sixth Judicial Circuit Court of Florida

Mr. Richard McKyton, in his individual and official capacity as Assistant State Attorney for
    the Sixth Judicial Circuit Court of Florida

Mr. Fred L. Schaub, in his individual and official capacity as Assistant State Attorney for the
    Sixth Judicial Circuit Court of Florida

Mr. Joseph Montrone, in his individual and official capacity as Assistant State Attorney for the
    Sixth Judicial Circuit Court of Florida

Ms. Rhonda E. Stringer, in her individual and official capacity as Assistant State Attorney for
    the Sixth Judicial Circuit Court of Florida

Mr. Robert Angus Williams, in his individual and official capacity as Assistant State Attorney
    for the Sixth Judicial Circuit Court of Florida

Ms. Patricia A. Blackburn, in her individual and official capacity as an employee of the
    Pinellas County State Attorney's Office for the Sixth Judicial Circuit Court of Florida

Ms. Dorothy McNabb, in her individual and official capacity as an employee of the
    Pinellas County State Attorney's Office for the Sixth Judicial Circuit Court of Florida

Mr. Bob Dillinger, in his individual and official capacity as Public Defender for the Sixth
    Judicial Circuit Court of Florida

Ms. Violet Assaid, in her individual and official capacity as Assistant Public Defender for the
    Sixth Judicial Circuit Court of Florida

Mr. Anthony Clifton, in his individual and official capacity as Assistant Public Defender for
    the Sixth Judicial Circuit Court of Florida

Ms. Karleen F. DeBlaker, in her individual and official capacity as Clerk for the Sixth Judicial
    Circuit Court of Florida

Ms. Aida R. Trippett, in her individual and official capacity as Deputy Clerk for the Sixth
    Judicial Circuit Court of Florida

Ms. Felicia Wilson, in her individual and official capacity as Deputy Clerk for the Sixth
    Judicial Circuit Court of Florida

Ms. Saundra K. Caldwell, in her individual and official capacity as Deputy Clerk for the Sixth
    Judicial Circuit Court of Florida

*continued on page 9*

Page 8 of 152

*continued from page 8*

Ms. Barbara Hubbard, in her individual and official capacity as Deputy Clerk for the Sixth
    Judicial Circuit Court of Florida

The Pinellas County Sheriff's Office/Department

Mr. Everett Rice, in his individual and official capacity as Sheriff of Pinellas County Florida

Ms. Janice Jones Thibodeaux, in her individual and official capacity as Deputy of the Pinellas
    County Sheriff's Office/Department

Mr. Roscoe C. Dobson, in his individual and official capacity as Deputy of the Pinellas
    County Sheriff's Office/Department

Mr. Jeffrey Preising, in his individual and official capacity as Deputy of the Pinellas
    County Sheriff's Office/Department

Mr. James R. Cavagnaro, in his individual and official capacity as Deputy of the Pinellas
    County Sheriff's Office/Department

Mr. Lance R. Chambers, in his individual and official capacity as Deputy of the Pinellas
    County Sheriff's Office/Department

Mr. Norman Cramer, in his individual and official capacity as Deputy of the Pinellas
    County Sheriff's Office/Department

J. Gleason, in his/her individual and official capacity as Deputy of the Pinellas County Sheriff's
    Office/Department

A. Laughlin, in his/her individual and official capacity as Deputy of the Pinellas County
    Sheriff's Office/Department

Ms. Karen S. Greul, in her individual and official capacity as Forensic Specialist of the Pinellas
    County Sheriff's Office/Department

The Pinellas County Jail

Mr. Kenneth Remming, in his individual and official capacity as Commander of the Pinellas
    County Jail

Ms. Kathy Belveille, in her individual and official capacity as Secretary to the Commander of
    the Pinellas County Jail

Mr. Schmidt, in his individual and official capacity as Corrections officer of the Pinellas
    County Jail

Mr. Grover, in his individual and official capacity as Corrections officer of the Pinellas
    County Jail

Mr. Murphy, in his individual and official capacity as Corrections officer of the Pinellas
    County Jail

Mr. O'Brian, in his individual and official capacity as Corrections officer of the Pinellas
    County Jail

Mr. Stroud, in his individual and official capacity as Corrections officer of the Pinellas
    County Jail

Ms. Newman, in her individual and official capacity as Corrections officer of the Pinellas
    County Jail

*continued on page 10*

*continued from page 9*

Mr. George, in his individual and official capacity as Corrections officer of the Pinellas
County Jail

Ms. Jill Poorman, in her individual and official capacity as Court Psychologist for the Sixth
Judicial Circuit Court of Florida

Ms. Murray, in her individual and official capacity as an employee of the Pinellas County Jail
Trinity Food Services

Ms. Rene Dukes, in her individual and official capacity as an employee of Trinity Food
Services

The Pinellas County Juvenile Assessment Center

Mr. Martin, in his individual and official capacity as a Corrections Officer of the Pinellas
County Juvenile Assessment Center

Mr. Howard Hinesley, in his individual and official capacity as Superintendent of Pinellas
County Schools

Ms. Andrea M. Thacker, in her individual and official capacity as a member of the Pinellas
County School Board

Ms. Barbara J. Crockett, in her individual and official capacity as a member of the Pinellas
County School Board

Mr. Lee Benjamin, in his individual and official capacity as a member of the Pinellas County
School Board

Ms. Lucile O. Casey, in her individual and official capacity as a member of the Pinellas County
School Board

Ms. Corinne Freeman, in her individual and official capacity as a member of the Pinellas
County School Board

Ms. Susan Latvala, in her individual and official capacity as a member of the Pinellas County
School Board

Ms. Linda S. Lerner, in her individual and official capacity as a member of the Pinellas County
School Board

Ms. Jane Gallucci, in her individual and official capacity as a member of the Pinellas County
School Board

Mr. John Bowen, in his individual and official capacity as attorney for the Pinellas County
School Board

Ms. Judith Qualls, in her individual and official capacity as an Attendance Specialist for
Pinellas County Schools

The Pinellas County Education Foundation

Ms. Deborah Stone, in her individual and official capacity as Education Foundation
Scholarship Advisor of the Pinellas County Education Foundation

Ms. Victoria Desmond, in her official capacity as Principle of Tyrone Middle School

Mr. James M. Joyer, in his individual and official capacity as Assistant Principle of Tyrone
Middle School

*continued on page 11*

Page 10 of 152

*continued from page 10*

Mr. Bernard Pennington, in his individual and official capacity as Counselor of Tyrone Middle School

Mr. Tom Petit, in his individual and official capacity as Principle of  St. Petersburg High School

Mr. Tom Proctor, in his individual and official capacity as an employee of St. Petersburg High School

Mr. Don Driskell, in his individual and official capacity as I.B. Coordinator of St. Petersburg High School

Ms. Linda McPheron, in her individual and official capacity as I.B. Coordinator of St. Petersburg High School

Ms. Barbara Poanessa, in her individual and official capacity as Principle of Boca Ciega High School

Ms. Bette R.A. Ivey, in her individual and official capacity as an employee of Pinellas County Schools

Mr. Arlington Nunn,  in his individual and official capacity as an employee of Pinellas County Schools

Ms. Rebecca Norus,  in her individual and official capacity as an employee of Pinellas County Schools

Mr. Ralph Bailey,  in his individual and official capacity as an employee of Pinellas County Schools

Mr. Juan Lopez, in his individual and official capacity as a School Psychologist for Pinellas County Schools

Mr. Jack R. Lamb, in his individual and official capacity as an employee of Pinellas County Schools

Ms. Catherine A. Fleeger, in her individual and official capacity as an employee of Pinellas County Schools

Ms. Marion H. Plichieinski, in her individual and official capacity as an employee of Pinellas County Schools

Mr. Lewis Williams, in his individual and official capacity as an employee of Pinellas County Schools

Mr. William Grey, in his individual and official capacity as an employee of Pinellas County Schools

Ms. Susan Bailey, in her individual and official capacity as an employee of Pinellas County Schools

Ms. Patricia Caulfield, in her individual and official capacity as Principle of St. Jude Cathedral School and a nun of the St. Petersburg Catholic Diocese

Ms. Joseph Eilese Hukle, in her individual and official capacity as an employee of St. Petersburg Catholic Diocese at St. Jude Cathedral School

*continued on page 12*

Page 11 of  152

*continued from page 11*

Mr. Robert Lynch, in his individual and official capacity as Bishop of the St. Petersburg
  Catholic Diocese

Ms. Barbara Thomas, in her individual and official capacity as Director of the RCIA program
  at St. Jude Cathedral

Ms. Jane Mulligan, in her individual and official capacity as Principle of Pasadena Community
  Church School

Ms. Diane Knoke, in her individual and official capacity as Principle of Pasadena Community
  Church School

Ms. Jennifer Catcott, in her individual and official capacity as a teacher of Pasadena
  Community Church School

The City of St. Petersburg, Florida

Mr. David Fischer, in his individual and official capacity as Mayor of the City of St.
  Petersburg, Florida

The Pinellas County Campus Police

Mr. Joe Feracca, in his individual and official capacity as Police Chief of the Pinellas County
  Campus Police

Mr. Dennis Ingerson, in his individual and official capacity as an Officer of the Pinellas County
  Campus Police

Mr. Joseph Milana, in his individual and official capacity as an Officer of the Pinellas County
  Campus Police

Mr. Spencer Gross, in his individual and official capacity as an Officer of the Pinellas County
  Campus Police

Ms. Kim Griffith, in her individual and official capacity as an employee of the Pinellas County
  Campus Police

The St. Petersburg Code Enforcement Board of St. Petersburg, Florida

Mr. William Bartlett, in his individual and official capacity as a member of the St. Petersburg
  Code Enforcement Board

Ms. Sandy Bozeman, in her individual and official capacity as a member of the St. Petersburg
  Code Enforcement Board

Mr. Jim Bedinghaus, in his individual and official capacity as a member of the St. Petersburg
  Code Enforcement Board

Mr. Edward Vehling, in his individual and official capacity as a member of the St. Petersburg
  Code Enforcement Board

Ms. Shirley Rigo, in her individual and official capacity as a member of the St. Petersburg
  Code Enforcement Board

Mr. Eddie Roberson, in his individual and official capacity as a member of the St. Petersburg
  Code Enforcement Board

Ms. Rene Robinson, in her individual and official capacity as a member of the St. Petersburg
  Code Enforcement Board

*continued on page 13*

Page 12 of 152

*continued from page 12*

Mr. George Horstman, in her individual and official capacity as a member of the St. Petersburg Code Enforcement Board

The St. Petersburg Police Department

Mr. Darrel Stephens, in his individual and official capacity as Police Chief of the St. Petersburg Police Department

Mr. Charlie Barnes, in his individual and official capacity as an Officer of the St. Petersburg Police Department

Mr. Kraig Corry, in his individual and official capacity as Officer of the St. Petersburg Police Department

Mr. Kiesal, in his individual and official capacity as an Officer of the St. Petersburg Police Department

Mr. Goodwin, in his individual and official capacity as an Officer of the St. Petersburg Police Department

Mr. Steven Cureton, in his individual and official capacity as an Officer of the St. Petersburg Police Department

Mr. Tex Smith, in his individual and official capacity as an Officer of the St. Petersburg Police Department

Mr. Scott, in his individual and official capacity as an Officer of the St. Petersburg Police Department

Mr. Gary J. Stempinski, in his individual and official capacity as an Officer of the St. Petersburg Police Department

Mr. M. T. Story, in his individual and official capacity as an Officer of the St. Petersburg Police Department

Mr. Karl Sauer, in his individual and official capacity as an Officer of the St. Petersburg Police Department

Mr. Pat Stelmach, in his individual and official capacity as an Officer of the St. Petersburg Police Department

Mr. David M. Field, in his individual and official capacity as an Officer of the St. Petersburg Police Department

Mr. William E. Lusby, in his individual and official capacity as an Officer of the St. Petersburg Police Department

Mr. David J. Kidd, in his individual and official capacity as an Officer of the St. Petersburg Police Department

Mr. Richard Crater, in his individual and official capacity as an Officer of the St. Petersburg Police Department

Mr. Troy C. Turner, in his individual and official capacity as an Officer of the St. Petersburg Police Department

Ms. Wanda J. Williams, in her individual and official capacity as an Officer of the St. Petersburg Police Department

*continued on page 14*

Page 13 of 152

*continued from page 13*

Mr. Kenneth L. Smith, in his individual and official capacity as an Officer of the St. Petersburg
 Police Department

Mr. D. Mullinuix, in his individual and official capacity as an Officer of the St. Petersburg
 Police Department

Mr. J.W. Soule, in his individual and official capacity as an Officer of the St. Petersburg
 Police Department

Mr. J. Martini, in his individual and official capacity as an Officer of the St. Petersburg
 Police Department

Mr. R.D. Bricker, in his individual and official capacity as an Officer of the St. Petersburg
 Police Department

Mr. W. Gable, in his individual and official capacity as an Officer of the St. Petersburg
 Police Department

Mr. J.F. Snyder, in his individual and official capacity as an Officer of the St. Petersburg
 Police Department

Ms. Karen Eichler, in her individual and official capacity as an Officer of the St. Petersburg
 Police Department

Mr. J. Brubaker, in his individual and official capacity as an Officer of the St. Petersburg
 Police Department

Mr. Ziegler, in his individual and official capacity as an Officer of the St. Petersburg
 Police Department

The Kenneth City Police Department

Mr. Thomas Webster, in his individual and official capacity as Police Chief of the Kenneth
 City Police Department

Mr. Kevin Matson, in his individual and official capacity as an officer of the Kenneth City
 Police Department

Mr. Shane Collinsworth, in his individual and official capacity as an officer of the Kenneth
 City Police Department

Ms. Marjorie Shumaker, in her individual and official capacity as District Magistrate of
 Mountainhome, Pennsylvania

Mr. John Whitesell, in his individual and official capacity as as District Magistrate of
 Mountainhome, Pennsylvania

Mr. Henry McCoal, in his individual and official capacity as as District Magistrate of
 Mountainhome, Pennsylvania

Ms. Joyce A. Reese, in her individual and official capacity as Monroe County, Pennsylvania
 Prothonotary

Ms. Robin Rodenhaussen, in her individual and official capacity as Monroe County,
 Pennsylvania Head of Prothonotary

Ms. Joyce L. Stoddard, in her individual and official capacity as an employee of the Monroe
 County, Pennsylvania District Court Administration

*continued on page 15*

*continued from page 14*

The Swiftwater Pennsylvania State Police

Mr. John Hudson, in his individual and official capacity as an officer of the Swiftwater Pennsylvania State Police

The law firm of O'Malley, Walker, and Jensen

Mr. O'Malley, in his individual and official capacity as a partner in the law firm of O'Malley, Walker, and Jensen

Mr. Walker, in his individual and official capacity as a partner in the law firm of O'Malley, Walker, and Jensen

Mr. Jensen, in his individual and official capacity as a partner in the law firm of O'Malley, Walker, and Jensen

The Sunset Estates Lot Owner's Association

Mr. Michael Sarageno, in his individual and official capacity as a member of the Sunset Estates Lot Owner's Association

Mr. Anthony Gragnoniello, in his individual and official capacity as a member of the Sunset Estates Lot Owner's Association

Mr. Nick Amatrudi, in his individual and official capacity as a member of the Sunset Estates Lot Owner's Association

Ms. Ellen Krause, in her individual and official capacity as a member of the Sunset Estates Lot Owner's Association

Ms. Susan Sarageno, in her individual and official capacity as a member of the Sunset Estates Lot Owner's Association

Mr. Robert Deller, in his individual and official capacity as a member of the Sunset Estates Lot Owner's Association

Ms. Tina M. Deller, in her individual and official capacity as a member of the Sunset Estates Lot Owner's Association

Mr. Barry Moore, in his individual and official capacity as a member of the Sunset Estates Lot Owner's Association

Mr. Paul Miskinis

Aegis Security Insurance Company

Lake Timber Limited Partnership , an Illinois limited partnership authorized to do business in Florida, D/B/A Palm View Apartments

Ms. Mauri Rooks-Gordillo, in her individual and official capacity as property manager of Palm View Garden Apartments

Balcor Property Management, Inc.

Hunter Management Company, Inc.

Ms. Margret Brooks, in her individual and official capacity as property manager of Sunset Place Apartments

Mr. Robert Sandberg, in his individual and official capacity as real-estate manager of the Dolphin Village manager's office

*continued on page 16*

Page 15 of  152

*continued from page 15*

S&R Towing and Recovery, Inc.

PEMHS, Inc.

Ms. Sandra Gerard, in her individual and official capacity as an employee of PEMHS, Inc.

Ms. Nicola Anderson, in her individual and official capacity as an employee of PEMHS, Inc.

Mr. Harold Davis, in his individual and official capacity as an employee of PEMHS, Inc.

Edward White Hospital, St. Petersburg. Florida

Mr. Francois Picot, in his individual and official capacity as a doctor of Edward White Hospital

Mr. Nasser Moukaddem, in his individual and official capacity as a doctor of Edward White Hospital

All Children's Hospital, St. Petersburg. Florida

Mr. Everett, in his individual and official capacity as a doctor of All Children's Hospital

Action Bail Bonds

Mr. Frank Kopczynski, in his individual and official capacity as owner and proprietor of Action Bail Bonds

Ms. Julia Harris, in her individual and official capacity as an employee of Action Bail Bonds

Callahan Bail Bonds

Ms. Christine G. Johnson, in her individual and official capacity as an employee of Callahan Bail Bonds

Richard Dessi Insurance Agency

Mr. Richard J. Dessi, in his individual and official capacity as owner and proprietor of Richard Dessi Insurance Agency

McCrory Stores, Inc.

Mr. George Latzo, in his individual and official capacity as an employee of McCrory Stores, Inc.

Ms. Rose Ann Latzo

Mr. Dan McKnabb, in his individual and official capacity as an employee of McCrory Stores, Inc.

White Oak Ice Cream, inc.

Mr. Herby Armel, in his individual and official capacity as owner and proprietor of White Oak Ice Cream, inc.

Ms. Gloria Armel in her individual and official capacity as owner and proprietor of White Oak Ice Cream, inc.

Ms. Yvette D. Campbell

Ms. Melody Lynn Figurski

Ms. Kathleen A. Cook

Mr. Wayne J. Reese

Mr. Thomas W. Pifer

Ms. Kathryn S. Taylor

*continued on page 17*

Page 16 of 152

*continued from page 16*
Mr. Howard L. Schuele
Ms. Vicky L. Hess
Mr. Christopher M. Avington
Mr. Robert E. Galloway
Ms. Dorothy M. Miholics
Mr. Kern S. Sims
Mr. John L. Downing, Jr
Mrs. Angela Downing
Mr. Christopher Downing
Mr. Joseph Downing
Mr. Lee Timm
Mr. "Glenn"
Ms. Gloria Vinciguerra
Mr. Daniel Vinciguerra
Mr. Raymond White
Ms. Susan White
Mr. Tyler Inmen
Mr. Kieth Willhieght
Ms. Joanne Pavese
Mr. Richard Tuten
Ms. Kristina Tuten
Mr. Michael Day
Mrs. Day
Mr. Jawdett Rubaii, Esq.
Mr. Jack White, Esq.
Ms. Noel White, Esq.
Mr. Chriss Arbisi
Ms. Maurene Gray

Jointly and Severally,
respondents/defendants

## I.

This is a civil rights action for declatory, injunctive, and other relief pursuant to **42 U.S.C. §1983**, **42 U.S.C. §1985**, **28 U.S.C. §2201**, and **28 U.S.C. §2202** brought by Mr. Nagy Z.

Abdalla[1], Mrs. Paulette R. Hanna, Mr. Nathan T. Hanna, Mr. Shannon K. Hanna, and Mr. Jasen E. Hanna to enjoin enforcement of **Amendment I, Amendment IV, Amendment V, Amendment VI, Amendment VIII, Amendment XIII,** and **Amendment XIV** of the Constitution of the United States of America, copies of which are attached, made a part of this complaint, and designated as **Exhibit 1**.

The respective actions of the named defendants, as herein detailed, are violations of the plaintiffs' constitutional rights and were committed in the furtherance of a conspiracy to deprive the plaintiffs of their constitutional liberties as citizens of the United States of America, to whit: religious liberty, the exercise of free speech, freedom of the press, and the right to petition the government for a redress of grievances (pursuant to Amendment I); the right to be secure, in both person and property, against unreasonable searches and seizures (pursuant to Amendment IV); the right to be free from the deprivation of life, liberty, and property without due process of law (pursuant to Amendment V); the right to a public trial before impartial juries (pursuant to Amendment VI); the right to be free from the imposition of excessive bail and cruel and unusual punishment (pursuant to Amendment VIII); the right to be free from slavery and involuntary servitude (pursuant to Amendment XIII); the right to be free from the deprivation of life, liberty, and the pursuit of happiness without due process and the right to equal protection before the laws (pursuant to Amendment XIV) in the United States of America.

## II.

The jurisdiction of this court is invoked under **28 U.S.C. §1331** and **28 U.S.C. §1343**. The

---

[1]Referred to, throughout this complaint, as Mr. Nagy Z. Abdalla but also known as Mr. John N. Hanna. Any and all references, in this complaint, to the *Hanna family* include Mr. Nagy Z. Abdalla as well as the other plaintiffs under their former surname, when appropriate.

matter in controversy exceeds the cumulative sum of five-hundred million dollars per day since May 12, 1982 (the day Mr. Nagy Abdalla entered the United States of America, with the intention of making it his new home) until the date judgement is rendered in favor of plaintiffs.

III.

The Jewish belief system worships Mr. Lucifer, the Devil, as a God, as illustrated in the book of John chapter 8 verses 37-47, a copy of which is attached, made a part of this complaint, and designated **Exhibit 2a**. It is this entity that initiated the belief system known as Judaism. It is this entity that led the Jews out of the land of Egypt in order to secure their freedom to murder and sacrifice human children, animals, etc. to satisfy Mr. Lucifer's lust for blood. The Jews signed a covenant with Mr. Lucifer to obey his laws and fulfill his will on the face of this planet.

Many of those who believe in Jewish ideologies have been deceiving and psychologically conditioning the human race by systematically fabricating, falsifying, and convincing them that the God of Jewish ideology, Mr. Lucifer (also known as Satan or the Devil), is the Creator, our Father who is in heaven, and the Father of Jesus Christ, for the purpose of soliciting sympathy and financial assistance and for the purpose of retaining powerful and elite positions throughout the world. The purpose of this campaign of lies and misinformation is to use those who are deceived, and believe the lies of Jewish cultist ideology, as weapons against truth and those who would attempt to reveal it. They have engaged in a war with the truth, as well as those who seek to reveal it, which they have conducted throughout the course of human history. They continue to attack the truth even today and will continue to attack it in the future. Jewish political organizations, the Jewish State known as Israel, Jewish officials, and other advocates of the Jewish faith and Judaic ideologies have been leading this campaign of lies and deception across the globe and throughout the course of human history. These

Page 19 of  152

individuals, officials, organizations, the Jewish State of Israel, et al. have been utilizing and manipulating the power, the influence, and the people of the United States of America to maintain, as well as to disseminate, their cultist ideologies across the world and to rob the United States of America as well as other nations across the globe.

The Father who is in heaven, also known as the creator and the holy spirit of Christian belief, *who created the heavens and stretched them out, who spread forth the earth and that which comes from it, who gives breath to the people on it, and spirit to those who walk on it* has been striving, in a variety of different ways, to inform human beings, especially those who adhere to Jewish beliefs, by sending prophets, holy men, disciples, apostles, and other teachers to the people of the world. Many of those who hold Jewish beliefs, however, have killed, imprisoned, destroyed, and otherwise persecuted almost each and every one of them. Finally

the Father sent the world his only son to reestablish ownership of the planet, but those who held Jewish beliefs though that, by slaying the son of the Father, they could destroy his plans and inherit the world forever .

As has been predicted and described in Isaiah chapter 42 verses 1-9, chapter 49 verses 1-7, chapter 50 verses 4-11, etc. (copies of which are attached, made a part of this complaint, and designated **Exhibit 2b, 2c, 2d**, respectively), the Lord's *Servant*, *Comforter*, *Advocate*, and *Helper* is the one who shall conclude the final part of the Father's plan and reveal the truth to all humans on earth by *obtain*(ing) *a judgement to bring forth justice for truth* . . . (and by) *establish*(ing) *justice in the earth*. Because Jewish beliefs and the God of Jewish ideology are anti-life, anti-truth, and anti-justice, those who hold a belief in Jewish ideals have searched, since the day they barbarically executed Jesus Christ, for this person so that they might destroy him in order to secure and firmly establish their satanic lifestyle, evil beliefs, and savage God on the earth.

Page 20 of 152

The Devil and his children, the Jews, have identified Mr. Nagy Z. Abdalla as the servant of the Lord, also described by Jesus himself in the book of John chapter 16 verses 5-15 (a copy of which is attached, made a part of this complaint, and designated **Exhibit 2e**), as the *Helper, Comforter,* Advocate, and *Servant*. Since the first day Mr. Nagy Abdalla entered the United States of America (May 12, 1982), with the intention of making it a home for his family and himself, he, and every member of his immediate family, have been targeted by extremist criminal Jews[2] and their dogs[3] in a ***Racist Religious Conspiracy***, the goal of which has been and is to not only physically destroy, but also to harm in every conceivable aspect and manner, Mr. Nagy Abdalla and the other plaintiffs, as well as to prevent Mr. Nagy Abdalla from fulfilling his mission.

## IV.

This civil action is brought against every individual and entity herein categorized who has participated in, through positive criminal action, or made themselves a party to, through criminal inaction, this ***Racist Religious Conspiracy***, the goals of which have been to directly or indirectly harm or injure the plaintiffs, to prevent the plaintiffs from exercising their constitutional liberties, to deprive the plaintiffs of their constitutional liberties, and to negatively affect or degrade the lives of, or even end the lives of, any and/or all of the

---

[2]The term *Jew* being defined as any person who believes in the tenets of Judaism or partially believes in the tenets of Judaism. The term *Criminal Jew* being defined as any person previously described as a Jew who believes that the slaying of Jesus Christ was legal, morally justified, righteous, and necessary and accepts the blood of Christ, as did his Jewish ancestors when they demanded Christ's crucifixion and stated *Let his blood be on us and on our children*, and/or believes that criminal activities against non-Jews and non-Jewish ideologies are justified when committed in support of Jewish beliefs and the advancement of the Jewish people and the Jewish faith.

[3]The term *Jewish Dog* being defined as those who are non-Jews yet work in favor of the Jews and/or Jewish ideologies and are willing to commit and/or participate in any criminal activity, without regard for morality or human life, in order to satisfy the Jews and/or Jewish ideals.

plaintiffs in violation of **18 U.S.C. §241, 18 U.S.C. §242, 42 U.S.C. §1983**, and **42 U.S.C. §1985**.

## V.

The plaintiffs have resided at 1101 54th St. N., St, Petersburg, FL since March 1994. The Downing family (who resided next door to the plaintiffs at 5345 11 Ave. North), composed of John L. Downing Jr., Angela Downing, Christopher Downing, and Joseph Downing, were contacted by members of, and recruited into the service of, the *Racist Religious Conspiracy* being coordinated against the plaintiffs. On a multitude of occasions between March 1994 and April 1998, members of the Downing family broke into the plaintiffs' home and copied both electronic documents from the plaintiffs' word processor and paper documents from the plaintiffs' personal files. These copies were relayed to criminal jews and corrupt officials working in various levels of the local governmental structure who used the information to, oftentimes, respond to letters prepared by the plaintiffs which had not yet been sent or even printed out. For example, Mr. John Bowen, the attorney for the Pinellas County School Board, would often respond to letters (dealing with the corruption in the Pinellas County School system and the campaign to vandalize the minds of America's youth) addressed to him before they had even been fully prepared, printed, or sent to him or the school board. During the break-ins the Downings also stole, tampered with, or otherwise altered numerous objects in the plaintiffs' residence, including evidence mostly related to this *Racist Religious Conspiracy* and the Downings' involvement in it, as well as food in the plaintiffs' refrigerator and kitchen cupboards. The Downings also monitored the plaintiffs' daily activities, not only visually, but also through the use of specialized and technologically advanced electronic equipment stored in their home and supplied by their contacts in this *Racist Religious Conspiracy* who also, incidentally, trained them in the use of this equipment.

Page 22 of 152

All information gathered by the Downings was relayed to their contacts in the ***Racist Religious Conspiracy*** being conducted against the plaintiffs. In each instance, as a result of the specific information relayed, the Downings, as well as their friends and associates, were advised and ordered to engage in specific retaliatory criminal activities against the plaintiffs including, but certainly not limited to, harassment, stalking, slander, disturbing the peace, disorderly conduct, lude and lascivious behavior, indecent exposure, intimidation, the exhibition of intimidating objects and symbols, spying, trespassing, breaking and entering, petty theft, robbery, criminal mischief, destruction and vandalism of property, malicious mischief, verbal and physical assault, terroristic threats, armed trespassing, aggravated battery, aggravated assault, attempted arson, attempted murder, false arrest, filing false police reports against any and/or all of the plaintiffs with the St. Petersburg Police Department, filing false complaints of child abuse with the HRS and/or the DCF, perjury under oath, fabrication and alteration of official documents, solicitation, conspiracy, conspiracy to interfere with civil rights, etc.

All the crimes committed against the plaintiffs by the aforementioned defendants, between March 1994 and April 1998, were committed for the purpose of delaying, disabling, and otherwise preventing the plaintiffs both from carrying on their activism against the corruption in the American governmental structure and from coordinating their mission to reveal the truth to the American people.

In the summer of 1994 Mr. Joseph Downing and Mr. Christopher Downing stole Mr. Nathan Hanna's bike which had been left on the plaintiffs' front porch one night. When Mr. Nagy Abdalla mentioned to Mr. John Downing that Mr. Nathan Hanna's bike had been taken from the front porch of his residence Mr. John Downing stated that the neighborhood was very peaceful and that such things had never happened before. Mr. John Downing also advised Mr. John Hanna to continue to look for the bike. A few minutes later Mr. John Downing

loaded his pick-up truck with dry leaves, branches, debris, and garbage bags. Underneath all of this debris he hid various bike parts. Mr. John Downing traveled to the city dump, loading and unloading his truck over the course of a number of trips. This action was taken in an attempt to dispose of the evidence and to protect Mr. Christopher Downing, Mr. Joseph Downing, and their associates so that they might be able to commit further crimes against the plaintiffs.

On one occasion in 1995 Mr. Nagy Abdalla was working on his car in the plaintiffs' driveway, while the plaintiffs' garage door was kept open, and while Mr. Christopher Downing and Mr. Joseph Downing were playing in the Downing's driveway next door and on 11th Ave., just a few feet from the plaintiffs' driveway. After Mr. Nagy Abdalla had gone in and out of his home several times he noticed that his 1hp Craftsman electric belt sander, which had been on the floor at the front of the garage and which he had been using, was missing. Mr. Nagy Abdalla noticed, from the expressions on Mr. Christopher Downing's and Mr. Joseph Downing's faces and the way they ran and hid inside their house, that Mr. Christopher Downing and Mr. Joseph Downing had most likely stolen the sander. Mr. Nagy Abdalla waited until Mr. John Downing came home from work and he then spoke with Mr. John Downing and informed him of the incident and requested that the sander be returned. Mr. Nagy Abdalla also told Mr. Downing that he would consider this incident nothing more than a "borrowing" of the tool. Mr. Nagy Abdalla also stated that there should be no official action taken in this matter because it was merely a child's mistake. Mr. John Downing apologized to Mr. Nagy Abdalla and stated that he would see what he could do. In the following days Mr. John Downing, Mr. Christopher Downing, and Mr. Joseph Downing operated the stolen sander in their garage while standing at the entrance of their garage and laughing at Mr. Nagy Abdalla. These activities were not only instances of trespassing and petty theft but they also qualify as hate crimes.

On numerous occasions between March 1994 and April 1998 Christopher Downing and Joseph Downing, with the participation of their friends, Daniel Vinciguerra, Tyler Inmen, Raymond White, and several others, often gathered atop the roof of the Downing residence at dinnertime and exposed themselves, screaming obscenities at the plaintiffs' residence, while the plaintiffs ate dinner in their dining room. Within the plaintiffs' dining room one has full view of the Downings' roof. These young men often screamed the names of the plaintiffs and jumped, from the roof, into the Downings' pool.

Christopher Downing and Joseph Downing, with the participation of their friends, including Tyler Inmen, threw half-filled glass beer bottles at Mrs. Paulette Hanna from the Downings' roof as Mrs. Paulette Hanna was hanging laundry in her back yard on July 24, 1996. As they threw the bottles they also exposed themselves, mocked, and otherwise harassed Mrs. Paulette Hanna. These acts were committed in an attempt to murder Mrs. Paulette Hanna, but St. Petersburg Police Officer Kiesal refused to address or investigate the matter when he arrived at the scene, claiming that there was no way to know who threw the bottles at Mrs. Hanna (police report #41059).

On a number of occasions between March 1994 and April 1998, Christopher Downing and Joseph Downing, with the participation of their friends, including Raymond White, Daniel Vinciguerra, Tyler Inmen, et al., exposed themselves to the plaintiffs. These incidents occurred in different locations including the Downing roof and on 11th Avenue, in front of the plaintiffs' and the Downings' respective properties.

Mrs. Angela Downing threw, on numerous occasions between March 1994 and April 1998, various articles of refuse over the Downings' fence and onto the plaintiffs' property, including empty *Kash & Karry* plastic grocery bags, empty cans and containers, as well as potentially hazardous personal objects such as, but not limited to, her own underwear.

The Downing family, on numerous occasions between March 1994 and April 1998, threw refuse onto the east, west, and south sections of the plaintiffs' property, including the driveway, the cars, the front and rear porch, and the lawn. This refuse consisted of beer bottles and cans, other alcoholic beverage containers, soda bottles and cans, hazardous materials such as a used medical syringe, and other garbage.

Christopher Downing, Daniel Vinciguerra, and other associates, on numerous occasions between March 1994 and April 1998, maliciously drove their vehicles on the plaintiffs' lawn while drunk, screaming obscenities, and throwing beer bottles and cans, hard liquor bottles, and other refuse at all hours of the day and night. A number of these incidents occurred after periods of heavy rain for the purpose of causing more severe and lasting damage to the plaintiffs' lawn.

At all hours of the day and night and on a number of occasions, between March 1994 and April 1998, Christopher Downing, Daniel Vinciguerra, Joseph Downing, and several associates, in a variety of vehicles and on a number of occasions, drove on 11th Ave. N. and 54th St. N., while drunk, crossing over the plaintiffs' property, blowing their horns, and screaming obscenities directed at the plaintiffs.

Members of the Downing family, and their associates, including John Downing, Christopher Downing, Daniel Vinciguerra, and Raymond White, on numerous occasions between March 1994 and April 1998, videotaped the plaintiffs over the Downings' fence, from the Downings' driveway, and from 11th Avenue without the permission of and against the will of all of the plaintiffs.

On a number of occasions between March 1994 and April 1998, Christopher Downing, Joseph Downing, and their girlfriends threw eggs at the plaintiffs' home and Daniel

**Page 26 of 152**

Vinciguerra, a friend, and several associates threw eggs at the plaintiffs' cars.

On or about April 11, 1996 Christopher Downing and Daniel Vinciguerra smashed the front windshield of one of the plaintiffs' cars with a golf club. On this day they were playing golf on 11th Avenue in front of the Downings' driveway and hitting the golf balls towards the west, in front of the plaintiffs' home, while the plaintiffs were in the driveway. On or about this same date John Downing, Christopher Downing, and Joseph Downing threw white paint brush wash on the plaintiffs' car, driveway, and lawn. The plaintiffs reported the incident at the St. Petersburg Police Station (report #96-1963). The investigation was handled by Officer Goodwin and Officer Steven Cureton.

On or about September 25, 1996 Daniel Vinciguerra, a friend, and other associates, at nighttime, kicked one of the plaintiffs' cars causing damage to the body of the car including the driver's side door, the left rear passenger door, and the rear gate on the plaintiffs' station wagon. They came a second time and increased the damage in the same locations. The incidents were reported to the St. Petersburg Police Department (police report #96-47502) and the investigation was handled by Officer Tex Smith. A follow up report was made, by telephone, on November 23, 1996 to Officer Scott. On or about the same night, at 12: 15 A.M., Sgt. Karen Eichler made a phone call to the plaintiffs' residence regarding an internal affairs investigation in the St. Petersburg Police Department regarding Officer Gary J. Stempinski. During this phone call, Daniel Vinciguerra and a number of associates were in the plaintiffs' driveway kicking the plaintiffs' car once again and causing further damage to the same areas of the vehicle.

On or about January 10, 1997, Daniel Vinciguerra, Christopher Downing, Joseph Downing, and other associates, while driving down 11th avenue in Daniel Vinciguerra's car, threw a white brick into the plaintiffs' driveway while several of the plaintiffs were standing in

the driveway. The brick struck one of the plaintiffs' cars in the rear windshield, damaging the glass. Mr. Nagy Abdalla and Mr. Nathan Hanna observed Mr. Daniel Vinciguerra driving the same white car he had used during other incidents of vandalism upon the plaintiffs' property. Mr. Nagy Abdalla and Mr. Nathan Hanna cruised the neighborhood searching for this car, hoping to find Daniel Vinciguerra's address. When they found the car parked on 12th Ave. N. (between 3:30-3:45 P.M.) Mrs. Gloria Vinciguerra and Mr. Daniel Vinciguerra charged from their home (5037 12th Ave. N.) with their associates. Mrs. Gloria Vinciguerra, while screaming obscenities, attempted to assault the plaintiffs while driving in their car. The plaintiffs contacted the St. Petersburg Police Department. Officer Karl Sauer (report #1793) informed the plaintiffs that he would speak with the Vinciguerras to follow up on the old police reports.

Joseph Downing, under the instruction of his mother, Angela Downing, on several occasions between March 1994 and April 1998, urinated on the plaintiffs' lawn.

John Downing, Lee Timm, and Glenn hung three large Israeli flags from atop the Downings' garage door and atop the Downings' rear porch. These flags flew from the Downings' property for approximately one year; from 1996 until they were taken down on March 20, 1997. Two of the flags were the flags of the Israeli State. The third was a another flag, hung above the Downings' garage door, portraying a human skull against a black background, with two rifles and two arrows across the skull, and a threat imprinted on the flag stating *Mess with the best, die like the rest*. This third flag was positioned to face the plaintiffs' driveway.

Christopher Downing, Raymond White, Angela Downing, Daniel Vinciguerra, and several other associates, made harassing phone calls to the plaintiffs' residence on a multitude of occasions between March 1994 and April 1998, at all hours of the day and night. These phone

**Page 28 of 152**

calls often occurred soon before or after sessions of driving their vehicles in the streets in the vicinity of the plaintiffs property while screaming obscenities, blowing their horns, and driving over the plaintiffs' lawn.

## VI.

On or about April 13, 1998 the Downing family abandoned their property, after they vandalized it, leaving garbage, furniture, clothes, and other personal belongings scattered about the property. The pool was abandoned and left to stagnate, becoming a neighborhood health hazard by hosting mosquitoes, snakes, rats, and other pests.

On one occasion in the latter half of 1998 Angela Downing, with the accompaniment of John Downing and Joseph Downing, stood in the Downings' driveway, opened a plastic bag she was carrying and took out a rope in the shape of a hangman's noose. Ms. Downing gave the noose to Joseph Downing and pointed to the plaintiffs' property. Mr. Joseph Downing then trespassed on the plaintiffs' property and hung the noose on one of the bushes bordering the plaintiffs' driveway.

Between October 28, 1998 and November 1, 1998 Christopher Downing, accompanied by another associate of the Downing family, drove a truck towing a utility trailer carrying the name of *Courtesy Termites and Pest Control, Inc.* Over this period they made two visits to the Downing's abandoned residence and hauled plastic storage containers to and from the Downing's abandoned house. On the morning of Halloween, October 31, 1998, the plaintiffs discovered a full grown scorpion in the middle of their home.

## VII.

Christopher Downing and Raymond White, on April 22, 1996, began harassing Mr. Nagy Abdalla while he was in his driveway working on his car. They mocked Mr. Abdalla and when Mr. Abdalla ignored them they began to spit on him and continued to do so for quite some time while he was under the hood of his car and while Mr. Nathan Hanna and Mr. Shannon Hanna witnessed the incident. When Mr. Abdalla discovered the reason for the wetness of his shirt he became upset and gave Christopher Downing and Raymond White a stiff lecture regarding the importance of respecting others and observing neighborly behavior. Mr. Abdalla stopped working on his car, closed his garage door, and went into his house. While cleaning his hands he observed Christopher Downing and Raymond White opening a section of the Downings' fence. They began yelling Mr. Abdalla's name while dancing and laughing in the plaintiffs' backyard. Christopher Downing had a battery operated drill in his hand which he was using to disassemble the fence.. Mr. Abdalla hid a tape recorder underneath his arm, wrapped in the rags with which he was cleaning his hands, and went into his backyard with his wife and children, Mr. Nathan Hanna, Mr. Shannon Hanna, and Mr. Jasen Hanna. This was several minutes before the police arrived. The entire incident was recorded on audio tape and with photos taken with the plaintiffs' camera, both which record Christopher Downing's and Raymond White's incriminating behavior. When Raymond White advised Christopher that Mr. Abdalla had a recording device underneath his arm Christopher examined the bundle of rags under Mr. Abdalla's arm and immediately attempted to obtain it, trying to grab it with his left hand. When Christopher failed to obtain the tape recorder he struck Mr. Abdalla in the face with the rags he had grabbed from under Mr. Abdalla's arm. During this incident Christopher Downing also attempted to injure or murder Mr. Abdalla with the drill he had been using to disassemble the fence. Christopher Downing, while operating the drill, quickly moved it towards Mr. Nagy Abdalla's face but was unable to strike Mr. Nagy Abdalla with the drill. When the police arrived, Officer Steven Cureton of the St.

Petersburg Police Department, and after an investigation had been conducted, a police report was initiated with four witness affidavits, one for each member of the Hanna family, and two witness affidavits, one by Christopher Downing and another by Raymond White. None of these affidavits claimed that Mr. Nagy Abdalla had committed any act qualifying as battery against Christopher Downing or Raymond White. Christopher Downing and Raymond White claimed, in their affidavits, that Mr. Nagy Abdalla had stolen a pair of glasses belonging to Christopher Downing. Officer Cureton was about to arrest Christopher Downing and informed the plaintiffs of his intent to do so. The plaintiffs, however, refused to support such action and insisted on some other alternatives that the police could proceed with in order to end the problem.

In spite of the fact that the plaintiffs had called 911 to report the incident the police report was mis-logged with Mr. Nagy Abdalla as the suspect and Christopher Downing as the victim. On the bottom of the report there was a false statement, which Officer Cureton claims to have written, stating that he knew that Mr. Abdalla "did it" referring to the accusation of stealing Christopher's glasses.

On or about the night of April 22, 1996 and/or the early morning of April 23, 1996 Mrs. Angela Downing filed a false police report claiming that, at around midnight, she had observed Mr. Nagy Abdalla standing in his driveway teasing Mrs. Angela Downing and waving Christopher's eyeglasses in his hands. A police officer handled the investigation which occurred in the early hours of the morning of April 24, 1996. The conclusion was that it was a false report. The St. Petersburg Police Department, however, denies any record of such an incident.

Christopher Downing, on April 24, 1996 at about 2:30 P.M., hid his truck in the parking lot of the Church across the street from the plaintiffs property. He then came and hid behind

Page 31 of 152

the bushes on the plaintiffs' property on the west side of the plaintiffs' driveway, while wearing only a pair of jean shorts. When Mr. Nagy Abdalla and Mr. Nathan Hanna arrived they parked their car in their driveway (after returning from Lakewood High School) and walked from their car to their house. Christopher Downing appeared from behind the bushes on the plaintiff's property and physically attacked Mr. Nathan Hanna in the plaintiffs' driveway, punching him in the face and stealing his prescription eyeglasses. While he was fleeing the scene Christopher Downing knocked down Mr. Nagy Abdalla, injuring Mr. Abdalla's knees, and ran to his truck which was parked in the church parking lot. He escaped in his truck but was arrested a few days later at Boca Ciega High School. Christopher Downing was charged with (what appears to be) strong-arm robbery and petty theft. He was tried and convicted on all counts in the Pinellas County Juvenile Courts in case no. CRC 96-4356 DLANO-5.

On May 31, 1996, during the legal proceedings against Christopher Downing by the State of Florida for the crimes he committed against Mr. Nagy Abdalla and Mr. Nathan Hanna, Joseph Downing  and Kieth Willhieght were playing with two go-carts in the Downings' driveway and around and on 11th Avenue. Joseph Downing gathered a pile of dry leaves on the Downings' driveway, soaked them with the go-cart fuel, placed them at the bases of two trees on the plaintiffs' property, and attempted to set the trees on fire with the leaves, which he ignited while the plaintiffs' were in their home. In doing so he hoped to destroy the plaintiffs' home and prevent them from participating in the legal proceedings against his brother, Christopher Downing, being conducted by the State of Florida. Joseph Downing was fully aware, and well instructed, of the fact that the plaintiffs' property, at the time, was temporarily uninsured. The plaintiffs called emergency services and Officer Charlie Barnes (an officer of the St. Petersburg Police Department and a self-admitted "intimate" friend of Mrs. Angela Downing), Lt. D. Glass (of the St. Petersburg Fire Department), and other emergency personnel arrived on the scene. Officer Barnes refused to handle the report, claiming himself

to be a friend of the Downings, and stated that his participation in any investigation would be a conflict of interest. Officer Barnes allowed Mrs. Angela Downing to flee the scene (with her son Joseph downing in her car), while madly yelling at the plaintiffs in order to secure Joseph and Angela Downing's escape. The St. Petersburg Police Department report (police report #96-30037) and the St. Petersburg Fire Department report were both falsified and the officer from the St. Petersburg Police Department who conducted the investigation (Officer Pat Stelmach) was immediately given four days off from his duties. The falsified reports both stated that the fire was ignited in an open grass area and, even if it had been allowed to continue burning, it would have burned nothing but grass. This statement contradicts the fact that the plaintiffs' property is a heavily wooded property with many old and extremely tall trees and that the burning leaves had been placed at the bases of two trees on the plaintiffs' lawn. This false statement was also accompanied by an admission by Joseph Downing that he was the one who ignited the leaves using go-cart fuel and also contained a complete description of the facts that there was spilled fuel and a pile of burned leaves in the Downings' driveway.

The plaintiffs followed up on this incident with numerous correspondence, phone calls, letters, etc. to Sgt. Eichler, Sgt. J. Brubaker, and Detective Ziegler. Each of these individuals participated in covering up the attempted arson and insisted either that no crime had been committed, that *attempted arson* is not a crime, or that there was no evidence to prosecute. An internal affairs investigation in the St. Petersburg Police Department found no wrongdoing by any officer or employees.

This attempt to burn down the plaintiffs' property, home, personal belongings, etc. was timely designed and conducted in response to the fact that their insurance agent, Mr. Richard Dessi, had played his part in this ***Racist Religious Conspiracy*** by canceling the plaintiffs' homeowner's insurance policy with Allstate Insurance. Mr. Richard Dessi lied to the plaintiffs

Page 33 of 152

regarding the cancellation of their policy, the availability of new policies in Florida, the terms of any new policies, the premiums of any new policies, etc. Mr. Richard Dessi also used his position as the plaintiffs' insurance agent to coerce and timely force them into accepting a new homeowner's insurance policy with much less coverage, with nearly twice the premium of the old policy, and without the cost of replacement of the home as a term of the new insurance policy. This was done in order to secure the effect of any disaster that would, and was being prepared to, destroy the plaintiffs' capability to maintain their standard of living and way of life.

No action has ever been taken against Mr. Joseph Downing by the St. Petersburg Police Department or the Pinellas County State Attorney's Office, in spite of the plaintiffs' many written complaints to several officials.

**VIII.**

Officer Charlie Barnes, a community resource officer for the plaintiffs' neighborhood, personally stalked the plaintiffs around their neighborhood at many locations, including stores, streets, etc on numerous occasions between March 1994 and April 1998. Officer Barnes also slandered the plaintiffs' reputation by disseminating lies to their neighbors, neighborhood businesses, and other St. Petersburg Police officers.

The plaintiffs sent numerous letters, not only to neighborhood store managers, but also to the St. Petersburg Police Department, St. Petersburg Police Chief Darrel Stephens, St. Petersburg Mayor David Fischer, etc., advising them of Officer Barnes' unprofessional behavior and continuing criminal activities against the plaintiffs. The plaintiffs also demanded the removal of Officer Barnes from, not only their neighborhood, but from the St. Petersburg Police Department entirely. The plaintiffs never received any replies to their complaints. The

**Page 34 of 152**

plaintiffs, however, did experience an escalated level of criminal retaliation against them.

Almost a year after Christopher Downing disassembled the Downing's fence and assaulted Mr. Nagy Abdalla in his own backyard the Pinellas County State Attorney's Office decided to proceed and file a battery charge, dated January 29, 1997. Because the police report had been mis-logged and Mr. Nagy Abdalla appeared as the suspect and Christopher Downing appeared as the victim (even though the text of the report clearly indicated that Christopher Downing was the one who was seen by the witnesses striking Mr. Abdalla in the face) a charge of battery was filed against the victim, Mr. Nagy Abdalla, in lieu of the proper charges which should have been file against Christopher Downing for the crimes committed against Mr. Nagy Abdalla. Christopher Downing, the offender, became a witness testifying on behalf of the state against the victim, Mr. Nagy Abdalla.

The Clerk of the Circuit Court, Ms. Karleen F. DeBlaker, mailed a false summons for the battery charge to Mr. Nagy Abdalla on January 31, 1997. Mr. Nagy Abdalla refused to receive the summons, which was sent via certified mail, and requested for the certified item to be returned to the sender. The Clerk of the Circuit Court received the returned item on February 5, 1997. The Clerk of the Circuit Court intentionally and knowingly, mis-logged the returned summons as returned *unclaimed* on February 5, 1997, hoping to give her the freedom to be able to obtain a warrant for the arrest of Mr. Nagy Abdalla.

The matter did not proceed for several weeks because the summons to Mr. Nagy Abdalla had not been legally served as required by **Fla. R. Crim. P. 3.030**. Because of this Mr. Nagy Abdalla had no responsibility or liability upon him to encourage him to proceed with this matter.

For over a month no judge issued or signed a warrant for Mr. Nagy Abdalla's arrest

Page 35 of 152

because there was no probable cause in the police report upon which to base the issuance of a warrant.

Judge Paul Levine allowed what appears to be a stamp of his signature to appear on a false order directed to the Clerk of the Circuit Court to issue a capias to "take" Mr. Nagy Abdalla. This order was issued without probable cause and was not a proper legal remedy in this matter. The Clerk never issued any warrant for this matter. The Clerk did, however, issue a false capias dated and filed March 21, 1997 at 3:26 P.M., almost thirty hours after the kidnapping and abduction of Mr. Nagy Abdalla and Mrs. Paulette Hanna by officers of the St. Petersburg Police Department. A capias was not the proper remedy in this matter because no judgement had been entered against Mr. Nagy Abdalla.

Judge Levine, Clerk of the Circuit Court Karleen F. DeBlaker, Pinellas County State Attorney Bernie McCabe, and their assistants, deputies, and prosecutors, et al. proceeded with this illegal matter even though they had been fully informed and were aware of the following:

*The police report declared clearly that the battery was committed by Christopher Downing against Mr. Nagy Abdalla as stated in the affidavits of the witnesses.

*There was never any warrant to support the ambush, attack, and kidnapping of Mr. Nagy Z. Abdalla on March 20, 1997.

*Judge Levine never signed any order directed to the Clerk of the Circuit Court to issue any warrant or capias.

*Neither Judge Levine or any other Judge ever signed any warrant, capias, or any writ ordering the capture or arrest of Mr. Nagy Abdalla.

*In the majority of the instances where the clerk/s filed Mr. Nagy Abdalla's documents they were tampered with and later temporarily removed from the file numerous times.

*The majority of the Clerk's logs on the docket sheet were altered, falsified, and otherwise tampered with.

*The judgement in this matter was also tampered with, falsified, and mis-logged.

*The state intentionally elected to proceed with charges against the victim, Mr. Nagy Abdalla, rather than the suspect who actually committed the crimes, Mr. Christopher Downing.

*The state intentionally and knowingly refused to file any charges against Christopher Downing or Raymond White for any of their criminal activities which took place on the plaintiffs' property on April 24, 1996 and which were described in the police report.

*The St. Petersburg Police Department never corrected the mis-logging of the police report regarding the incident which occurred on April 24, 1996 to accurately state that Mr. Nagy Abdalla was the victim and Mr. Christopher Downing was the suspect.

Because this matter was illegal and unconstitutional Judge Paul Levine went to extreme lengths to cover up its illegality by denying and rejecting each and every motion, instrument, and request submitted by Mr. Nagy Abdalla so that the state would be able to proceed with criminal charges intentionally directed against the victim, Mr. Nagy Abdalla.

On March 20, 1997 Officer Charlie Barnes, at about 9:00 A.M., accompanied by Mr. John Downing, waited at the Downings' driveway for Mr. Nagy Abdalla to return to his home.

After Mr. Abdalla parked in his driveway Officer Charlie Barnes blocked the plaintiffs' driveway with his police cruiser and charged at Mr. Abdalla demanding that Mr. Abdalla go with him because there was a warrant for Mr. Abdalla's arrest. Mr. Abdalla asked to see the warrant but Officer Barnes stated that he didn't have to show Mr. Abdalla anything and began pulling Mr. Abdalla to the bushes on the plaintiffs' property. When Mr. Abdalla realized that this was not official business he refused to go with Officer Barnes without first being shown a warrant. At this time Officer Barnes began to physically assault Mr. Abdalla and also requested for Mr. John Downing to join him in the assault. Officer Charlie Barnes sprayed Mr. Abdalla with a chemical weapon numerous times (so generously, in fact, that Officer Barnes later required medical treatment for spray that got into his own eyes). Mr. Nagy Abdalla screamed Mrs. Paulette Hanna's name and she then came running out of the plaintiffs' house. When Mrs. Paulette Hanna saw the situation and, especially, the two assailants she realized that this was not official or legal business but an obvious attempt to murder Mr. Nagy Abdalla. Mrs. Paulette Hanna screamed at both assailants a number of times that the property was posted no trespassing and directed them to leave the property immediately. Mr. John Downing then charged at Mrs. Paulette Hanna in order to silence her but Mrs. Paulette Hanna ran inside her house to call 911 emergency services. When the call to 911 was blocked, Mrs. Hanna searched for, but failed to find, her gun. Mrs. Paulette Hanna ran outside her house once again, hoping to prevent the murder of her husband. Within a few minutes the plaintiffs' property was swarmed with police officers, who arrested Mr. Nagy Abdalla and charged him with resisting arrest with violence and battery on a police officer. They also arrested Mrs. Paulette Hanna and charged her with attempting to deprive an officer of his means of protection and resisting arrest with violence. The officers invaded the plaintiffs' house and spent several hours inside without any arrest warrants or search warrants upon which to legally base their actions. The officers present (who assisted Officer Barnes in unlawfully raiding the plaintiffs' home, kidnapping Mr. Nagy Abdalla and Mrs. Paulette Hanna, covering up Officer Barnes's criminal activities, etc.) were Officer David M. Field, Officer William E.

Page 38 of 152

Lusby, Officer David J. Kidd, Officer Richard Crater, Officer Troy C. Turner, Officer Wanda
J. Williams, and Officer Kenneth L. Smith.

On the same day, March 20, 1997,  when Mr. Nathan Hanna was called from his classes at
Lakewood Senior High School he was informed of the incident by an employee of the
Department of Children and Families, Ms. Wanda Goodridge, who was working under the
supervision of Mr. Donald Policella. Mr. Nathan Hanna and Mr. Shannon Hanna convinced
Ms. Goodridge to bring them home so that they could secure the home and some personal
belongings. When they were brought home Mr. Nathan Hanna covertly ran to St. Jude
Cathedral School to pick up his brother, Mr. Jasen Hanna. At. St. Jude Cathedral School Mr.
Nathan Hanna was diverted and obstructed from picking up Mr. Jasen Hanna by Sister
Patricia Caulfield, the principal, and two unknown individuals who verbally claimed
themselves to be police officers (yet presented no form of identification and wore no
uniforms). Sister Patricia Caulfield, these individuals, and the school personnel hid Mr. Jasen
Hanna, prevented Mr. Nathan Hanna from securing Mr. Jasen Hanna's safety, and covertly
delivered Mr. Jasen Hanna from the back door of the school to Ms. Goodridge, even after Mr.
Nathan Hanna had verbally agreed to submit himself to the custody of the Department of
Children and Families so that he might accompany Mr. Jasen Hanna. These acts were
intentionally committed to divide the plaintiffs and to cause as much harm as possible to each
member of the Hanna family in the hopes of destroying the Hanna family.

The Clerk of the Circuit Court falsely issued a capias against Mr. Nagy Abdalla on March
21, 1997 and filed it at about 3:26 P.M. The capias was signed by an unknown deputy clerk.
The Clerk of the Circuit Court also illegally and falsely mis-logged, on the case progress
docket, that a capias had been issued to the Pinellas County Sheriff on February 26, 1997,
without any capias actually existing in the file for this date or even any evidence that such a
document was served to the Pinellas County Sheriff. The Clerk of the Circuit Court also

illegally and fraudulently mis-logged that the capias had been returned executed on March 21, 1997. In actuality only one capias was issued and it was issued on March 21, 1997, signed by an unknown deputy clerk, and prepared without Mr. Nagy Abdalla's address (who owns a residence in Pinellas County on which he pays annual property taxes). This was done to aid in the cover-up of Charlie Barnes's attempted murder of Mr. Nagy Abdalla on March 20, 1997 at approximately 9:00 A.M. A capias is also not the proper legal remedy for such a situation. Because the Clerk was unable to find any judge to sign a false warrant she decided to issue a false capias and have it signed by one of her deputy clerks.

The Clerk of the Circuit Court also illegally, fraudulently, and knowingly logged on the case progress docket that pleas of *not guilty* had been entered for all charges when, in actuality, the defendants, Mr. Nagy Abdalla and Mrs. Paulette Hanna, had refused, both verbally and in writing, to enter any pleas in this matter (logged as case no.'s CRC 97-05017 CFANO, CTC97-03143MMANO, and CRC 97-05022 CFANO).

Ms. Rhonda E. Stringer, Assistant State Attorney, on January 9, 1997, filed a false charge of battery against Mr. Nagy Abdalla under oath (case no. CTC 97-03143 MMANO), but signed it, under oath, on January 22, 1997 with a notarization by Patricia A. Blackburn. Ms. Mary Handsel, prosecutor in this matter, decided to add a new charge of petty theft on August 19, 1997. The amended document for the charges was prepared and signed under oath by Ms. Mary Handsel but was never properly filed with the Clerk of Circuit Court. Ms. Mary Handsel, however, prosecuted Mr. Nagy Abdalla for two counts and, when he was found *not guilty* on both counts, Judge Paul Levine did not sign any judgement of *not guilty* for the second count of *petty theft*.

The Clerk of the Circuit Court, on April 19, 1997, falsely, illegally, and fraudulently logged in the case progress docket that there was an order granting the defendant's motion to

continue when the defendant had never filed any motion to continue, verbally or in writing, and had refused to participate in the **_Racist Religious Conspiracy_** being conducted against him. The matter was rescheduled for a trial on October 8, 1997 at 8:30 A.M.

Mr. Nagy Abdalla was falsely and illegally brought before Judge Paul Levine on October 8, 1997 and was tried for two false accusations: battery (on Christopher Downing) and petty theft (stealing Christopher Downing's glasses). Mr. Nagy Abdalla was found *not guilty* on both counts by a six-member jury. There is no judgement in the file, however, to prove the innocence or the verdict of *not guilty* in favor Mr. Nagy Abdalla for the charge of petty theft nor has any copy of such a judgement ever been furnished to Mr. Nagy Abdalla, nor has any such verdict ever been recorded on Mr. Nagy Abdalla's record, in spite of Mr. Nagy Abdalla's numerous demands and requests for proof of the verdict. The judgement for the charge of petty theft and, indeed, the charge itself, have been deleted from the record.

Mr. John Downing, Mr. Christopher Downing, and Mr. Raymond White and his mother, Mrs. Susan White, and Officer Steven Cureton all came to the Pinellas County Justice Center on October 8 and/or 9, 1997 and perjured themselves on the witness stand under oath supporting the false allegations that Mr. Nagy Abdalla had stolen Mr. Christopher Downing's glasses and had committed battery against Christopher Downing on April 22, 1996.

Ms. Mary Handsel, the prosecutor in this case, with the assistance of two counselors  from the Pinellas County State Attorney's Office (one of whom was Assistant State Attorney Robert Angus Williams), also knowingly participated in this **_Racist Religious Conspiracy_** by persisting on proceeding with these false accusations and also by adding a new charge of petty theft against Mr. Nagy Abdalla even after reviewing the evidence, including photographs and an audio tape, proving that the battery was committed by Christopher Downing against Mr. Nagy Abdalla and not by Mr. Nagy Abdalla, as the state falsely contended.

Ms. Mary Handsel is also an old enemy of the plaintiffs due to her involvement in previous false and illegal court proceedings against Mrs. Paulette Hanna as detailed herein.

## IX.

Judge R. Timothy Peters decided to proceed with false charges filed on May 13, 1997 in case no. CRC 97-05022 against Mr. Nagy Abdalla for two counts: 1) battery on a law enforcement officer 3°F and 2) resisting arrest with violence 3°F. Judge Peters also decided to proceed with case no. CRC 97-05017 CFANO against Mrs. Paulette Hanna for two counts: 1) attempting to deprive an officer of means of protection and 2) resisting arrest with violence 3°F.

Judge R. Timothy Peters, the Clerk of the Circuit Court, State Attorney Bernie McCabe, and all their assistants, deputies, et al. (named herein) were fully aware of the following:

*The information filed on May 13, 1997 with the Clerk of the Circuit Court was supposedly filed under oath by Assistant State Attorney F. L. Schaub . The information filed was notarized by notary public of the State Attorney's Office, Ms. Dorothy McNabb on May 13, 1997.

*There was never any warrant or capias at the time of Officer Charlie Barnes's assault on Mr. Nagy Abdalla and at the time of the arrest of Mrs. Paulette Hanna on March 20, 1997.

*There was never any probable cause upon which to base the issuance of a warrant or capias for the arrest of Mr. Nagy Abdalla or Mrs. Paulette Hanna.

*The Clerk of the Circuit Court, Karleen F. DeBlaker, and/or her deputies tampered with

Page 42 of 152

and mis-logged, on numerous occasions, the instruments filed by Mr. Nagy Abdalla and Mrs. Paulette Hanna, removing them from the file so that the judge would not have to rule on them. The Clerk went as far as to remove and rearrange papers from the individual instruments to make them incoherent.

*Judge Peters allowed the assistant State Attorney, Mr. Evan Brodsky, to obtain court rulings on instruments which were never timely filed and/or which had never been served to the defendants.

*Judge Peters ruled in favor of the state over and over against the defendants' objections on instruments filed by the state which were not processed properly pursuant to the Florida Rules of Criminal Procedure.

*Mr. Evan Brodsky illegally requested the consolidation of felony matters with misdemeanor matters in direct violation of the Florida Statutes and the Florida Rules of Criminal Procedure and without any legal right to ask for such consolidation. The consolidation was requested solely for the purpose of containing the sensitive and highly explosive evidence of a vast criminal conspiracy within the realm of his control.

*Judge Peters ordered and held several hearings on several dates off of the record, without serving notices of hearing, and without giving the proper and required time periods between hearings in order to deprive the defendants of a reasonable amount of time to prepare for court proceedings and to address the issues before the court, thereby giving himself an excuse to side with the state in all matters.

*Judge Peters granted to the state a consolidation of felony matters with misdemeanor matters in violation of the Florida Rules of Criminal Procedure and the Florida Statutes.

*Judge Peters proceeded with CRC 97-05022 CFANO and CRC 97-05017 CFANO (illegally consolidated) without any plea from either of the defendants, Mr. Nagy Abdalla and his wife Mrs. Paulette Hanna.

*In spite of the fact that both defendants, Mr. Nagy Abdalla and his wife Mrs. Paulette Hanna, had refused to enter any pleas and had refused to allow anyone to enter any pleas on their behalf, and the written documentation they filed stating these facts, Judge Peters verbally stated that he had entered a plea of *not guilty* on behalf of both defendant's. Judge Peters, however, never signed or filed any plea captions confirming the entrance of such pleas.

*Judge Peters had to force the matter into a trial (on August 20, 1997) without following the proper procedure set forth in the Florida Rules of Criminal Procedure and without the proper preparation of the files for trial.

*On August 20, 1997, Mrs. Angela Downing came to the court on the trial date and, over the course of her stay, taunted, mocked, insulted, and otherwise harassed the defendants, Mr. Nagy Abdalla and his wife Paulette Hanna, in order to distract them and weaken their ability to coordinate their defense.

*On August 20, 1997, Mr. Frank Kopczynski, of Action Bail Bonds, came to the court on the trial date and spent the entire twenty hours of the proceedings, both inside and outside the courtroom, harassing, threatening, annoying, insulting, and stalking both defendants, Mr. Nagy Abdalla and his wife Paulette Hanna, in order to distract them and weaken their concentration on their defense. Judge R. Timothy Peters explicitly refused to remove Mr. Kopczynski from the courtroom, even after Mr. Nagy Abdalla and Mrs. Paulette Hanna requested that he be removed due to the purposes for which he was attending the trial. Mr. Kopczynski attended the trial to hear a ruling on a motion he had filed to revoke the bond of

**Page 44 of 152**

Mrs. Paulette Hanna (even though he and Ms. Julia Harris had violated the bond agreement prior to the trial, in order to apply pressure, financial exhaustion, psychological distress, etc. upon Mr. Nagy Abdalla and Mrs. Paulette Hanna, and had been informed, by certified mail, that the contract was in abeyance). Judge R. Timothy Peters, after refusing to review his motion, allowed the infuriated Mr. Kopczynski to maliciously harass, intimidate, insult, and otherwise intentionally distract Mr. Nagy Abdalla and Mrs. Paulette Hanna from coordinating their defense. Mr. Kopczynski's behavior, as well as his earlier violation of Mrs. Paulette Hanna's bond agreement, directly implicates him as an active participant in the *Racist Religious Conspiracy* against the plaintiffs.

*Mr. Evan Brodsky had to submit the order for capias, which he called the warrant, in place of a warrant as an exhibit. Judge Peters received this document, examined it, and accepted it as a warrant in open court, in front of the jury, and while sitting on the bench on August 20, 1997.

*Judge Peters had to conduct a continuous twenty hour long trial from approximately 8:00 A.M. on August 20, 1997 until approximately 4:00 A.M. on August 21, 1997 without allowing the jury their free meals and intentionally, knowingly, and maliciously ignoring the physical and medical disabilities of a number of jurors.

*Judge Peters had to conduct a continuous twenty hour long trial from approximately 8:00 A.M. on August 20, 1997 until approximately 4:00 A.M. on August 21, 1997 intentionally, knowingly, and maliciously exceeding the endurance of the defendants and ignoring the physical and medical disabilities of the defendants. Judge Peters was so extreme in the continuation of the proceedings that he intentionally failed to even give the defendants adequate time to rest or eat.

*On August 20, 1997, Judge Peters continued the trial even after being informed numerous times by both defendants, Mr. Nagy Abdalla and his wife Mrs. Paulette Hanna, that they were incapable of defending themselves due to extreme physical and mental exhaustion. Judge Peters forced the defendants to continue the proceedings without an attorney or any form of legal assistance.

*On August 20, 1997, Judge Peters refused to continue the trial for the following day or any other day to suit the physical or medical needs or the family obligations of the jury or the defendants, even though the defendants, Mr. Nagy Abdalla, a diabetic who endured the twenty hour trial with almost no time to eat and no available method for the administration of his medication, and his wife Mrs. Paulette Hanna, objected numerous times to the continuation of the trial into the extremely late hours of the night and early morning.

*On August 21, 1997, Judge Peters had to deny the jury's request to review the testimony of Officer Charlie Barnes while they were deliberating, maliciously ignoring the provisions of **Fla. R. Crim. P. 3.410**.

*On or about August 21, 1997, Judge Peters had to intentionally lie to the jury in the jury instructions that the defendants, Mr. Nagy Abdalla and his wife Mrs. Paulette Hanna, had entered pleas of *not guilty* in this matter and he did so over the direct objection of both defendants.

*In order to obtain a guilty verdict Judge Peters and Assistant State Attorney Evan Brodsky intentionally, cooperatively, and maliciously created extremely uncomfortable and painful conditions for the defendants and the jurors in order to undermine the case of the defense, its communication, and the ability of the jury to absorb and understand the information provided to them by the defense and by the court.

*The Clerk of the Circuit Court falsified a document, which appears to be signed by Judge Peters, titled *Jury Trial* stating that the matter "has been duly and regularly set for trial at this time, and the parties having announced ready; thereupon comes a jury of six good and lawful persons, to-wit; . . ." and also stating "after hearing all of the testimony . . . the jury retired to consider its verdicts and on the next day reported into open Court with the following verdicts: Guilty as charged both counts . . ." for both Mr. John Hanna and Mrs. Paulette Hanna. This document was prepared by the Clerk of the Circuit Court, and appears to have been signed by Judge R. Timothy Peters on August 20, 1997; one day before the verdict was actually announced. This document was not filed until August 29, 1997.

*In spite of all the strange circumstances that surrounded this matter, including the illegal and unusual manner in which the trial proceeded, the physical and medical conditions both of the defendants (Mr. John Hanna and his co-defendant/wife Mrs. Paulette Hanna) and the jury (which was brought both to the attention of the court and the jury numerous times during the trial), the lack of information given to the jury, and the intentional deprivation of information conducted by the court and the assistant state attorney against the jury (including the inappropriate denial of their request to rehear testimony and the intentional failure to allow them to examine exhibits and evidence submitted by the state), the jury came to a *guilty* verdict, which they claimed to have reached beyond any reasonable doubt, against both defendants on all counts. This behavior was only the result of the fact that Mr. Evan Brodsky mentioned that Mr. Nagy Abdalla and his wife Mrs. Paulette Hanna send letters incriminating the validity and morality of the Jewish religion and those who believe in and practice it. The verdict was incomplete, inaccurate, and illegal and also was delivered only because of courtesy towards and fear of the Jews. The verdict in this matter was issued in the fulfillment of the goals of a ***Racist Religious Conspiracy*** into which the members of the jury had been initiated, against the standard jury instructions they were given. The members of the jury were: Yvette D. Campbell, Melody Lynn Figurski, Kathleen A. Cook, Wayne J. Reese,

Thomas W. Pifer, and Kathryn S. Taylor.

*On August 21, 1997, Judge Peters, the Clerk of the Circuit Court, and the State Attorney received, accepted, and approved of an obviously illegal and illegitimate verdict of *guilty* and Judge Peters illegally ordered the defendants to be remanded into the custody of the Pinellas County Sheriff.

*From March 1997 through the present time, Judge Peters had to go to extreme lengths to cover up his criminal activities against Mr. Nagy Abdalla and his wife Paulette Hanna, not only by denying and ignoring dozens and dozens of the defendants motions, letters, requests, and their family's correspondence, but also by ignoring all facts and taking steps to actively hide the truth in this matter in order to falsely incriminate both defendants. Judge Peters even verbally denied motions submitted by Mr. Nagy Abdalla and his wife Mrs. Paulette Hanna, which he had not even seen or reviewed.

*On August 20, 1997, Mr. John Downing, Officer Charlie Barnes, Officer Richard Crater, Ms. Joanne Pavese, and Ms. Kristina Tuten came to the trial to take an active part in this ***Racist Religious Conspiracy*** to illegally incriminate both defendants by perjuring themselves on the witness stand under oath.

*Judge Peters scheduled a sentencing hearing for September 19, 1997 and also ordered a pre-sentence investigation.

*Between August 21, 1997 and September 19, 1997, Mr. Mark Van Cott, Florida Correctional Probation Officer, and Ms. Mary E. Robinson, Florida Correctional Probation Supervisor, of the Florida Department of Corrections, falsely and maliciously prepared a pre-sentence investigation report, for Mr. Nagy Abdalla, signed by both under oath, in which they

intentionally miscalculated the points of the accusations to 53.4 points and illegally and maliciously deceived the court by stating that the offense carries a minimum sentence of 19.05 months to a maximum of 31.75 months in custody and recommended that the defendant, Mr. Nagy Abdalla, be remanded into the custody of the Florida Department of Corrections for 2 years. This recommendation is a direct violation of **Florida Statute §921.0014** regarding recommended sentences because, in actuality, the defendant, Mr. Nagy Abdalla, scored a total of -0.6 (minus zero-point-six) sentencing points; a total, not even being a positive point value, which would never allow or direct any form of incarceration whatsoever.

*Between August 21, 1997 and September 19, 1997, Mr. Mark Van Cott, Florida Correctional Probation Officer, and Ms. Mary E. Robinson, Florida Correctional Probation Supervisor, of the Florida Department of Corrections, falsely and maliciously prepared a pre-sentence investigation report, signed by both under oath in which they intentionally recommended "Resources available to assist this particular offender: the department officers a wide variety of psychological services which may be used to service this particular offender." This recommendation was made pursuant to the fact that the defendant, Mr. Nagy Abdalla, refused to be interviewed and, apparently, was also based on the fact that the defendant was and is preaching the words of Jesus Christ, stating that the Jewish ideology worships the Devil. This motivated these two individuals to falsify the PSI report in order to cause as much harm as possible to Mr. Nagy Abdalla and his family, even at the cost of incurring liability resulting from their gross violations of the law.

*Mr. B. J. Brown, Florida Correctional Probation Officer, and Ms. Mary Robinson, Florida Correctional Probation Supervisor, on September 16, 1997, prepared a false pre-sentence investigation report stating that Mrs. Paulette Hanna scored 35.8 points when, in actuality, she scored approximately -5 (minus five) points. The second offense was falsified from *Attempt to deprive an officer of means of protection*, which is a misdemeanor, to the

actual act of *Depriv*(ing) *an officer of means of protection,* which is a third degree felony. These acts were committed intentionally and with full knowledge in order to falsify a recommendation in this matter and ask the court to sentence Mrs. Paulette Hanna to a far more severe punishment in order to inflict injury to Mrs. Paulette Hanna and to her family. They also falsely and illegally recommended two years probation with the Department of Corrections and, as a condition of the probation, that she be made to serve six months in the Pinellas County Jail. As an alternative recommendation they recommended eighteen months probation with the Department of Corrections.

 *Between August 21, 1997 and September 19, 1997, Mr. Evan Brodsky, the prosecutor in this matter, in the preparation of the sentencing guidelines scoresheet for Mr. Nagy Abdalla, illegally crossed out the primary offense and replaced it with the secondary offense in order to illegally inflate the sentencing points by 6 points, contradicting the information filed in this matter. Mr. Evan Brodsky also falsely and fraudulently added 4 points under victim injury against facts stated in the police report that there was no injury at all suffered by Officer Charlie Barnes, who was supposed to be the victim, and the fact that Dr. Oliver, of Edward White hospital, had stated that there was no injury suffered by Officer Charlie Barnes. Mr. Evan Brodsky knowingly and willingly committed these acts in order to illegally harm Mr. Nagy Abdalla and his family by obtaining a far more severe punishment.

 *Between August 21, 1997 and September 19, 1997, Mr. Evan Brodsky, the prosecutor in this matter, in the preparation of the sentencing guidelines scoresheet for Mrs. Paulette Hanna, illegally crossed out the primary offense and replaced it with the secondary offense in order to illegally inflate the sentencing points by 6 points, contradicting the information filed in this matter. Mr. Evan Brodsky knowingly and willingly committed these acts in order to illegally harm Mrs. Paulette Hanna and her family by obtaining a far more severe punishment.

*The Clerk of the Circuit Court illegally falsified the filing stamp for the sentencing guidelines score sheets for both Mr. Nagy Abdalla and his wife Mrs. Paulette Hanna with a fabricated stamp showing that the filing dates for both documents were September 19, 1997, however both documents were never stamped by the electronic stamp showing the correct time, day, month, and year of filing. These two documents, in actuality, were prepared several months later.

*On September 19, 1997 Judge R. Timothy Peters received the sentencing guidelines score sheet forms mentioned above, which were prepared by Mr. Evan Brodsky. Judge Peters not only examined the forms and accepted the illegal and obvious fabrications and alterations made to them but also maliciously chose to add a 15% increase to what he knew to be an illegally inflated point total in order to apply the harshest possible duration of incarceration against the defendant, Mr. Nagy Abdalla. Judge Peters sentenced Mr. Nagy Abdalla to a 12.9 month long incarceration.

*On September 19, 1997 Judge Peters ordered four years probation for Mrs. Paulette Hanna. During this court proceeding Mrs. Paulette Hanna was handed the agreement for probation on which Mrs. Paulette Hanna stated in writing *I do not agree* instead of signing the agreement. Mrs. Paulette Hanna was released from the custody of the Pinellas County Jail on September 19, 1997.

*The Clerk of the Circuit Court logged, on September 19, 1997, on the case progress docket that Judge Peters had sentenced Mr. Nagy Abdalla to "*JAIL TIME: 12M.*" Mr. Nagy Abdalla was, however, illegally transferred, by the Pinellas County Sheriff's Office on or about November 1997, into the custody of the Department of Corrections to serve a sentence of 12.9 months in prison.

*Judge Peters failed to sign or timely file the uniform commitment papers as required by Florida law.

*Ms. Christine G. Johnson, a bonds-person of Callahan Bail Bonds, filed a receipt surrender certificate on August 27, 1997 (dated August 23, 1997), in violation of the bond agreement between Mr. Abdalla and Callahan bail bonds, claiming that she had turned custody of the defendant, Mr. Nagy Z. Abdalla, over to the Pinellas County Sheriff's Office for a false charge, with a false bond amount written in. This was done in order to justify the false incarceration of Mr. Nagy Abdalla in the Pinellas County Jail (after the issuance of a false verdict and without any uniform commitment order), in the hopes of assisting the Pinellas County Sheriff's Office in escaping liability in this matter by covering up the corruption evident from the false incarceration of Mr. Nagy Abdalla and to make it appear that Mr. Nagy Abdalla was incarcerated because his bond had been terminated.

*Between November 1997 and July 1998, The Clerk of the Circuit Court, Karleen F. DeBlaker, falsely and fraudulently prepared the uniform commitment papers by fabricating signatures and filing stamps and submitting them to the Florida Department of Corrections.

*After the illegal sentencing Judge Peters was shocked to be informed that the defendant's had appealed their cases and therefore, in order to protect himself, the Pinellas County State Attorney's Office, the Pinellas County Sheriff's Office, the St. Petersburg Police Department, the Florida Department of Corrections, the Pinellas County Clerk of the Circuit Court, et al. On October 7, 1997, Judge Peters personally decided to file his own motion, consider it, and grant it, to seal the pre-sentence investigation report in the court file. This was done, under the color of law, for the purpose of concealing falsified, fabricated records and to cover up the corruption of his court and all other involved parties.

Page 52 of 152

\*Mr. Nagy Abdalla submitted to Judge Peters, in the lower tribunal, a *Motion to Vacate, Cancel, Revoke False Sentence and Declare it Void, Null, and Illegal* where he explained the fault of the court and the illegality of the sentence and demanded immediate relief through the termination of the false incarceration to which he was being subjected. Judge Peters still appears to have denied (there was no signature on the document) Mr. Nagy Abdalla's motion without any logical or legal explanation in order to continue the false incarceration. Mr. Abdalla submitted the motion in April 1998, but the motion was not denied by Judge Peters until June 5, 1998.

## X.

During these illegal proceedings against the plaintiffs the criminal Jews and Jewish dogs coordinating this *Racist Religious Conspiracy* took all steps possible to distract and harm Mr. Nagy Abdalla and his wife, Mrs. Paulette Hanna, as much as possible in order to weaken their ability to concentrate on and properly coordinate their defense. Under the supervision of Mayor David Fischer, the City of St. Petersburg's Codes Compliance Division continued a campaign of constant harassment (beginning in 1996 and still continuing today) against the plaintiffs by filing complaints against them regarding violations which existed, and were being maintained, due to their nature as evidence of the crimes committed against the plaintiffs. The complaints were timely and maliciously filed, not for the purpose of upholding the ordinances of the City of St. Petersburg, but in the hopes of disposing of evidence of the crimes committed against the plaintiffs by the participants in this *Racist Religious Conspiracy*, and also for the purpose of distracting the plaintiffs from coordinating and planning their defense. The City also later pursued existing and actual violations which were their responsibility to correct, due to the fact that they did not exist on the plaintiffs' property. The personnel of the Codes Compliance Division, however, chose to treat the violations as if it they were the plaintiffs' responsibility to correct and as if the violations existed on the plaintiffs' property.

**Page 53 of 152**

This was done for the purpose of covering up the City of St. Petersburg's failure to maintain streets and roads and for the purpose of undermining the plaintiffs' abilities to properly and effectively resist the ***Racist Religious Conspiracy*** being conducted against them. One of the most active and persistent Codes Compliance Investigators was Ms. Faye Lewis, who filed numerous complaints against the plaintiffs in order to cover up the crimes committed against the plaintiffs.

## XI.

In 1997, Mr. Nagy Abdalla and his wife Mrs. Paulette Hanna filed an appeal with the Second District Court of Appeals against the verdict, judgement, and sentencing of the lower court in matter no. CRC 9705017 CFANO and matter no. CRC 97-5022 CFANO.

In November, 1997 Mr. Nagy Abdalla was illegally transferred to the Department of Corrections Central Reception Center in Orlando (under the supervision of Superintendent Les Ryder) without any legal documentation for his charges, a legal judgement, or a legal sentencing. Classification Officer Gransbury actively covered up these facts and processed Mr. Nagy Abdalla into the system, in spite of the fact the Mr. Nagy Abdalla informed him, several times, that there were no legal commitment papers in his file. Ms. Wedel, the Law Librarian, violently acted to prevent Mr. Nagy Abdalla from filing his appeal and insisted that Mr. Nagy Abdalla must obtain the representation of a lawyer in order to carry out his appeal and attempted to force Mr. Nagy Abdalla to sign a form requesting a public defender. Upon the refusal of Mr. Nagy Abdalla to sign such a form Ms. Wedel threw Mr. Nagy Abdalla out of the law library and ordered him to never return to "her" law library. Mr. Nagy Abdalla remained incarcerated in the Department of Correction's custody until July 17, 1998. During this time he suffered from physical and psychological torture, threats, intimidation, monitoring and spying, poisoning, slavery, abuse and punishment by being thrown into solitary

confinement without purpose, attempts to force an attorney on him in order to legalize the matters against him, deceptions and lies to vandalize his and his wife's appeal, an unhealthy and inhumane environment, attempts to murder him, exposure to a satanic environment, constant violations of his civil and constitutional rights, etc. Jackson Correctional Institution, under both the newly assigned and previous superintendents, Mr. Al Solomon and Mr. Jerry Rabion respectively, and under the Assistant Superintendent, Mr. Jerry Lewis, refused, numerous times, to release Mr. Nagy Abdalla and terminate his false incarceration, even after Mr. Nagy Abdalla had won his appeal. Personnel of the Florida Department of Corrections and personnel of Jackson Correctional Institution knowingly made themselves parties to this **Racist Religious Conspiracy** by choosing to conduct a campaign of torture and abuse against Mr. Nagy Abdalla (and on a more severe level after Mr. Nagy Abdalla had won his appeal) and violate his most basic civil rights, actively seeking to prevent (including stealing and tampering) Mr. Nagy Abdalla from sending out any legal correspondence to follow up on his release, and knowingly and maliciously ignoring the fact that Mr. Nagy Abdalla was being held illegally. These individuals include, but are not limited to, Mr. Harry K. Singletary, Mr. Michael W. Moore, Kerry Flack, Mr. Bill Thurber, Mr. Ron Kronenberger, Ms. Janet Hebenthal, Ms. Ernetta Roberts, Mr. Matt Crockett, Ms. Ellen B. Roberts, Mr. Al Solomon, Mr. Jerry Lewis, Mr. Stevens Moore, Ms. Donovan Hamilton, Lieutenant Ham, Lieutenant Felicia Noble, Officer Marjorie Stewart, Mrs. D. Garrison, et al.

After a few months of following the procedures and orders of the Second District Court of Appeals the court granted Mr. Nagy Abdalla and his wife Mrs. Paulette Hanna their appeal and all relief sought, including the disposal of the entire matter in the lower tribunal. A copy of this judgement and a court order for the immediate termination of Mr. Nagy Abdalla's false incarceration was mailed to the Florida Department of Corrections and Jackson Correctional Institution, to Mr. Nagy Abdalla in Jackson Correctional Institution, to Paulette Hanna at the plaintiffs' residence, to Clerk of the Circuit Court Karleen F. DeBlaker, and to Florida

**Page 55 of 152**

Attorney General Robert Butterworth. This judgement was stolen from Mr. Nagy Abdalla's mail at Jackson Correctional Institution and replaced with a false document. This document was also stolen from Mrs. Paulette Hanna's mail. The Florida Department of Corrections and Jackson Correctional Institution chose to hide the document and refused to abide by the court order for Mr. Abdalla's release. Mr. Butterworth and his assistants, including Ann E. Sheer, ignored the court's judgement and chose to continue and assist in the torture and abuse being inflicted upon the plaintiffs.

Ms. Karleen F. DeBlaker, the Pinellas County Clerk of the Circuit Court, also hid this document, fabricated a false document claiming that the appeal for both defendants had been dismissed, and fraudulently and illegally logged that the appeal had been dismissed for both defendants in the county records. Ms. DeBlaker also issued a warrant for the arrest of Mrs. Paulette Hanna for violation of probation, knowing full well that the probation had been terminated by the Second District Court of Appeals. Constant falsifications and alterations of the record began in 1998 and continue through the present day.

XII.

On February 4, 1998 Mrs. Paulette Hanna took her son, Mr. Jasen Hanna, to his school, Pasadena Community Church School, at approximately 8:30 A.M. At this time Mrs. Paulette Hanna had a conversation with Ms. Sandy Gable, the school secretary, and made an inquiry regarding Ms. Jeannine Brunelle, Mr. Jasen Hanna's former first grade teacher, who had recently left her position at the school. Mrs. Paulette Hanna stated that she hoped that Ms. Brunelle hadn't been fired for political reasons because of the plaintiffs. This inquiry was made known to Ms. Jane Mulligan, the school principal, who followed up on it with a telephone call to Mrs. Paulette Hanna. Soon after Mrs. Paulette Hanna's return home from the school Ms. Cherrita McBride, a probation officer with the Florida Department of Corrections, called the

Page 56 of  152

plaintiffs' residence at 9:30 A.M. to harass Mrs. Paulette Hanna. Mrs. Paulette Hanna informed Ms. Cherrita McBride that, if she had anything to say to Mrs. Paulette Hanna, she should put it in writing. At this point Mrs. Paulette Hanna ended the conversation. Ms. Cherrita McBride had not contacted Mrs. Paulette Hanna for a period of approximately five months and Mrs. Paulette Hanna had not been on any form of probation for these five months. A few hours after the telephone conversation with Mrs. Paulette Hanna Ms. Cherrita McBride filed a falsified *affidavit violation of probation* against Mrs. Paulette Hanna. The timeliness of Ms. Cherrita McBride's actions prove that they were little more than retaliation intended to distract Mrs. Paulette Hanna from recognizing the evolving plot against the plaintiffs proceeding in Pasadena Community Church School; proceeding through the appointment of Ms. Susan Melvin as a teacher for Mr. Jasen Hanna and also the replacement of the principle by Ms. Diane Knoke. Under the supervision of these two individuals, and others,  Mr. Jasen Hanna was poisoned numerous times by narcotics. Even after being informed of the crimes being committed against Mr. Jasen Hanna, the faculty and administration of Pasadena Community Church School, including his second grade teacher Ms. Jennifer Catcott, refused to acknowledge that any problem may have existed, refused to investigate the matter, and continued to make decisions which they knew were detrimental to the education and well-being of Mr. Jasen Hanna.

## XIII.

On February 7, 1998 Mrs. Paulette Hanna mailed, from the Crossroads Station U.S. Post Office on 66th St. N., St. Petersburg, an official request to the Florida Department of Corrections for the Uniform Order of Commitment for the incarceration of Mr. Nagy Abdalla. Because the Uniform Order of Commitment was not prepared, signed, sealed, notarized, filed, or served in the Pinellas County Clerk's Office, the Pinellas County Sheriff's Office, or the Department of Corrections, in violation of Florida Law, this was an extremely sensitive

subject.

On the afternoon of February 7, 1998 Mrs. Paulette Hanna, shortly after mailing this official request, was illegally stalked by and stopped by Officers Kevin Matson and Shane Collinsworth], of the Kenneth City Police Department, on the north side of the parking lot of a K-Mart department store on 66th St. N. and 46th Ave. N., St. Petersburg. Officer Collinsworth issued a summons to Mrs. Hanna for an expired Florida License tag but continued to harass her and threaten her by demanding that she step out of her vehicle in order to sign the summons. When Mrs. Paulette Hanna insisted that she was capable of signing the summons inside her car Officer Collinsworth kept her sitting inside her car for over a half of an hour. He returned several times during this period falsely informing Mrs. Paulette Hanna that her driver's license had been revoked and he falsely ordered her to step out of her car because she was under arrest. Mrs. Paulette Hanna informed Officer Collinsworth that this information regarding her driver's license was incorrect, invalid, and wholly without proof in its support. Officer Collinsworth and Sergeant Kevin Matson continued to intimidate, threaten, harass, annoy, misinform, etc. Mrs. Paulette Hanna. Mrs. Paulette Hanna realized that this situation was nothing more than a direct form of retaliation in response to her official inquiry to the Florida Department of Corrections regarding her husband's, Mr. Nagy Abdalla's, false incarceration. Mrs. Paulette Hanna began to drive her vehicle towards her home to avoid this criminally conspired ambush in which she refused to participate. Officer Collinsworth and Officer Kevin Matson chose to chase Mrs. Paulette Hanna and recklessly drive on the road, blocking Mrs. Paulette Hanna's right of way and forcing her into an accident with another car, not only endangering her life but also carelessly endangering the lives of others. This was also done to exhaust Mrs. Paulette Hanna financially as a later judgement for over $16,000 entered against Mr. Nagy Abdalla and Mrs. Paulette Hanna illustrates (this amount continues to accumulate interest). Mrs. Paulette Hanna was then kidnapped, handcuffed, and held in Officer Collinsworth's police cruiser for almost four hours.

**Page 58 of  152**

The officers clearly announced their criminal intentions by stating, while joking and laughing, that they would "throw the book" at Mrs. Paulette Hanna and file as many charges against her as they possibly could. During this time Officer Collinsworth wrote seven summon: 955262-V X, 955263-V 3, 955264-V 6, 955265-V 9, 955266-V 1, 955267-V 4, and 955268-V 7. Police Chief Thomas Webster came to the scene to consult how to properly handle the administration of the *Racist Religious Conspiracy* against Mrs. Paulette Hanna. During this four hour long period of false imprisonment in the police cruiser Mrs. Paulette Hanna's vehicle was stolen and towed, before her eyes, by *Joe's Towing and Recovery Service* under the order of the Kenneth City Police Department. Personal merchandise in the vehicle totaling to a value of approximately one-hundred and twenty dollars were also stolen under the order, assistance, and protection of the Kenneth City Police Department. The certified receipts for the official inquiry sent to the Florida Department of Corrections, which Mrs. Paulette Hanna had just mailed, were also in the vehicle. Neither the car nor any of its contents were ever returned.

Mrs. Paulette Hanna was held in the Pinellas County Jail for less than twenty-four hours and was released the following morning, February 8, 1998, on *ROR*. This release appears to have been approved by Judge R. Timothy Peters. The release of Mrs. Paulette Hanna did not coincide with the normal or expected reaction of a court in such a situation nor does it coincide with the documents surrounding this incident. Because of the dates, the issues written, the fabricated filing stamps, the inconsistencies in the dates and incidents, the peculiar timing of each and every document related to the arrest incident, and the allegations in these false documents, the entire matter proves itself to be part of the *Racist Religious Conspiracy* committed to harm and/or destroy, not only Mrs. Paulette Hanna, but also her efforts to release her husband from his false incarceration in the Florida Department of Corrections.

Because these acts were part of the *Racist Religious Conspiracy* against the plaintiffs the

Clerk of the Circuit Court, the Florida Department of Corrections, Cherrita McBride, and the Pinellas County Sheriff's Department/office took the following steps, not only to protect Officer Collinsworth for the false affidavits to which he had affixed his signature (claiming that he had arrested Mrs. Paulette Hanna on a warrant for violation of probation) but also to initiate new false legal matters in order to harm and/or destroy, not only Mrs. Paulette Hanna, but each and every member of her family:

1) Cherrita McBride, Probation Officer, filed a complaint, signed under oath, against Mrs. Paulette Hanna with the Clerk of the Circuit Court and submitted a copy to Judge R. Timothy Peters, knowing full well that no probation existed. Ms. Cherrita McBride, in fact, had to fabricate her own order for probation. The Clerk of the Circuit Court, Ms. Cherrita McBride, and Supervisor William F. Elliott prepared an illegal fabricated *affidavit violation of probation* and filed it on February 5, 1998. The filing stamp on this document was fabricated. The same also prepared another false and fabricated *amended affidavit violation of probation* and filed it on February 18, 1998.

2) On February 4, 1998 a false warrant to arrest Mrs. Paulette Hanna was issued, appearing to bear the signature of Judge R. Timothy Peters and based on the affidavits of Supervisor William F. Elliot and Probation Officer Cherrita McBride, which were filed on February 5, 1998. This warrant appears to have been filed on February 9, 1998.

3) Probation Officer Ms. Cherrita McBride, her supervisor William F. Elliott, Clerk of the Circuit Court Karleen F. DeBlaker, and Judge R. Timothy Peters falsified, fabricated, and tampered with public records and court documents in order to justify the illegal abduction of Mrs. Paulette Hanna on February 7, 1998 and her false incarceration in the Pinellas County Jail when all were fully aware of the fact that Mrs. Paulette Hanna had obtained a judgement in her favor, entered by the Second District Court of Appeals, disposing of the entire matter.

This behavior was done intentionally to illegally harm and/or even destroy not only Mrs. Paulette Hanna, but every member of the Hanna family.

## XIV.

In 1996 Mrs. Angela Downing moved out of the Downing residence while allowing terrorists and professional criminals such as Mr. Lee Timm and Mr. Glenn to move into the Downing's home under Mrs. Angela Downing's and Mr. John Downing's supervision, instruction, and accommodation. Mrs. Angela Downing's sister also moved into the Downing's house in order to better accommodate these criminals so that they would be able to concentrate solely on the design and execution of criminal activities against the plaintiffs.

Mr. Lee Timm threatened Mr. Nagy Abdalla numerous times between the time he moved in, in 1996, and April 1998. He also threatened to physically assault Mr. Nagy Abdalla with two knives on November 2, 1996. Mr. Lee Timm also stated on numerous occasions to Mr. Nagy Abdalla "I'm here to make your life a living hell" and "I'm your worst nightmare." The plaintiffs reported several of these crimes to the St. Petersburg Police Department but officers refused, on each occasion, to take any action against the criminals in the Downing's home. St. Petersburg Police Officers D. Mullinuix and K. Sauer (police report #96-60921), of the St. Petersburg Police Department, went as far as to excuse Mr. Lee Timm's threat, conducted with deadly knives, against Mr. Nagy Abdalla as a *conditional threat*. The St. Petersburg Police Department's assistance aided these criminals and encouraged them to not only continue their crimes against the plaintiffs but to also escalate the severity of their crimes.

On November 3, 1996 Officer Tex Smith, of the St. Petersburg Police Department, came to the plaintiffs' property to harass them with a phony water complaint (police report #96-47502). After being unable to speak to the plaintiffs Officer Smith went to the Downing's

home and spoke with Mr. John Downing.

On November 4, 1996 Officer Smith's supervisor, with two accompanying officers from the St. Petersburg Police Department, trespassed on the plaintiffs' property to harass the plaintiffs.

On October 8, 1996 the plaintiffs found that their car tires had been slashed. This incident was reported to Officer J.W. Soule, of the St. Petersburg Police Department (police report #96-55969).

During the months of August and September, 1996, Mr. Lee Timm prowled on the plaintiffs' property numerous times during the night; throwing his lit cigarette butts on the plaintiffs' lawn. These are also evidence of attempts to destroy the plaintiffs' home through acts of arson. A police report(#6276708) was filed regarding these actions on September 14, 1996 with Officer J. Martini, of the St. Petersburg Police Department. Officer Martini falsified the date of the incident on the card he gave the plaintiffs (to December 14, 1996).

Mr. John Downing and Mrs. Angela Downing went as far as to allow Mr. Lee Timm and Mr. Glenn, during the duration of their stay at the Downing residence, to have their hair cut, to have their toe nails trimmed, to have their nose hairs trimmed, and to engage in other hygienic activities on the front porch of the Downing's property, at all hours of the day and night and in the Florida heat while the Downing's home was closed with the air conditioning running. All of this was done in order to maintain constant surveillance of the plaintiffs and their daily activities.

Mr. John Downing and Mrs. Angela Downing, on numerous occasions between March 1994 and late 1998, ordered their children, Christopher and Joseph Downing, and their

children's juvenile associates to commit numerous crimes against the plaintiffs. All these criminal acts were committed under the supervision of Mr. John Downing and Mrs. Angela Downing and under the protection of and with the assistance of the St. Petersburg Police Department, the St. Petersburg Fire Department, the Pinellas County State Attorney's Office, the Pinellas County Clerk of the Circuit Court, et al.

Between 1996 and 1998, Mr. John Downing, Mrs. Angela Downing, Christopher Downing, and Joseph Downing celebrated with their associates, both adults and minors, by and through the vandalism of the plaintiffs' property; most often by vandalizing the plaintiffs' trees and bushes. This was one of their preferred modes of harassment. They screamed and yelled the plaintiffs' names and often yelled "Nagy we're cutting your trees". The Downing's video recorded nearly every one of these events. They created homemade tools which they used to vandalize the plaintiffs' s trees and property. They even used their vehicles to break down parts of the plaintiffs' trees. These acts endangered not only the lives of the Downings and their associates, but also the lives of each and every member of the Hanna family.

Mr. Christopher Downing, Mr. Joseph Downing, and their mother, Mrs. Angela Downing, broke into and forcibly entered the plaintiffs' home numerous times in the first few years the plaintiffs resided at their current address, since March 1994. When the plaintiffs became aware of the Downing's suspicious and peculiar behavior and found that the break-ins were being conducted through open windows, they began to close all windows before leaving their house. The Downings began to use the back door of the plaintiffs' house to break and enter, possibly using a master key or some other tool to unlock the door. The plaintiffs purchased a chain lock and changed the lock on the back door of their home. Mr. Christopher Downing, Mr. Joseph Downing, and their mother, Mrs. Angela Downing, began to use a key they had in their possession to unlawfully open the front door of the plaintiffs' home, while the plaintiffs were away, and unlawfully enter the plaintiffs' residence. The plaintiffs replaced the lock on

the front door of their home. The Downing children used a ladder to try to enter the plaintiffs' residence through the ventilation system in the roof, tearing down the attic screen and leaving cosmetic damage on the roof of the plaintiffs' residence. When the Downings could not enter the residence through the attic they constructed gates in their fence which allowed them access to the plaintiffs' backyard. After utilizing these gates they removed the glass window to the dining area of the plaintiffs' residence and again continued to enter the plaintiffs' home. These illegal break-ins took place over the course of several years and they were all used to commit a variety of crimes against the plaintiffs. The plaintiffs eventually found it necessary and agreed to never leave their residence unattended. The plaintiffs were forced to always leave a member of the family to guard the residence whenever the other members of the family left. The plaintiffs were deprived of any semblance of a normal life and could not live together as a normal American family. Mr. Shannon Hanna was unable to attend his brother's, Mr. Nathan Hanna's, graduation (Mr. Nathan Hanna graduated as the valedictorian of Lakewood Senior High School in 1997). The plaintiffs could not go on vacations because they could not go together as a family. The plaintiffs could not go to movies or shows together as a family because they could not leave the house alone. The plaintiffs were deprived of engaging in the normal activities that define the American way of life and the American family.

All of the crimes committed by the Downing children against the plaintiffs were discussed a number of times with Mr. John Downing and Mrs. Angela Downing. While Mrs. Downing refused to address the matters at all, her husband, Mr. John Downing, blamed Christopher's and Joseph's behavior and constant involvement in criminal activity on the "bad company" they kept. The crimes, however, never ceased and, instead, continued to escalate in severity.

Mr. Christopher Downing, Mr. Joseph Downing, and their associate Mr. Daniel Vinciguerra attempted, several times in the summer of 1998, to murder Mr. Nathan Hanna and Mr. Shannon Hanna by attempting to and threatening to run them over using Mr.

Christopher Downing's pickup truck. These incidents occurred on 11th Ave. N., St. Petersburg while Mr. Nathan Hanna and his brother, Mr. Shannon Hanna, were traveling, on foot, to or from the neighborhood supermarket, Winn Dixie, on 58th St. and 11th Avenue N.

## XV.

In 1996, Mr. Jasen Hanna, unknown to and against the will of Mr. Nagy Abdalla and Mrs. Paulette Hanna, was enrolled in (Fair Mount Park Elementary) a public elementary school in St. Petersburg, FL. This was done while Mr. Jasen Hanna was attending a local Catholic School. The public school authorities became involved, claiming that Mr. Nagy Abdalla and Mrs. Paulette Hanna were preventing Mr. Jasen Hanna from going to school. On Thursday, October 24, 1996, at approximately 1:00 P.M., Ms. Judith Qualls, an attendance specialist for Pinellas County Schools, trespassed on the plaintiffs property, relentlessly knocked on the front door and windows of the plaintiffs' home, loudly called "Paulette, Paulette...", peered through the plaintiffs' open windows, and relentlessly harassed Mrs. Paulette Hanna. When Mrs. Paulette Hanna answered the door Ms. Qualls falsely informed Mrs. Paulette Hanna that Mr. Jasen Hanna was not attending school and that legal action would be taken against the plaintiffs. Mrs. Paulette Hanna informed Ms. Qualls that she was trespassing. Ms. Qualls, however, refused to leave and attempted to serve upon Mrs. Paulette Hanna a notice for absenteeism regarding Mr. Jasen Hanna. Mrs. Paulette Hanna refused to accept the papers and informed Ms. Qualls that Mr. Jasen Hanna was attending a local Catholic School. Ms. Qualls, however, refused to believe Mrs. Paulette Hanna and persisted in her harassment; attempting to enter the plaintiffs home and finally simply throwing the papers into the plaintiffs' living room. After Ms. Qualls left the premises Mrs. Paulette Hanna called the police. Officer Gary J. Stempinski took a report from Mrs. Paulette Hanna (report #6318572). Ms. Qualls was never arrested for her actions. These acts against the plaintiffs were committed in order to contrive legal problems against Mr. Nagy Abdalla and Mrs. Paulette Hanna and to deprive

them of the custody of their son, Mr. Jasen Hanna. Later Internal Affairs investigations (regarding this and other matters), supervised by Officer M. T. Story of the St. Petersburg Police Department, refused to acknowledge the misconduct of officers involved.

## XVI.

In July, 1996, when the plaintiffs attempted to develop several rolls of photographic film and obtain photographic evidence of the *Racist Religious Conspiracy* being conducted against them, they traveled several miles to submit the rolls of film to a department store. When they later went to collect the developed photos the plaintiffs found several of the photos to be unfocused, intentionally darkened, intentionally colored over, poorly developed, etc. The plaintiffs also found that parts of a number of photos had been intentionally deleted. These acts were committed in order to smear the evidence, degrade their quality and coherence, and make them unclear and inadmissable in a court of law. A problem was also contrived with a clerk of the department store, who was evidently fully prepared with the instruction to illegally withhold all pictures and negatives from the plaintiffs, and who intended to deprive the plaintiffs from essential evidence of the *Racist Religious Conspiracy* against them.

## XVII.

Mr. Nagy Abdalla and his wife, Mrs. Paulette Hanna, were enrolled in the RCIA program at St. Jude Cathedral between 1995 and 1996. The program instructor was Ms. Barbara Thomas, who worked under the supervision of Bishop Robert Lynch. Mr. Nagy Abdalla and his wife, Mrs. Paulette Hanna, used to attend RCIA meetings weekly until they graduated from the program and became Catholic. They even returned the following year, between 1996 and 1997, to assist as volunteers and sponsors in the program with the new candidates. Mr. Nagy Abdalla's and Mrs. Paulette Hanna's involvement in the program was perceived as an

opportunity to continue to surveille them and gather information about them. Several Pinellas County Sheriff's Deputies, St. Petersburg Police Officer/s, and Jewish-Israeli people were placed in the program, undercover and with the protection and assistance of Ms. Barbara Thomas, to covertly surveille, study, and gather as much information as possible on Mr. Nagy Abdalla and Mrs. Paulette Hanna for the purpose of using it against the plaintiffs and to facilitate the operation and fulfillment of the *Racist Religious Conspiracy* being coordinated against them.

## XVIII.

As matter no. CRC 97-05017 CFANO and CRC 97-05022 CFANO proceeded the State Attorney realized that the state would have no chance of obtaining a conviction against Mr. Nagy Abdalla or his wife Mrs. Paulette Hanna. The State Attorney's Office, the Assistant State Attorneys, the Clerk of the Circuit Court and her deputies, Judge R. Timothy Peters, Judge Paul Levine, the St. Petersburg Police Department, and those who have headed and participated in this *Racist Religious Conspiracy* realized that they had already committed too many crimes in the process of these matters; not only violations of Florida Statutes and Florida Rules of Court, but also violations of federal and constitutional laws in their efforts to deprive every member of the Hanna family of their civil and constitutional liberties. The purveyors of this *Racist Religious Conspiracy* therefore decided to take radical and deadly action to turn the tide to their favor. They used the fact that Mr. Shannon Hanna was regularly performing volunteer work at St. Jude Cathedral School, under the supervision of a Jewish Nun, Sister Joseph Eilese Hukle, and the fact that Mr. Shannon Hanna regularly traveled with his father, Mr. Nagy Abdalla, to the University of Florida Campus in Gainesville, FL (to pick up and transport Mr. Nathan Hanna) to their favor.

On Tuesday, July 8, 1997 Sister Joseph Hukle strangely called to confirm whether or not

Mr. Shannon Hanna would keep his appointment to volunteer for one hour in her office later that day. She was notified that Mr. Shannon Hanna would keep the appointment, which Mr. Shannon Hanna did. During this hour of work Sister Jospeh Hukle insisted that Mr. Shannon Hanna make phone calls regarding school business and he therefore placed a number of telephone calls. Sister Hukle also gave Mr. Shannon Hanna more work to do at home which he was to return with the following week. On the following Wednesday and Thursday, the 9th and 10th of July, 1997, Mr. Shannon Hanna experienced strange sensations and exhibited confusion, disorientation, mild body tremors, and other symptoms indicative of a physical malady. Mr. Shannon Hanna refused to go to the doctor when he was advised to do so because he said he felt no physical illness. On the afternoon of Friday, July 11th, 1997, Mr. Shannon Hanna experienced a severe seizure while in the car with his father, Mr. Nagy Abdalla, while they were beginning their trip to Gainesville, FL on 11th Ave. N. approaching 49th St. N., St. Petersburg. Mr. Nagy Abdalla performed CPR on Mr. Shannon Hanna and advised one of the neighbors to call 911 for an ambulance. Mr. Nagy Abdalla also drove to the fire station on 9th Ave. and 49th St. N. He stopped the car in front of the fire station and continued CPR until the ambulance arrived.

The ambulance transported Mr. Shannon Hanna to Edward White Hospital. Mr. Nagy Abdalla followed the ambulance in his personal vehicle. Upon Mr. Shannon Hanna's arrival at the emergency room he was placed on a respirator under the supervision of an anesthesiologist. The emergency room doctor, Dr. June McMillin also ordered immediate tests to determine the cause of the seizure. Some test results came from the hospital's lab within a few minutes and indicated that Mr. Shannon Hanna had three forms of narcotics in his system. Dr. McMillin informed Mr. Nagy Abdalla of the test results and explained that these narcotics, when combined, were commonly known as a *speed ball*. The doctor also diagnosed the seizure as resulting from an overdose of narcotics (in the form of the *speed ball* mixture) occurring seventy-two hours prior to the seizure. Mr. Nagy Abdalla explained to the

doctor his suspicions that Mr. Shannon Hanna had been poisoned by these narcotics in order to murder him because of the plaintiffs' involvement in civil rights activities. The St. Petersburg Police were called to the hospital and, when Mr. Nagy Abdalla asked them "Does anyone know what the hell is going on here?" the two officers left. A few minutes later the nurse took another specimen sample from Mr. Shannon Hanna and it was sent to the lab for confirmation. Mr. Shannon Hanna was moved to the intensive care unit and Mr. Nagy Abdalla went with him. In the intensive care unit the nurses viciously and maliciously ordered Mr. Nagy Abdalla to leave. When Mr. Nagy Abdalla requested to be informed of the reason why he should leave none was given and the nurses began to behave belligerently and make outrageous and false accusations against Mr. Nagy Abdalla. During this entire time Mr. Shannon Hanna was unconscious and exhibiting violent bodily spasms. At any given time there were four to five personnel (who had to be continually rotated due to exhaustion), including Mr. Nagy Abdalla, attempting to hold Mr. Shannon Hanna down on the bed. Mr. Nagy Abdalla continued to remain in the room with Mr. Shannon Hanna. Late that night Dr. Francois Picot was called. Dr. Picot came to the room to see Mr. Shannon Hanna, who was still unconscious, and introduced himself to Mr. Nagy Abdalla as a neurologist and also expressed his intention to perform a neurological exam, which consisted of taking specimen samples from Mr. Shannon Hanna's spinal cord as well as other areas of his body. When Mr. Nagy Abdalla asked to be informed of the purpose of the test no reason was given, rather these tests were described as "standard procedures" in Dr. Picot's expert medical opinion. When Mr. Nagy Abdalla brought forth the issue of the lab results that indicated the presence of the three narcotics in Mr. Shannon Hanna's system Dr. Picot expressed his ignorance of the lab results and indicated that such reports were irrelevant and that the tests must still be performed. Dr. Picot also went as far as to request Mr. Nagy Abdalla's signature on a document which explained the possible side effects and dangers of the tests and the possibility of permanent partial paralysis, a variety of permanent effects on brain function (ranging from headaches to loss of memory), and several other dangerous and possibly debilitating side

effects. When Mr. Nagy Abdalla expressed his fear of the possibility of these occurrences and requested a second opinion the St. Petersburg Police Department was called, along with the Department of Children and Families, and a false verbal accusation, by Dr. Picot and a number of nurses at the hospital, was made that Mr. Nagy Abdalla was preventing "essential medical treatments" for his son, Mr. Shannon Hanna. The form requiring Mr. Nagy Abdalla's signature was snatched from Mr. Nagy Abdalla's hand by one of the nurses and it was hidden. The Department of Children and Families employee declared that the DCF was taking custody of Mr. Shannon Hanna from Mr. Nagy Abdalla, his father, and that a custody hearing would be held the following morning in the Pinellas County Courthouse, Clearwater FL regarding the custody of Mr. Shannon Hanna. The four St. Petersburg Police Officers then started to threaten Mr. Nagy Abdalla, both in verbal and physical forms. Mr. Nagy Abdalla was escorted by the four St. Petersburg Police Officers, against his will and under their constant threats and intimidating actions, to the parking lot of the hospital. Mr. Nagy Abdalla was ordered to leave the hospital and never return. Mr. Nagy Abdalla was also told that one of the nurses had filed a no trespassing warning against Mr. Nagy Abdalla.

The following morning, July 12, 1997, Mr. Nagy Abdalla attended the custody hearing. At this hearing the attorney for the Department of Children and Families claimed that there was a fireman who testified that Mr. Nagy Abdalla had held Mr. Shannon Hanna and had prevented emergency medical services from assisting him for over an hour while Mr. Shannon Hanna was not breathing. The counsel for the DCF demanded that custody of Mr. Shannon Hanna be turned over to the Department of Children and Families. Mr. Nagy Abdalla explained the entire story to the court regarding the request for his signature and the side effects of the tests. Mr. Nagy Abdalla also added that if the court had been in the same position it would have acted in the same manner as he did; simply working, in the best interests of the child, to find the most effective and safe medical treatments. The judge replied that it was improper to bring the court into the matter and also stated that he did not appreciate the time Mr. Nagy Abdalla

had taken to explain the situation early on a Saturday morning. The judge, outwardly expressing belief in the logical impossibility of a person remaining alive for one hour without the benefit of respiratory function, awarded custody of Mr. Shannon Hanna to the Department of Children and Families.

Without the consent of the parents, indeed directly against their will and over their objections, the dangerous tests were performed upon Mr. Shannon Hanna by another doctor. The tests were performed in spite of numerous objections and a final clear refusal from Mr. Nagy Abdalla to allow the procedure. These objections were voiced to Dr. Picot and a number of hospital employees (over the telephone) but were ignored. Some of the administrators of Edward White Hospital, including a person named Frank, attempted to force Mr. Shannon Hanna through a tremendous amount of neurological treatment without any medical reasons or medical need; only to serve and fulfill the goals of the *Racist Religious Conspiracy* being conducted against the plaintiffs; treating Mr. Shannon Hanna as a veritable guinea pig in order to steal as much money as possible from the DCF and force Mr. Shannon Hanna to endure the most severe and extreme medical procedures and experiments. This was done in order to destroy or maliciously harm Mr. Shannon Hanna's memory, his life, and the well being of his family because Mr. Shannon Hanna was and is living evidence of the fact that Jewish criminals and their criminal dogs, working to fulfill the goals of this *Racist Religious Conspiracy*, intentionally subjected children to narcotics within a Catholic School. Mr. Shannon Hanna's condition was also contrived and utilized for the purpose of subverting the defense of his parents, Mr. Nagy Abdalla and his wife Mrs. Paulette Hanna, in the above mentioned legal matters presided over by Judge R. Timothy Peters. Methods similar to this were and are used by the Pinellas County State Attorney's Office and the Pinellas County Justice System to obtain judgements, convictions, and sentences against innocent people when such victories would otherwise be impossible to obtain through the use of honest legal methods and the observance of lawful procedures.

Page 71 of 152

Mr. Nagy Abdalla was unable to visit his son, Mr. Shannon Hanna, at Edward White Hospital but Mrs. Paulette Hanna, Mr. Shannon Hanna's mother, went to the hospital several times a day until Mr. Nagy Abdalla, after consulting with other private neurologists, demanded the transfer of Mr. Shannon Hanna to a children's hospital so that he might be placed under the care and supervision of a children's neurologist. Mr. Shannon Hanna was transferred to All Children's Hospital after a few days of intense argument, extreme and forceful resistance, and malicious delay by the staff and administration of Edward White Hospital, including Dr. Nasser Moukaddem who actively covered-up, with continual lies and deceptions, the test results from the hospital lab which indicated the existence of narcotics in Mr. Shannon Hanna's system. He had refused to recognize or consider the test results, claiming them to be unreliable.

Mr. Shannon Hanna was transferred to All Children's Hospital and Mr. Nagy Abdalla was able to visit him there. All Children's Hospital held a conference with Mr. Nagy Abdalla at which Mr. Nagy Abdalla informed hospital personnel clearly and simply that Mr. Shannon Hanna had been poisoned by narcotics because of the plaintiffs' civil rights activities against the corruption in their community and society. The Doctors and staff of All Children's Hospital interrogated Mr. Shannon Hanna without his parents consent and reported the results to the Department of Children and Families. As a result of this report the DCF requested and was granted an emergency custody hearing in the Pinellas County Court. At this hearing the DCF requested that custody of Mr. Shannon Hanna be returned to his biological parents, Mr. Nagy Abdalla and his wife Mrs. Paulette Hanna. Custody of Mr. Shannon Hanna was then returned to his parents.

Mr. Shannon Hanna was held in All Children's Hospital under the care of Dr. Everette, who refused to acknowledge the lab results from Edward White Hospital showing three forms of narcotics in Mr. Shannon Hanna's system. Dr. Everett stated that the tests had not been

performed in All Children's Hospital, that he had no knowledge of the tests, and that he could not rely on tests conducted by or in other hospitals. Dr. Everette also took steps to keep Mr. Shannon Hanna for the longest time possible in order to force him to undergo several severe medical treatments. This was done, not only to engage Mr. Nagy Abdalla and Mrs. Paulette Hanna in the chaos and confusion resulting from the situation and distract them from the defense in their legal matters, but also in the hopes of accusing Mr. Nagy Abdalla or Mrs. Paulette Hanna of any parental violations or forms of child neglect in order to cover up the crimes committed against Mr. Shannon Hanna, who had been intentionally poisoned by being subjected to illegal narcotics while performing volunteer work in a Catholic school and while under the supervision of a Jewish nun.

Mr. Shannon Hanna verbally refused any further unnecessary forms of treatment because the treatments he was being forced to undergo were making him extremely ill. Mr. Shannon Hanna also demanded that the unnecessary intravenous systems to which he was connected be removed. Mr. Nagy Abdalla and Mrs. Paulette Hanna requested from Dr. Everette the release of Mr. Shannon Hanna after having gathering enough information from the medical staff. Dr. Everette opposed and resisted the release of Mr. Shannon Hanna and delayed the release as long as possible. Dr. Everette finally had to release Mr. Shannon Hanna on July 19, 1997, but not without prescribing medicine for Mr. Shannon Hanna used in the treatment of several types of sexually transmitted diseases, including a prescription for an extremely expensive medication (costing approximately three-hundred dollars) which was available over-the-counter, in another form, for under ten dollars.

This attempt on Mr. Shannon Hanna's life was also designed to confirm and maintain corrupt criminal control over the educational system. It was a timely form of retaliation and revenge against both Mr. Shannon Hanna and his parents, Mr. Nagy Abdalla and his wife Mrs. Paulette Hanna, because Mr. Shannon Hanna had gained admittance into the International

Baccalaureate Program after a long battle against the criminal corruption in the American public education system.

## XIX.

What happened to Mr. Shannon Hanna in this ordeal confirmed the plaintiffs' suspicions about what had happened to Mr. Jasen Hanna at St. Jude Cathedral School, where he had attended classes the previous school year (from August 1996 until June 1997). Mr. Jasen Hanna was six years old when he began to suffer from symptoms similar to what his brother, Mr. Shannon Hanna, exhibited months later. Mr. Jasen Hanna suffered from nausea, stomach pain, vomiting, disorientation, mood swings, violent emotional eruptions, irrational fear and crying, etc. These symptoms continued for most of the school year. Mr. Nagy Abdalla and Mrs. Paulette Hanna had several conferences with Ms. Callahan, Mr. Jasen Hanna's kindergarten teacher. At the last conference Sister Patricia Caulfield, the school principal, forced her presence into the meeting (she was also accompanied by a school secretary) and had the entire conference surveilled by a Pinellas County Sheriff's Deputy. At this conference Sister Caulfield, after hearing of Mr. Jasen Hanna's condition and after being informed that medical care was provided to him without success, began to attack and accuse the plaintiffs of having problems at home that caused Mr. Jasen Hanna's symptoms, especially after being shown the connection between Mr. Jasen Hanna's symptoms and his school attendance. She wholly denied the possibility that any problems which could be the cause of Mr. Jasen Hanna's condition might have existed at the school, without having conducted any investigation or form of inquiry into the matter, and terminated the conference before Mr. Nagy Abdalla and Mrs. Paulette Hanna could inquire as to the environmental circumstances at the school (i.e, possible allergenic or poisonous substances of which the school personnel may have been unaware as well as people who may have had access to Mr. Jasen Hanna's lunch bag). Mr. Jasen Hanna was introduced to illegal narcotics under the supervision of Ms. Callahan, his

teacher, Sister Patricia Caulfield, his principal, and Bishop Robert Lynch, the head of the St. Petersburg Catholic Diocese.

## XX.

Mr. Shannon Hanna, while still in middle school, applied for placement in the gifted students program in 1994. The administration of Azalea Middle School, Tyrone Middle School, and the Pinellas County School System required that Mr. Shannon Hanna be administered an IQ test before he could qualify for the program. When Mr. Shannon Hanna participated in the IQ testing, conducted by Mr. Juan Lopez on March 10, 1994, which took approximately three hours, he did not score highly enough to be placed in the gifted program. When Mr. Nagy Abdalla and Mrs. Paulette Hanna investigated the matter they found out that the school psychologist had stretched the time length of the test to three hours, far beyond the normal one hour length, and had allowed absolutely no breaks or even time for Mr. Shannon Hanna to go to the bathroom. This was intentionally done in order to exhaust Mr. Shannon Hanna (as it would have exhausted any child of comparable age) and actively reduce his ability to accurately answer and solve the test questions.

A few days later Mr. Nagy Abdalla and Mrs. Paulette Hanna received an *Informed Notice of Ineligibility* form from the Pinellas County Schools, carrying thirteen signatures of school personnel, stating that Mr. Shannon Hanna was not qualified for the gifted students program due to the inadequate score he had obtained on the IQ test administered to him.

In or about August 1994, Mr. Shannon Hanna was removed from his advanced science course in Tyrone Middle School and was placed in an academically lower level science course. This removal was conducted under the supervision of Principle Mrs. Victoria Desmond, Assistant Principle Mr. James M. Joyer, and Counselor Mr. Bernard Pennington. After the

plaintiffs sent several certified complaints to and attended several conferences at Tyrone Middle School, requesting to be informed of any reasons for the removal of Mr. Shannon Hanna (save for discriminatory or racist reasons), Mr. Shannon Hanna was reinstated in the advanced science course near the end of September, 1994.

Mr. Nagy Abdalla and Mrs. Paulette Hanna arranged to have Mr. Shannon Hanna privately tested by Mr. Dennis Apple, another Pinellas County School Psychologist, on February 18, 1995. This examination cost the plaintiffs one-hundred dollars. The test was only one hour long and Mr. Shannon Hanna scored a full scale IQ of 128 (as opposed to the earlier score of 116 achieved on the exam administered by Mr. Juan Lopez), enough to qualify for the gifted students program with two teacher's recommendations. The difference between the two test results were and are clear, obvious, and indisputable evidence of the criminal corruption in the American public educational system and the crimes committed against the American children. Mr. Juan Lopez was promoted to a higher position and was not able to contact or explain to Mr. Nagy Abdalla or Mrs. Paulette Hanna the difference in Mr. Shannon Hanna's test results or why the test he administered took almost three continuous hours.

Mr. Shannon Hanna, by virtue of his IQ test score, was enrolled in the gifted student's program and later became a candidate for the International Baccalaureate Program. This candidacy was faced with extreme opposition from the corruption in the Pinellas County School Administration. Extreme pressure was applied upon the personnel of Tyrone Middle School and they were instructed to take any and all actions necessary to prevent Mr. Shannon Hanna from gaining admittance to the International Baccalaureate Program. The sudden and suspicious death of the principle of Tyrone Middle School, Mrs. Victoria Desmond, was not the only suspicious incident seemingly contrived for this purpose. Indeed, the deaths of several family members related to some of Mr. Shannon Hanna's teachers also appear to have been intentionally caused for the purpose of applying pressure upon the staff and faculty of Tyrone

Middle School.

All these criminal activities against Mr. Shannon Hanna were committed with the intention of destroying his education. These crimes were carried out by Pinellas County school personnel, including Principle Mrs. Victoria Desmond, Assistant Principle Mr. James M. Joyer, Counselor Mr. Bernard Pennington, Ms. Bette R.A. Ivey, Mr. Arlington Nunn, Ms. Rebecca Norus, Dr. Ralph Bailey, Mr. Juan Lopez, and others. These crimes were also covered up, protected, and often initiated by the members of the Pinellas County School Board: Ms. Barbara J. Crockett, Andrea M. Thacker, Mr. Lee Benjamin, Ms. Lucile O. Casey, Ms. Corinne Freeman, Ms. Susan Latvala, and Ms. Linda S. Lerner. The Superintendent of the Pinellas County Schools, Mr. Howard Hinesley, and the Attorney for the Pinellas County School Board, Mr. John Bowen, also actively participated in covering up and assisting with the crimes committed against Mr. Shannon Hanna, as well as other crimes committed against the plaintiffs.

Mr. Shannon Hanna gained admittance to the International Baccalaureate Program in 1996, in the heat of a battle between his parents and the criminals who were the source of corruption in the Pinellas County Schools administration and who constituted the single most dangerous impediment to the education of the children of Pinellas County. The coordinator of the International Baccalaureate Program, Mr. Don Driskell, abruptly resigned after Mr. Shannon Hanna enrolled in the program and was replaced by Dr. Linda McPheron.

This battle between Mr. Nagy Abdalla and his wife, Mrs. Paulette Hanna, against the corruption in the Pinellas County School System not only successfully gained Mr. Shannon Hanna his rights as an American student of the public education system, but also proved to every parent in the United States that fighting for the rights of their children would yield significant advances in the quality of both their children's educations and their children's lives.

It is for this reason, among others, that Mr. Nagy Abdalla, his wife Mrs. Paulette Hanna, and their children were declared, and are presently considered to be, targets of hatred and violence by criminal Jews, criminal officials, and their dogs. The plaintiffs were incessantly and viciously attacked with the intention of making an example of them in order to intimidate and discourage all who considered tirelessly fighting against corruption for their rights and the rights of their children.

## XXI.

Participants in the ***Racist Religious Conspiracy*** against the plaintiffs conspired to make the attendance of Mr. Shannon Hanna in the International Baccalaureate Program at St. Petersburg Senior High School as difficult as possible. Great pressure was applied upon Mr. Shannon Hanna's teachers to maliciously vandalize and reduce his grades, falsify his test scores, and engage and participate in several plots against Mr. Shannon Hanna's personal safety and well being (many of which involved other school personnel and the St. Petersburg High School resource officer, Officer Kraig Corry).

Mr. Nagy Abdalla used to transport Mr. Shannon Hanna to and from St. Petersburg Senior High School daily, since Mr. Shannon Hanna began high school in 1996. This arrangement was targeted by school personnel, and the Pinellas County Schools administration, for the purpose of making Mr. Shannon Hanna's attendance in the International Baccalaureate Program and the continuation of his education as difficult as possible.

While Mr. Nagy Abdalla and his wife Mrs. Paulette Hanna continued their fight against the corruption in the American public education system and attempted to correct Mr. Shannon Hanna's maliciously vandalized grades, of which they had gathered several pieces of evidence, steps were being taken to silence them. On October 22, 1998, a date for which  Dr. Linda

McPheron, the International Baccalaureate Program coordinator, had scheduled a conference with Mr. Nagy Abdalla and Mr. Shannon Hanna for approximately 2:15 P.M., Dr. McPheron called the Hanna residence and left a message on the answering machine claiming that she was canceling the appointment. She instructed Mr. Nagy Abdalla to contact Mr. John Bowen, the Pinellas County School Board Attorney, if he wished to schedule conferences with members of the school faculty. At approximately 2:10 P.M., after Mr. Nagy Abdalla had picked up Mr. Shannon Hanna from school, Mr. Nagy Abdalla and Mr. Shannon Hanna were followed, stalked, stopped, and harassed by Officer Charlie Barnes and Officer Corry (in order to prevent them from attending the conference with Dr. McPheron and prevent Mr. Nagy Abdalla from conducting his duty as a parent by participating in his son's, Mr. Shannon Hanna's, education, as is dictated by the International Baccalaureate Program agreement) for approximately forty-five minutes, while in their car and at two different locations. Joining in this false imprisonment and illegal harassment was Mr. Tom Petit, the Principle of St. Petersburg High School, and Mr. Tom Proctor, an employee of St. Petersburg High School, who videotaped Mr. Nagy Abdalla and Mr. Shannon Hanna against their will and over their objections. Mr. Nagy Abdalla's and Mr. Shannon Hanna's demands that they not be videotaped were ignored by the officer, who stated that they could do nothing because they were on a public street. Officer R.D. Bricker, Sgt. W. Gable, and Sgt. J.F. Snyder also participated and supervised the illegal ambush. Mr. Nagy Abdalla was threatened by Mr. Petit and Officer Corry to sign a no trespassing warning. Mr. Nagy Abdalla refused to sign the warning, upon which he stated, in writing, "I do not agree." Officer Charlie Barnes and Officer Corry illegally ordered Mr. Nagy Abdalla to present his driver's license (but no other documents required to be examined during a lawful traffic stop), which he did. Officer Charlie Barnes and Officer Corry, however, falsified a summons (#638804-U X) in which they stated that Mr. Nagy Abdalla did not have any driver's license, yet they managed to copy the information from the driver's license he gave them, they managed to correctly spell Mr. Nagy Abdalla's foreign name, and they made other mistakes by looking at and incorrectly

interpreting other information on the driver's license. All these crimes were witnessed by both Mr. Nagy Abdalla and his son, Mr. Shannon Hanna.

Mr. Nagy Abdalla refused to sign the summons numbered above and stated in writing "I do not agree" on the summons. On October 23, 1998, at about 12:00 P.M., the plaintiffs faxed a letter to the St. Petersburg Police Department and St. Petersburg Senior High School. A copy of this letter was also furnished to the Clerk of the Circuit Court, Karleen F. De Blaker, and all the judges of the Pinellas County Justice System, informing them of the criminal activities committed against the plaintiffs, the illegality of the traffic summons, and the illegality of the no trespassing warning. The letter also warned the St. Petersburg Police Department against presenting the citation to anyone as a legal document or falsely claiming that it carried Mr. Nagy Abdalla's signature. The St. Petersburg Police Department appears to have considered the summons legally valid and continued to harass Mr. Nagy Abdalla through the Pinellas County Justice System. Only five days later, on October 27, 1998, Mr. Nagy Abdalla received a notice from the Clerk of the Circuit Court informing him that the court appearance for the summons had been rescheduled for November 17, 1998 at a different location than that appearing on the summons. There was never any warning of the issuance of a warrant for nonappearance nor any order instructing Mr. Nagy Abdalla to appear.

## XXII.

On November 23, 1998, at approximately 2:00 P.M., while Mr. Nagy Abdalla was driving on 5th Ave., he was followed by a white vehicle and, when he made a right turn onto 26th St. N. going south, the vehicle followed him. Another similar vehicle appeared from the alley behind the office of the *Bay Cab* taxi company and headed north. This car stopped in front of Mr. Nagy Abdalla's vehicle and the other car stopped directly behind Mr. Nagy Abdalla's vehicle to block Mr. Nagy Abdalla from going either forward of backward. Officer Dennis

Ingerson, wearing a black uniform visually similar to those worn by the SWAT team, and two other officers, Officer Joseph Milana and Officer Spencer Gross, wearing grey uniforms emerged from the cars and started saying, several times to their shoulder speakers, "The rat is in the box." Officer Ingerson approached the driver's side of Mr. Nagy Abdalla's vehicle and stated "Mr. Hanna, open your window." When Mr. Nagy Abdalla opened the rear passenger window of his vehicle, between one and one-half inches, and informed the officer that the driver's side window was not working, Officer Ingerson then stated that he had a warrant for Mr. John Hanna's arrest, pulled out his chemical weapon, and ordered Mr. Nagy Abdalla to step out of the vehicle while attempting to spray his chemical weapon through the one to one-half inch open window. Mr. Nagy Abdalla closed that window. Mr. Nagy Abdalla replied, several times, "Show me the warrant." Officer Ingerson stated that he would have to use force to enter the vehicle. Mr. Nagy Abdalla informed him that the arrest was a false one and that any use of force was prohibited by law. Officer Ingerson then took out his baton and began to hammer the front driver's side window and the front windshield of Mr. Nagy Abdalla's vehicle. He was successful only in cracking the front windshield and proved incapable of breaking open the driver's side window. One of the other officers went to the car that was being used to block the rear right of way of Mr. Abdalla's vehicle and brought out a metal tool with which he hammered the right rear passenger side window of Mr. Nagy Abdalla's vehicle. The officer succeeded in smashing open that window. He entered his arm into the vehicle and unlocked the front passenger door while handing the tool to Officer Ingerson. The officer who broke the window and unlocked the door then opened the front passenger door and generously sprayed Mr. Nagy Abdalla with a chemical weapon which incapacitated Mr. Abdalla. At this moment Officer Ingerson, maliciously ignoring the central lock of the car and his obvious ability to manually open the front driver's side door, smashed the front driver's side window, with the same metal tool, only a few inches from Mr. Nagy Abdalla's face, causing the glass to shatter over Mr. Nagy Abdalla's body and lacerate his face, arms, and hands. Officer Ingerson then unlocked the door from the inside, opened it and, with the

Page 81 of 152

assistance of another officer, pulled Mr. Nagy Abdalla (who, under the influence of the chemical weapon, could neither see nor breath) from his vehicle, dragged him along the ground atop the broken glass and, with their knees in his back and on the back of his neck, caused further injury to his face and chest and introduced injury to his neck and back. During this ordeal Officer Ingerson was yelling to the other two officers to keep their eyes on Mr. Shannon Hanna, "the son." One of the officers then replied that he (meaning the other officer) "got" the son. This other officer then began stalking, intimidating, threatening, illegally interrogating, and harassing Mr. Shannon Hanna. This officer demanded that Mr. Shannon Hanna reveal his name and age. The officer carried out these acts while wearing dark sunglasses, placing his arms across his chest in an intentionally intimidating pose, and attempting to block Mr. Shannon Hanna's view of the ambush, assault, attempted murder, and false arrest of Mr. Nagy Abdalla. The officer attempted to coerce Mr. Shannon Hanna to submit to interrogation through the use of intimidation and attempted to prevent him from moving freely. Mr. Shannon Hanna, however, refused to submit to the officer's requests or answer the officer's questions and he entered the taxi company office. The officer followed Mr. Shannon Hanna into the taxi office and stated that he would not allow Mr. Shannon Hanna to get a taxi unless Mr. Shannon Hanna told the officer his name and age. The officer also ordered the taxi dispatcher not to call Mr. Shannon Hanna a taxi. Mr. Shannon Hanna left the taxi office and started walking west on 5th Avenue while still being stalked by the officer. After a few hundred feet the officer left Mr. Shannon Hanna's presence and Mr. Shannon Hanna proceeded on his way home.

Mr. Nagy Abdalla was forced onto his knees, in the glass covered street, and a pre-prepared gallon of water was poured over his face and head in order to extend the effective time of the chemical weapon. Mr. Nagy Abdalla was then forced into one of the undercover vehicles and the officers left him in the vehicle while one or more of them received medical assistance from fire rescue personnel in the form of eye-drops, which were necessary because

of their excessive and malicious use of chemical weapons. Mr. Nagy Abdalla was then transported to the Pinellas County Jail facility. When Officer Ingerson opened the door of the car for Mr. Nagy Abdalla he again threatened Mr. Nagy Abdalla not to "resist" him and told him that he had better leave the vehicle and come with him. Inside the jail Mr. Nagy Abdalla was met by a group of Pinellas County Sheriff's Deputies, one of whom was Lt. Stroud. Mr. Nagy Abdalla stated to the Sheriff's Deputies that the arrest was a false one, constituted kidnapping, and that there was no warrant. One of the Deputies checked the computer, returned back to the arresting officers, and stated that there was no warrant on the computer for Mr. Nagy Abdalla's arrest. One of the arresting officers then began whispering to Lt. Stroud regarding the phone call of a man whose name Mr. Abdalla could not hear. The arresting officer then stated that they would write affidavits that the arrest was lawful. The Sheriff's Deputies then escorted Mr. Nagy Abdalla, by force, to a cell. They ordered Mr. Nagy Abdalla to take off his clothes and give the clothes to them and further ordered Mr. Nagy Abdalla to throw a pile of bloody napkins, which Mr. Abdalla had used to wipe the blood from his body before being pulled from his vehicle, into a black plastic garbage bag. Mr. Nagy Abdalla initially refused but the Deputies then began yelling and making physical threats against Mr. Nagy Abdalla. Mr. Nagy Abdalla then gave them the pile of napkins and his clothes. The Deputies handed Mr. Nagy Abdalla a blue uniform and a shower curtain and told him to take a shower so that Mr. Nagy Abdalla could remove the chemicals from his body.

It appears that the campus police, with the cooperation and assistance of Officer Kraig Corry (from the St. Petersburg Police Department) and a Deputy from the Pinellas County Sheriff's Office, ordered the towing of Mr. Nagy Abdalla's vehicle, which contained personal belongings and groceries, by *ABC* towing company. Officer Kraig Corry stated that the vehicle had been left on the campus for several days. The Sheriff's Deputy claimed that the vehicle had been left unattended. In spite of the plaintiffs' efforts to have their car returned, including an offer to ABC towing to reimburse them for the expense of returning the vehicle,

ABC towing refused to return it. The plaintiffs' vehicle was never returned.

The aforementioned acts committed by the Pinellas County Campus Police were committed with the supervision, assistance, and protection of Chief Joe Feracca and with the assistance of Ms. Kim Griffith.

**XXIII.**

From November 23, 1998 until March 8, 1998 Mr. Nagy Abdalla was never booked, classified, medically screened, nor did he attend any legal court hearings. During this period he was also held in several different confinement cells, being occasionally moved from one cell to another without reason, save to block and interfere with his release. During the first few weeks of this period several administrative personnel conducted investigations regarding the situation, constantly brought to the attention of jail and court personnel due to the letters and complaints issued by the plaintiffs, and all of them stated that there was (and had been) no warrant for Mr. Nagy Abdalla's arrest. When Mr. Nagy Abdalla stated to the Jail commander, Major Kenneth Remming, that there was (and had been) no warrant for his arrest, Major Remming verbally confirmed that there was no warrant by replying that he was sure they were holding Mr. Nagy Abdalla "for something." Because Mr. Nagy Abdalla refused to participate in the mock-proceedings taking place against him in the Pinellas County Criminal Justice Center and because Mr. Nagy Abdalla refused to acknowledge his kidnapping, false arrest, illegal incarceration, the fabrication and alteration of records, the assault and attempts on his life, the theft of his car and its contents, etc. as legal acts, Pinellas County Sheriff's Deputies kept Mr. Nagy Abdalla in solitary confinement cells. Mr. Nagy Abdalla was intentionally subjected to extremely unhealthy conditions and a contaminated environment, both specially contrived and applied for the purpose of damaging and destroying his physical and mental health. During the entire 106 day period Mr. Nagy Abdalla was held in confinement he was

**Page 84 of 152**

the target of an intense psychological and physical torture campaign, at all hours of the day and night, by the Sheriff's Deputies (such as Lt. Schmidt, Corporal Grover, Corporal Murphy, Officer O'Brian, and others, in the Pinellas County Jail ), who refused to release Mr. Nagy Abdalla numerous times against court instructions. On one occasion during the 106 day confinement period several deputies came to Mr. Nagy Abdalla's confinement cell and physically assaulted, handcuffed, and shackled Mr. Nagy Abdalla and transported him, in a wheelchair and against his will, to face a Judge via an audio-video system. This was done without any form of notification, and without valid charges against Mr. Nagy Abdalla. On another occasion during the 106 day confinement period, under the supervision of Lt. Stroud and the instruction of Sgt. Newman, a number of deputies (Sgt. George, Crpl. Murphy, and others) physically assaulted Mr. Nagy Abdalla, handcuffed and shackled him, strapped him into a black torture device, and transported him to Judge Paul Levine's courtroom, where an illegal hearing was held, in a state of extreme discomfort, extreme pain, and significantly inhibited respiratory function. This incident was videotaped by hand-held video camera (by one of the deputies), over Mr. Nagy Abdalla's direct verbal objection. At this hearing Judge Levine told Mr. Nagy Abdalla that he would be tried on March 8, 1999 and, after Mr. Nagy Abdalla protested and stated that there were no formal or valid charges, stated that the matters being conducted against him were a "kangaroo" procedure, and informed Judge Levine that any such trial would be the biggest mock-trial of his career, Judge Levine told Mr. Nagy Abdalla not to be mean to him so that he would not be mean to Mr. Nagy Abdalla. Judge Levine further threatened Mr. Nagy Abdalla that, if he refused to attend on March 8th, Mr. Nagy Abdalla would be brought in the same manner to the courtroom.

During this 106 day incarceration Mr. Nagy Abdalla was placed in a psychiatric holding section of the Pinellas County Jail and was imprisoned, against his will and over his objections, in a psychiatric unit of the facility, under the supervision of Dr. Murray and without any valid charges against him.

After Mr. Nagy Abdalla had been in the Pinellas County Jail for approximately three weeks, Judge William Overton was informed that the charges against Mr. Nagy Abdalla had been dropped. He therefore canceled the bail of fourteen-hundred dollars and ordered the release of Mr. Nagy Abdalla. The Clerk of the Circuit Court, however, logged on the computer that Mr. Nagy Abdalla's bond had been reset at seventy-five-thousand dollars. Sgt. Newman, from the Pinellas County Sheriff's Office, came to Mr. Nagy Abdalla's cell, with a mocking attitude, congratulating him that the bail had been raised to seventy-five-thousand dollars and stating that Mr. Nagy Abdalla would never get the "hell" out of the Pinellas County Jail.

On March 8, 1999 Sgt. George, from the Pinellas County Sheriff's Office, escorted Mr. Nagy Abdalla to Judge Levine's courtroom to face trial. Sgt. George had refused to release Mr. Nagy Abdalla, in defiance of court instructions, several times prior to this date, claiming that he did not know who Mr. Nagy Abdalla was. On this date, however, Sgt. George was confident in escorting the body of Mr. Nagy Abdalla, as the correct defendant to be delivered from the Sheriff to the Sixth Judicial Justice system, to face trial.

## XXIV.

On March 8, 1999 Judge Paul Levine held a mock trial (for CTC 98-37585 MMANO) against Mr. Nagy Abdalla, who stated clearly, in open court, that he was not ready for a trial, that there was no plea in this matter, that there were no legal charges in this matter, and that the Florida Rules of Criminal Procedure and other bodies of Florida law had not been followed in this matter. Judge Paul Levine decided to proceed with the trial without Mr. Nagy Abdalla's request or demand for a trial. He also allowed the assistant state attorney, Ms. Lydia Wardell, to assign a new charge (no valid driver's license, no valid driver's license, resisting arrest without violence) different than the supposedly original ones (no valid driver's license,

Page 86 of 152

driving with a suspended license, resisting arrest without violence). Judge Levine claimed that the law allowed the state to verbally "amend" the charges during the trial.

On March 8, 1999 Ms. Lydia Wardell submitted a fabricated and falsified document, stating itself to be a warrant to arrest Mr. Nagy Abdalla and signed by Deputy Clerk Aida R. Trippett, stating that the warrant had been issued upon the order of Judge Walter Fullerton. The warrant has three different filing stamps: one for the Pinellas County Sheriff's Office (fugitive section) dated November 23, 1998, 12:29 P.M.; another for the South County Branch Office dated November 24, 1998 (time indeterminate); and another for the County Criminal Court Records dated December 17, 1998, (no time given). Ms. Lydia Wardell stated to the jury that this "warrant" was issued on November 17, 1998 and that it was a valid and legal warrant to arrest Mr. Nagy Abdalla at any time after November 17, 1998. She also submitted this falsified document as an exhibit to Judge Levine, who received it, examined it, and accepted it as an exhibit submitted by the state. Ms. Lydia Wardell also slandered Mr. Nagy Abdalla before the jury, stating and/or implying that he is a terrorist, a racist, and that the Hanna family is little more than a group of criminals. She furthermore stated to the jury and brought witnesses to testify to the jury that the plaintiffs' residence was constantly monitored and that "we" (meaning government officials and law enforcement authorities) have been out to get the plaintiffs for a long time. Ms. Lydia Wardell did all of this with full knowledge of the fact that the charges against Mr. Nagy Abdalla had been dropped. Ms. Lydia Wardell knew that she was conducting a prosecution against an innocent man who was falsely incarcerated. Ms. Lydia Wardell's intentional illegal behavior illustrates her active participation in this *Racist Religious Conspiracy* against the plaintiffs.

On March 8, 1998 Judge Paul Levine prevented Mr. Nagy Abdalla from submitting numerous exhibits which, if submitted, would undoubtedly have led the jury to find Mr. Nagy Abdalla *not guilty*. Judge Levine also conducted the trial in a manner contrived to secure a

verdict of *guilty* against Mr. Nagy Abdalla. Judge Paul Levine's behavior and court room demeanor was specially designed to illustrate his dislike of Mr. Nagy Abdalla to the jury. He participated in several conversations with a clerk of the court, in front of the jury, for the purpose of making the jury believe that Mr. Nagy Abdalla is a liar (regarding his appeal verdict in favor of Mr. Nagy Abdalla in the Second District Court of Appeals for cases CRC 97-050-17 and 97-05022 CFANO-B and also regarding his name, which appeared on those two cases, and also regarding the seventy-five-thousand dollars bail for his release) and that he was perjuring himself on the witness stand.

On March 8, 1998 Officer Ingerson, who participated in the attack on Mr. Nagy Abdalla on November 23, 1998, perjured himself under oath on the witness stand and made false statement before the jury in order to assist and participate in the ***Racist Religious Conspiracy*** being conducted against the plaintiffs; a conspiracy whose (then) present goal was to achieve the false conviction of Mr. Nagy Abdalla for crimes that did not even exist.

On March 8, 1998, after an illegal and unconstitutional kangaroo trial, the jury, in spite of the fact that they observed that the judge had unlawfully held numerous facts, documents, and information (even their exposure to applicable laws) from them and the fact that they had witnessed the slanderous and malicious methods used by the prosecutor, rendered a *guilty* verdict. The verdict was issued under the pressure of wishing simply to go home (as the hour was late) and also as a courtesy to the Jewish people in the hope that they might either personally benefit, or simply not be hurt, by finding Mr. Nagy Abdalla *guilty*. By doing this Howard L. Schuele, Vicky L. Hess, Christopher M. Avington, Robert E. Galloway, Dorothy M. Miholics, and Kern S. Sims made themselves parties to this ***Racist Religious Conspiracy*** against the plaintiffs.

On March 8, 1998, after the delivery of the mock verdict of *guilty* on all counts, Judge

Paul Levine maliciously stated, in open court, his personal belief in the following lie: that the evidence of Mr. Abdalla's guilt was overwhelming. In truth he knew that all documents and statements (including many biased statements by Judge Levine himself) put forth against Mr. Nagy Abdalla in his courtroom were fabricated, falsified, and untrue. Judge Levine allowed this false evidence to be submitted simply to obtain a verdict of *guilty* against Mr. Nagy Abdalla. Judge Levine, with full knowledge, participated in this ***Racist Religious Conspiracy*** and ordered the maximum sentence for charges that he knew had been dropped. He sentenced Mr. Nagy Abdalla to 365 days in the Pinellas County Jail. Judge Levine, however, failed to sign the judgement and sentencing documents in this matter or any other documents related to this matter. He also fined Mr. Nagy Abdalla one-thousand dollars in court costs and placed this fine in the form of a lien on Mr. Nagy Abdalla. Judge Levine also ordered and supervised inhumane treatment in his courtroom, inflicted by three court bailiffs, designed and applied to break Mr. Nagy Abdalla's bones. Judge Levine stood in the courtroom, supervised the abuse of Mr. Nagy Abdalla, and asked the court bailiffs if they needed any further assistance. These acts were committed under the guise of procuring Mr. Nagy Abdalla's fingerprints, which had not yet been taken.

## XXV.

The Pinellas County Sheriff accepted Mr. Nagy Abdalla into the Pinellas County Jail, without the legal order of commitment, and forced him, through the use of threats, acts of intimidation, and several other intentionally inhumane methods, into slavery, under the most inhumane of conditions in the maximum security kitchen of the Pinellas County Jail, for a period of several months, until June 17, 1999. This kitchen was under the management of *Trinity Food Services* and under the direct supervision of Sgt. George and Ms. Rene Dukes. These individuals actively sought to apply pressure on Mr. Nagy Abdalla through verbal insults, extreme overwork in a harsh and medically hazardous environment, etc.

When Mr. Nagy Abdalla was released he found that his pants and socks had been washed and his T-shirt was not given back to him. Each of these articles of clothing had been soaked in his blood and undoubtedly contained traces of the chemical weapons used against him during his abduction the previous November. The disposal of both his shirt and the evidence of the crimes committed against him was executed for the purpose of covering up evidence of the criminal activities committed against Mr. Nagy Abdalla.

## XXVI.

While Mr. Nagy Abdalla was incarcerated in the Pinellas County Jail, between November 1998 and June 1999, the plaintiffs continued to send complaints to the authorities regarding the *Racist Religious Conspiracy* against them and regarding the corruption in the Pinellas County Sixth Judicial Justice System. Because of the sensitive nature of the facts stated within these complaints, especially those regarding the false incarceration of Mr. Nagy Abdalla by the Pinellas County Sheriff's Office, direct retaliation commenced. On January 24, 1999, at approximately 10:00 P.M., Pinellas County Sheriff's Deputies raided the plaintiffs' residence, breaking the garage window, attempting to break the garage door (leaving severe damage on the door), bending and twisting the two gates to the plaintiffs' fenced backyard, entering the plaintiffs' garage, breaking down the home's door to the garage, damaging stored merchandise and property in the garage, damaging areas all over the house (including the air conditioning system), pointing their guns at the Hanna children and attempting to shoot and murder them, physically abusing and assaulting the two Hanna children (Mr. Shannon Hanna, 16, and Mr. Jasen Hanna, 8). This behavior was undoubtedly the result of the fact that they had been falsely informed by the St. Petersburg Police Department, most likely Officer Charlie Barnes, that the house had three guns inside. The names of the deputies were Roscoe C.

Dobson, Jeffrey Preising, James R. Cavagnaro, Lance R. Chambers, and Norman Cramer. Accompanying the deputies was Karen S. Greul, a forensic specialist, whose presence was most likely needed for the purpose of covering-up the murders the deputies intended to commit that night.

The Sheriff's Deputies arrested Mrs. Paulette Hanna and charged her with the old charges in case no. CRC 97-05017 CFANO which had already been overturned on appeal and ordered dismissed by the Second District Court of Appeals in appeal no. 97-04342 (consolidated with appeal no. 97-04347). They also arrested Mr. Shannon Hanna after pointing their guns in his face and wrestling him to the ground, later charging him with obstructing or opposing an officer without violence, while he was attempting to protect his eight-year-old brother, Mr. Jasen Hanna, who the Deputies grabbed and flung in the air into a couch in the plaintiffs' living room. The Deputies also abducted Mr. Jasen Hanna and placed him into the custody of the Department of Children and Families.

The Pinellas County Sheriff's Deputies also made long distance phone calls, some of them overseas, from the plaintiffs' residence telephone. They also closed the vandalized house which contained three different types of pets including a sick dog undergoing treatment, two parakeets, and three aquariums of fish. For three days none of these animals were fed, watered, let outside, or cared for in any way. These deputies falsely accused and charged Mr. Shannon Hanna with a maliciously contrived false and illegal charge because he was/is a witness to most of their crimes, especially since all of this was done without a valid arrest warrant or search and seizure warrant against any of the plaintiffs. These acts were also timely committed in order to both prevent the plaintiffs from preparing further complaints regarding the false incarceration of Mr. Nagy Abdalla and also to quietly prevent Mr. Nagy Abdalla's release, which had been ordered by the court on January 25, 1999.

## XXVII

Mrs. Paulette Hanna endured approximately six weeks in the Pinellas County Jail, from January 24, 1999 to March 10, 1999. Under the supervision and action of Major Kenneth Remming, Lt. Schmidt, and Dr. Murray Mrs. Paulette Hanna was imprisoned and kept in a psychological unit at the maximum security section of the Pinellas County Jail. During her entire six week false incarceration Mrs. Paulette Hanna was also forced to live in a harsh, inhumane, and medically hazardous environment.

Mrs. Paulette Hanna was held as a political prisoner in the Pinellas County Jail for approximately six weeks, without any legal warrant for her arrest or valid charges against her, before she was finally bonded out for more than five-thousand three hundred dollars on March 10, 1999. Mrs. Paulette Hanna was never advised, arraigned, or formally dealt with as prescribed by law. The Clerk of the Circuit Court falsely and illegally logged onto the computer records that Mrs. Paulette Hanna had a bail of over fifty-three thousand dollars in order to secure the maintenance of her incarceration and the continuance of the campaign of physical and psychological torture against her. The Pinellas County Sheriff's Office, with the cooperation of the Clerk of the Circuit Court, the Sixth Judicial Justice System, the Pinellas County State Attorney's Office, the Pinellas County Public Defender's Office, et al. conspired to falsely label Mrs. Paulette Hanna incompetent so that they might not only involuntarily commit Mrs. Paulette Hanna to the indefinite custody of a mental institution, but also create for themselves a means of escape from having to admit and obey the appeal judgement disposing of CRC 97-05017/18 CFANO (in which the Second District Court of Appeals admitted the illegality and the outrageous behavior of the Pinellas County Justice System and granted the appellants all relief sought), and also to protect themselves from liability and prevent the inevitable inception of pro se legal action against them by any or all of the plaintiffs.

Since January 24, 1999, until the present day, the aforementioned used Dr. Jill Poorman, Psy. D., to fabricate documents falsely claiming that she had conducted a psychological examination of Mrs. Paulette Hanna when, in actuality, no such examinations had ever been conducted by Ms. Jill Poorman or any other qualified persons. Because attempts by Dr. Jill Poorman, Dr. Murray, et al. to coerce Mrs. Paulette Hanna into submitting to a psychological evaluation proved unsuccessful, Dr. Jill Poorman, with the cooperation, assistance, and supervision of the aforementioned (including Major Kenneth Remming and Dr. Murray), illegally arranged to have Mrs. Paulette Hanna transported to PEMHS inc., 11254 58th St. N., Pinellas Park, FL on March 1, 1999. Mrs. Paulette Hanna was illegally accepted into the facility by Ms. Sandra Gerard. Ms. Nicola Anderson forcibly examined and forcibly interrogated Mrs. Paulette Hanna against her will. Mr. Harold Davis and other employees of PEMHS, inc. also participated in this *Racist Religious Conspiracy* against Mrs. Paulette Hanna. Following her transfer to PEMHS, inc. Mrs. Paulette Hanna continued to refuse to submit to any form of psychological examination or evaluation because she knew for a fact that the appeal in this matter had been granted in her favor, that there were no grounds for conducting a psychological evaluation upon her, and she had no knowledge of anyone who had ordered an evaluation. Because Mrs. Hanna refused to submit she was sent back to the Pinellas County Jail without any evaluation or diagnosis having taken place.

On or about January 24, 1999 the Clerk of the Circuit Court falsely logged on the jail and court computer that Mrs. Paulette Hanna had a bail of more than fifty-three thousand dollars in order to insure and secure the length of her false incarceration and to minimize the possibility of any release. In actuality Mrs. Paulette Hanna had no felony charges against her because her appeal had been granted. Mrs. Paulette Hanna had to pay more than five-thousand three-hundred dollars to *Coast-to-Coast Bail Bonds* as a bond for a bail that did not exist. The jail accepted the bond of five thousand dollars when Mrs. Paulette Hanna should have been unconditionally released on her own recognizance. There are no records in the jail

or the court documenting that Mrs. Paulette Hanna paid five-thousand dollars to be released from the Pinellas County Jail.

After her release on March 10, 1999 Mrs. Paulette Hanna was forced, under the threat of incarceration, to attend hearings, still being held even today, at the Pinellas County Criminal Justice Center for felony charges that were overturned on appeal. Judge R. Timothy Peters, Judge Philip J. Federico, and Judge Mark I. Shames held hearing after hearing, proceeding with a felony matter that did not exist. Judge Patrick Caddell also chose to hold hearings on charges that arose from false arrests for fabricated felony warrants on felony matters that did not exist. The Clerk of the Circuit Court, the Pinellas County State Attorney's Office, the Pinellas County Public Defender's Office, Judge Patrick Caddell, Judge R. Timothy Peters, Judge Philip J. Federico, Judge Mark I. Shames, Dr. Jill Poorman, et al. carefully organized and systematically executed this *Racist Religious Conspiracy* by fabricating documents, falsifying and tampering with case files, removing and deleting documents, scheduling hearings in a manner designed to spy in order to gather information that could be utilized against Mrs. Paulette Hanna, and more.

After her release from the Pinellas County Jail on March 10, 1999, Mrs. Paulette Hanna filed a multitude of complaints against court officials and employees involved in this *Racist Religious Conspiracy*, regarding their violations and crimes, to a number of regulatory agencies, including the Judicial Qualifications Commission and the Florida Bar. As a result of these complaints Judge R. Timothy Peters and Judge Philip J. Federico recused themselves from these matters, claiming their recusals to be voluntary and *sua sponte*. State Attorney Bernie McCabe, Public Defender Bob Dillinger, and Clerk of the Circuit Court Karleen F. DeBlaker, however, continued to order, supervise, allow, and commit numerous crimes against the plaintiffs.

# XXVIII.

On July 9, 1999 Mrs. Paulette Hanna attempted to review the file for the felony matter (CRC 97-05017 CFANO) twice, but the file was hidden and she was prevented from reviewing it for the purpose of sabotaging her preparation for a hearing against her scheduled for July 13, 1999.

On July 12, 1999 Judge Patrick Caddell held an illegal hearing against Mrs. Paulette Hanna based on nine invalid charges stemming from felony matters that had been dismissed by the Second District Court of Appeals. He refused to recuse himself from the matter even though there were several official complaints against him before the Judicial Qualifications Commission regarding his judicial misconduct and his criminal activities against Mrs. Paulette Hanna. Judge Caddell gave forty-five days for the matter of an incompetency evaluation to be solved and scheduled a status check, a bond review, and a pre-trial hearing (all in one hearing) to be held on September 2, 1999. This was all done in spite of the fact that he was personally served a copy of the complaint against him to the Judicial Qualifications Commission, in open court, by Mrs. Paulette Hanna.

On July 13, 1999 Mrs. Paulette Hanna traveled to the Pinellas County Criminal Justice Center to attend a hearing for matter CRC 97-05017 CFANO (a hearing for which she had never received a notice of hearing. Mrs. Paulette Hanna attended simply because of the constant threats against her that her five-thousand dollar bond would be revoked.) A new judge, Judge Mark I Shames, had been conveniently imported from the civil division and, in spite of his self-admitted lack of familiarity with this matter and in spite of the fact that Mrs. Paulette Hanna informed him that the appeal had been granted in her favor and that the Second District Court of Appeals had ordered the lower court to dispose of this matter, and also in spite of the fact that Ms. Violet Assaid (an assistant public defender illegally assigned

by Judge Douglas W. Baird) informed him that there was absolutely no communication between herself and Mrs. Paulette Hanna, he continued proceedings based on the public defender's false and inadequate legal representation. Judge Mark Shames threatened Mrs. Paulette Hanna, stating that she had two choices; either she could be evaluated immediately or she could be placed in the custody of the Pinellas County Jail (so that her whereabouts could be known at all times and the evaluation could be easily conducted). Mrs. Paulette Hanna was placed in the custody of the Pinellas County Sheriff at approximately 9:30 A.M. that morning. Mrs. Paulette Hanna was then handed a piece of paper that stated that her *R.O.R.* had been revoked. According to the Pinellas County Jail records Mrs. Paulette Hanna was in the jail in order to have a psychological evaluation conducted upon her and, until then, she would not be released. On Saturday, July 17, 1999 the Pinellas County inmate records and information had been changed to state that Mrs. Paulette Hanna was being held in the Pinellas County Jail because her bail bond agency, *Coast-to-Coast Bail Bonds*, had revoked her bond on July 14, 1999 and that Mrs. Paulette Hanna was being held on three misdemeanors with $1013.00 bail each. These incidents were further elaborated upon in complaints filed with the Judicial Qualifications Commission, the Florida Bar, and others.

On July 18, 1999 Mr. Nagy Abdalla bonded Mrs. Paulette Hanna out of the Pinellas County Jail for more than three-hundred dollars. As a result of this Mrs. Paulette Hanna was released from the Pinellas County Jail. Mrs. Paulette Hanna's criminal records also did not reflect any information regarding the five-thousand dollar bail that had been posted with *Coast-to-Coast Bail Bonds* nor did it reflect any reason why they supposedly revoked her bond.

## XXIX.

On January 26, 1999 a false *Complaint* by Deputy Roscoe C. Dobson was filed at 5:07 A.M. at the Clerk of the Circuit Court's Office in the Criminal Justice Center while the office was

closed and no deputy clerks were on duty. This complaint also incorrectly states that the child, Mr. Shannon Hanna, *denies* the alleged offense. With this complaint, on the same day and at the same time, was also filed a *Detention Petition* recommending that Mr. Shannon Hanna be kept in detention for an alleged offense not severe enough to legally merit detention. This petition claimed Mr. Dobson to be an *Officer* with the Clearwater Police Department. This petition also lists the name of Mr. Shannon Hanna as "John Doe" yet accurately lists his date of birth. This petition also has only one illegible signature and is not notarized.

Mr. Shannon Hanna was placed in the false custody of the Department of Juvenile Justice in the Pinellas County Juvenile Assessment Center after he was wrestled to the ground and physically and psychologically abused by Pinellas County Sheriff's Deputies in his own home, as already detailed. He was forced to spend a night on bare concrete without a blanket, a pillow, any linen, or even a mattress and also without food. He was refused food and access to bathroom facilities. He was photographed (with a hand held polaroid camera) against his will and, when voicing his refusal to be photographed, the photographer informed Mr. Shannon Hanna that he did not care whether or not Mr. Shannon Hanna consented to be photographed. Mr. Shannon Hanna's phone calls were tapped. He was woken up in the middle of the night numerous times and questioned without the presence of his parents or an attorney. Officer Martin threatened to break Mr. Shannon Hanna's arms in order to coerce fingerprints from him and also told him that he would have to wait to use bathroom facilities until he was transferred to the Pinellas County Jail the next day. The administrator of the Juvenile Assessment Center, having seen Mr. Shannon Hanna's refusal to cooperate, vocally observed that she thought that he wanted to be punished. On the following morning Mr. Shannon Hanna was shackled and handcuffed against his will and was transported to the Pinellas County Jail where he spent the entire day and night of Monday, January 25, 1999. The next day, Tuesday, he was handcuffed, shackled, and transported to face a judge over an audio-video system. The judge ordered the immediate release of Mr. Shannon Hanna because the accusation against him was not sufficient enough for detention. Again Mr.

Shannon Hanna (handcuffed and shackled) was returned to the Juvenile Assessment Center and from there once again transferred to the Pinellas County Jail (handcuffed and shackled) where he was finally released. When Mr. Shannon Hanna was released he was told that nothing would probably arise from this and that he would receive confirmation in the mail which he should keep as evidence.

## XXX.

Mr. Shannon Hanna was released into the custody of a family friend, the Mostafa family, along with his brother, Mr. Jasen Hanna. They stayed with the Mostafas for approximately one week. After that time they went to live in the plaintiffs' home with a full-time nanny. During this time the Hanna children were in close communication with their father, Mr. Nagy Abdalla, who was in the Pinellas County Jail. During the time they resided in their own home Mr. Shannon Hanna expressed over the phone, numerous times, to his father that he was determined to testify in court on his father's behalf. Only after stating that desire to his father, who was calling from the Pinellas County Jail, did Ms. Florita Weems, Department of Juvenile Justice, begin to call the plaintiffs' residence and leave messages to Mrs. Paulette Hanna (who at the time was still in the Pinellas County Jail), asking for Mrs. Hanna to return her call regarding the charges against Mr. Shannon Hanna. Ms. Florita Weems was fully aware that Mrs. Paulette Hanna did not, at that time, reside in her home. The purpose of these phone calls was simply to intimidate and coerce a witness in order to prevent him from testifying against the state. More than thirty days passed and no formal petition or information had been filed by the State Attorney's Office charging Mr. Shannon Hanna with a violation of the law. When Mr. Shannon Hanna, on March 8, 1999, went to his father's mock trial and took the witness stand to testify on his father's behalf the State Attorney, at the same time, filed a petition, forty-three days after his false arrest by the Pinellas County Sheriff's Office and thirteen days beyond the deadline allowed to the state by the law, against Mr. Shannon Hanna falsely alleging fabricated criminal violations against him and asked the court to issue

process to bring Mr. Shannon Hanna before it so that he might be "dealt with according to law." In this petition the state failed to mention the reason for their delay.

Between March, 1999 and July, 1999 Mr. Shannon Hanna submitted several instruments to the court of Judge Peter Ramsberger and all were either overlooked, ignored, or orally denied without being properly reviewed or considered by the court. Between March, 1999 and July, 1999 several complaints were filed against Judge Peter Ramsberger but, in spite of all of this, Judge Ramsberger still illegally continued the proceedings against Mr. Shannon Hanna. Judge Ramsberger illegally and unlawfully interrogated the defendant's witnesses in open court on March 31, 1999 (Mr. Jasen Hanna, eight years old), giving the state the advantage of acquiring information which they utilized by attempting to murder Mr. Jasen Hanna, the youngest child in the Hanna family, by poisoning him in his school (Pasadena Community Church School; under the supervision of his teacher, Ms. Jennifer Catcott, the church pastor, Reverend Cliff Melvin, and his principle, Ms. Diane Knoke). The preferred method of the State Attorney's Office, this was the second instance of attempted murder against one of the Hanna children through the use of narcotics, designed to give the State an advantage for the purpose of securing another illegal victory against the plaintiffs. Judge Peter Ramsberger went as far as to hold a trial without a plea of any kind, without announcing the defendant ready, without a demand or request from Mr. Shannon Hanna or from his parents for a trial (indeed, with a complete refusal to proceed to trial), with no valid charges or a valid petition against Mr. Shannon Hanna, without the participation of any of the plaintiffs in this trial (including all witnesses on the defendant's behalf), and while complaints against Judge Peter Ramsberger were before the Judicial Qualifications Commission in Tallahassee, FL. Judge Peter Ramsberger fulfilled the criteria of a biased judge but, in spite of all of this, he found Mr. Shannon Hanna guilty, beyond a reasonable doubt, without having heard testimony or evidence on Mr. Shannon Hanna's behalf. Judge Peter Ramsberger also held a sentencing hearing on June 23, 1999 against Mr. Shannon Hanna and claimed him to be a delinquent child. Judge Ramsberger sentenced Mr. Shannon Hanna by ordering six months

community control, that Mr. Shannon Hanna write a letter of apology to Deputy Roscoe Dobson for "noncompliance with the deputy's directives," that Mr. Shannon Hanna write a one-thousand word essay on the need for compliance with the law, and that Mr. Shannon Hanna perform fifty hours of community service outside of his home. Furthermore Judge Ramsberger failed to provide Mr. Shannon Hanna with any telephone number, names, or addresses of any probation agents or provide Mr. Shannon Hanna with any documentation to sign, nor did the Judge introduced Mr. Shannon Hanna to any social worker, agent, or employee of the Department of Juvenile Justice so that Mr. Shannon Hanna might carry out the Judge's instructions. Judge Ramsberger also gave no deadline or timetable for Mr. Shannon Hanna to initiate any action regarding this supposed court order. All of the illegal activities committed by Judge Ramsberger and the Pinellas County State Attorney's Office were committed with the cooperation and with the assistance of Ms. Michelle Mason.

On July 3, 1999 the Clerk of the Circuit Court sent the plaintiffs an altered document with the following evidence of fabrication: the petition number was incorrect, the document falsely stated that the petition was "duly filed," the document falsely stated that the child waived the right to an attorney, the document falsely stated that the court was "fully advised in the premises", the document falsely stated that the court "has jurisdiction over the child," the document falsely stated that Mr. Shannon Hanna had been found guilty, the document falsely stated a time limit of five days for a letter of apology to be written, and the document falsely stated that "the child shall contact the Juvenile Justice counselor this day." This document was falsely and illegally prepared and filed, with careful consideration given to fabricated dates and timetables, in order to falsely consider Mr. Shannon Hanna to have already violated the order upon its receipt.

All these violations against Mr. Shannon Hanna were committed by Judge Peter Ramsberger, State Attorney Bernie McCabe, Assistant State Attorney Michelle Mason, Clerk of the Circuit Court Karleen F. DeBlaker and her deputy clerks, Pinellas County Sheriff Everett Rice, Pinellas

County Sheriff's Deputy Roscoe C. Dobson, Pinellas County Sheriff's Deputy Jeffrey Preising, Pinellas County Sheriff's Deputy James R. Cavagnaro, Pinellas County Sheriff's Deputy Lance R. Chambers, Pinellas County Sheriff's Deputy Norman Cramer, Pinellas County Sheriff's Deputy Martin, personnel and employees of the Pinellas County Jail, Forensic Specialist Karen S. Greul, Ms. Florita Weems (under the supervision of Secretary William Bankhead and Deputy Secretary Francisco Alarcon, from the Florida Department of Juvenile Justice), et al. in order to harm or destroy Mr. Shannon Hanna's education, well-being, future, and life so that he would never be able to testify to the crimes committed against him and his family in this *Racist Religious Conspiracy*.

## XXXI.

From September, 1997 to the present day the plaintiffs sent several complaints, regarding the crimes committed by the participants in this *Racist Religious Conspiracy* who were attempting to undermine their appeal and those who were attempting to cover up the fact that the plaintiffs had won their appeal, to the Second District Court of Appeals. All complaints were addressed to the Clerk/s and the Judges of the Second District Court of Appeals; Mr. William A. Haddad, Mr. James Birkhold, Chief Judge Jerry R. Parker, Judge Paul W. Danahy Jr., Judge Richard H. Frank, Judge David F. Patterson, Judge Chris W. Altenberd, Judge Richard A. Lazzara, Judge James W. Whatley, Judge Montery A. Campbell, Judge Jack R. Schoonover, Judge Edward F. Threadgill, Judge John R. Blue, Judge Carolyn K. Fulmer, Judge Peggy A. Quincy, and Judge Steven T. Northcutt.

## XXXII.

During the first few months of their residence, in late 1996 or early 1997, at 5398 12th Ave. N., Mr. Richard Tuten and Mrs. Kristina Tuten individually or cooperatively trespassed on the

north side of the plaintiffs' property, removed and relocated the plaintiffs' property survey flags, and cut down several trees and other forms of vegetation on the plaintiffs' property. These acts were committed without notifying the plaintiffs and without the permission or consent of the plaintiffs. After being confronted Mr. And Mrs. Tuten threatened to cut down more of the plaintiffs' trees and build a fence on the plaintiffs' property. These acts were timely committed against the plaintiffs' for the purpose of creating more problems for the plaintiffs, depriving the plaintiffs of the privacy their trees afforded them, facilitating illegal acts of surveillance against the plaintiffs, and to distract the plaintiffs from defending themselves from the criminal acts being committed and prepared against them by participants in this *Racist Religious Conspiracy*.

## XXXIII.

Between March 15, 1994 and June, 1999 Mr. Michael H. Day and his wife, Mrs. Day, (who resided at the St. Vincent's Episcopal Church property at 5441 9th Ave. N., located across the street from the plaintiffs' property) willingly and knowingly allowed, on numerous occasions, various law enforcement, and other individuals, to illegally surveille the plaintiffs' home from the Days' home and the church property. These acts directly implicate Mr. And Mrs. Days as active participants in this *Racist Religious Conspiracy* against the plaintiffs.

## XXXIV.

In the summer of 1995 Mr. Nathan Hanna was attending a driver's education course at Boca Ciega High School. He was instructed by the driving instructors to apply for a driving permit so that he would be able to begin practicing on the road. The driving instructors told all of the students to make appointments at the Department of Highway Safety and Motor Vehicles to get their permits. The instructors also said that students without social security numbers or those who were not sure if they had them should just say they do not have one to make things go faster. Mr.

Nathan Hanna and his mother, Mrs. Paulette Hanna, went to the Department of Highway Safety and Motor Vehicles, applied for a driving permit, and correctly stated, on the application, that Mr. Nathan Hanna did not have a social security number. Issuance of the permit was delayed a number of times. The first time the Motor Vehicles personnel objecting to issuing a permit without a social security number, but they began the procedure to issue a permit after being informed of the fact that people who were never assigned a social security number were not required to apply for social security numbers in order to be issued a permit or a driver's license. Mr. Nathan Hanna took an eye exam and was told that he would have to obtain a new pair of prescription glasses and retake the exam. Mr. Nathan Hanna obtained a new pair of prescription glasses and returned to the same office to have his permit issued. At this time the Motor Vehicles employees started to argue with Mrs. Paulette Hanna regarding the social security number issue and they asked Mr. Nathan Hanna and his mother, Mrs. Paulette Hanna, to come back to the office the following day. Mrs. Paulette Hanna noticed peculiar behavior, not only from the motor vehicles personnel, but also from bystanders in the motor vehicles office. The following day, June 27, 1995, Mrs. Paulette Hanna and Mr. Nathan Hanna went to the motor vehicles office to receive the permit. Mrs. Paulette Hanna waited in the parking lot while Mr. Nathan Hanna went into the motor vehicles to receive his permit. Mr. Nathan Hanna was told by the motor vehicles personnel that Mrs. Paulette Hanna would have to come into the office because of the social security issue. Mr. Nathan Hanna then went to the parking lot and brought Mrs. Paulette Hanna into the motor vehicles office. Mrs. Paulette Hanna and Mr. Nathan Hanna then repeated the fact that people without social security numbers were not required to apply for them in order to be issued driver's permits or licenses. After the driver's license personnel looked into the matter and realized the truth of what Mr. Nathan Hanna and Mrs. Paulette Hanna were stating they began the process of issuing a permit to Mr. Nathan Hanna. Mr. Nathan Hanna had his picture taken and then went to wait in the waiting room while Mrs. Paulette Hanna waited in the parking lot. After waiting Mr. Nathan Hanna was told to come into a back office of the Driver's license office where  Pinellas County Sheriff's Deputy Janice Jones Thibodeaux was waiting. The deputy

interrogated Mr. Nathan Hanna without his parents present, in the hopes of creating a problem or contriving an excuse to arrest Mr. Nathan Hanna. The deputy questioned Mr. Nathan Hanna about whether or not he had a social security number and Mr. Nathan Hanna repeated that he did not. The Sheriff's Deputy then supposedly called a Social Security office on a speaker-phone and forced Mr. Nathan Hanna to inquire with the woman who answered whether or not Mr. Nathan Hanna had a Social Security number. The woman answered that he did. Mr. Nathan Hanna repeated that he did not have a social security number and did not know how he could have one. Mr. Nathan Hanna was then asked where his mother was but, upon going into the parking lot to get her, he found that she was no longer there. Mr. Nathan Hanna then called his home but, just as the phone was being picked up, Mrs. Paulette Hanna had arrived at her home and instructed the other members of the Hanna family to hang up the phone. Mr. Nathan Hanna then had to wait in the motor vehicles office until his mother, Mrs. Paulette Hanna, and his father, Mr. Nagy Abdalla, arrived. Mrs. Paulette Hanna went into the office where Mr. Nathan Hanna was but Mr. Nagy Abdalla was prevented from entering the office by a large male employee of the motor vehicles office, Mr. Ross Wilcox, and was told that Mr. Nathan Hanna was being interrogated as part of an ongoing investigation. Mr. Nagy Abdalla demanded the release of Mr. Nathan Hanna and stated that the investigation was being conducted against the will of Mr. Nathan Hanna and his parents. The motor vehicles employee who was blocking the back office door and keeping Mr. Nagy Abdalla out by physical intimidation then began yelling to the other motor vehicles employees to call the Sheriff's Office, when a Sheriff's deputy was already supposed to be in the back office interrogating Mr. Nathan Hanna and Mrs. Paulette Hanna. Mrs. Paulette explained to the deputy that Mr. Nathan Hanna had no social security number and that, though he had applied for one a year before, he was never issued one. Mrs. Paulette was accused of lying by a motor vehicles employee (Ms. Lynn Watkins), was arrested by the Pinellas County Sheriff's Deputy, and was brought to the Pinellas County Jail where she was accused of driver's license fraud, resisting arrest without violence, and disorderly conduct. Pinellas County Sheriff's Deputies J. Gleason and A. Laughlin falsely claimed to have conducted an investigation and

falsely claimed to have found that Mr. Nathan Hanna had a social security number.

Mrs. Paulette Hanna bonded out from the Pinellas County Jail through her husband, Mr. Nagy Abdalla, and *Action Bail Bonds* on June 27, 1995. A short time later Mr. Nathan Hanna received an application in the mail for a pre-approved credit card that required him to fill in only his name, his social security number, and his signature. Mr. Nathan Hanna did not have a social security number and so was not interested in applying for a credit card that required a social security number.

Mr. Jawdett Rubaii acted as counsel for Mrs. Paulette Hanna at the time and entered a *not guilty* plea. The State Attorney's Office, within the thirty-day time limit, consolidated the charges, crossed out the charges on August 3, 1995, and filed *no information* on August 3, 1995 at 5:16 P.M. A copy of the no information was mailed to the office of Mr. Jawdett Rubaii. The plaintiffs obtained a copy of the *no information* after several requests to a Ms. Wanda (an employee in Mr. Jawdett Rubaii office), who claimed several times that she had mailed a copy to the plaintiffs but that they had not received it. Mr. Nagy Abdalla finally had to make a personal visit to the office of Mr. Jawdett Rubaii to obtain a copy of the *no information*.

The plaintiffs mailed Ms. Mary Handsel, Assistant State Attorney, a letter, dated July 27, 1995, regarding the criminal corruption and the Jewish ideological corruption adversely affecting the lives of the American people. The letter was also directed and mailed to Senator Bob Graham, Senator Connie Mack, Sheriff Everett Rice, Mayor David Fischer, Governor Lawton Chiles, and the St. Petersburg Chief of Police. Immediately after Ms. Mary Handsel received the plaintiffs' certified letter, on or about August 8, 1995, Mrs. Paulette Hanna received a notice of hearing, dated August 10, 1995, for some of the charges that had been dropped by the State Attorney's Office. Assistant State Attorney Melissa Cardy and Assistant State Attorney Richard McKyton assisted in proceeding with the dropped charges against Mrs. Paulette Hanna.

Mrs. Paulette Hanna was constantly forced to attend hearings at the Pinellas County Courthouse numerous times over a period of several months, from August 1995 through November 13, 1995. During this time the files disappeared and reappeared and documents were falsified and tampered with after the originals had been stolen. The files finally had to be hidden for several weeks while the State Attorney, Judge William Overton, and Clerk of the Circuit Court Karleen F. DeBlaker worked to apply pressure on and intimidate Mrs. Paulette Hanna to coerce her into entering a plea of *guilty*, especially after Mrs. Paulette Hanna had dismissed Mr. Jawdett Rubaii and had withdrawn the plea entered by him on her behalf. Judge William Overton could not face the fact, of which he was informed of in open court, that the files he had in his hands were falsified copies and that the charges were dropped, remained dropped, and had never been reinstated. Judge Overton, the Clerk of the Circuit Court, the State Attorney, et al. insisted, however, on holding hearing after hearing and played an active role in destroying Mrs. Paulette Hanna's morale and ability to defend herself. They forced her, in open court and under the most severe threats and intimidation, to enter a plea of *nolo contendere*. Mrs. Paulette Hanna was then fined one-hundred and twenty dollars with credit given for jail time. Judge William Overton instructed Mrs. Paulette Hanna to pay the fine to the Clerk of the Circuit Court when he was fully aware that there were no valid charges against Mrs. Paulette Hanna and that no crime deserving such a fine existed on the record. Mr. Jawdett Rubaii and his assistant, Mr. Jack White, had continually lied to Mrs. Paulette Hanna, telling her that the charges against her were never dropped, that the State Attorney had the right to re-instate dropped charges whenever they wished, and that these hearings and schedules were perfectly legal, and they refused to ask for the matter to be dismissed.

## XXXV.

Mr. Nathan Hanna was refunded the money he had paid to the Department of Highway Safety and Motor Vehicles for the issuance of a driving permit on June 27, 1995. He was also given back

his application for the driving permit and he was told, by Mr. Ross Wilcox, that no permit would be issued to him without a social security number.

Some days later the majority of the cars being used for the driver's education course at Boca Ciega High School, where Mr. Nathan Hanna was taking his course, were vandalized during the night while they had been parked at the school. All of these acts were done to illegally prevent Mr. Nathan Hanna from driving and to keep him, as well as all other members of the Hanna family, under a tight restriction of their freedom of movement. Later, the Pinellas County Schools took an active role in covering up the criminal activities and the effects of these crimes upon Mr. Nathan Hanna's education by falsely altering his grade in the driver's education course from a *D* to a *B* on the forms used for issuance of student's report cards under the supervision of Ms. Barbara Poanessa. This fabrication was committed as part of a cooperative effort between the Pinellas County Schools, the Social Security Administration, and the Department of Highway Safety and Motor Vehicles in order to create the illusion that the crimes committed against Mr. Nathan Hanna had had no effect on his education and to cover-up evidence of those crimes.

## XXXVI.

The plaintiffs contacted the Social Security Administration numerous times (between 1996 and 1997), inquiring whether or not Mr. Nathan Hanna had a social security number, because Mr. Nathan Hanna had actually applied for a social security number in order to obtain a summer job and had been told that he had to wait for thirty days for his social security number. When Mr. Nathan Hanna received no social security number after the allotted time had passed the plaintiffs went to the social security office a number of times inquiring about the social security application status for Mr. Nathan Hanna, but the social security employees could not find any trace of Mr. Nathan Hanna's social security application. They voluntarily stated that the application was most likely lost or disposed of, in spite of the fact that the application was personally handed to the

office, and suggested that Mr. Nathan Hanna reapply for a social security number. During their second visitation to the social security office in St. Petersburg Mr. Nagy Abdalla and Mrs. Paulette Hanna, accompanied by their infant son Mr. Jasen Hanna, were discussing the matter with the social security clerk while there was an attempt, by two well-dressed ladies, to kidnap Mr. Jasen Hanna while the office security guards were conveniently not present. This visitation took place late in the summer that year and so Mr. Nagy Abdalla and Mrs. Paulette Hanna found no reason to apply for a social security for Mr. Nathan Hanna because his chance to get a summer job had already been lost. When Mrs. Paulette Hanna looked at one of the ladies suspiciously, while they were attempting to communicate with Mr. Jasen Hanna, one of the ladies replied that he was so cute (referring to Mr. Jasen Hanna). Mr. Nagy Abdalla and Mrs. Paulette Hanna left the social security office after they noticed that the two ladies left the social security office without conducting any business. Mr. Nagy Abdalla and Mrs. Paulette Hanna immediately went to a Staples office supply store on 34th St. and 22 Ave. N., St. Petersburg. In the parking lot Mr. Nagy Abdalla and Mrs. Paulette Hanna discovered that they had been stalked by the same two ladies from the social security office, who passed in front of the plaintiffs' car and behaved strangely when they were noticed by Mrs. Paulette Hanna. Mr. Nagy Abdalla canceled his business at the Staples office supply store, returned to his car, and took his wife and son home.

## XXXVII.

In August 1993 Mr. Nathan Hanna began his first year of High School at Northeast Senior High School, Pinellas County, FL. Mr. Nathan Hanna was allowed no input in his class placement and was intentionally placed in some of the lowest level classes, with extremely poor academic standards. Mr. Nathan Hanna was even placed in courses which he had completed twice before. These actions were intentionally committed by the school personnel for the purpose of maliciously damaging Mr. Nathan Hanna's education in the fulfillment of the *Racist Religious Conspiracy* against the plaintiffs. When Mr. Nagy Abdalla and Mr. Nathan Hanna protested, and took steps

to have Mr. Nathan Hanna placed in higher level academic courses, not all of the intentional mis-placements were rectified. Though Mr. Nathan Hanna was allowed entrance into the honors level freshman science course, he was barred from entering the honors level freshman mathematics course. Mr. Nathan Hanna, at first, had been intentionally placed in a math course two years below his academic level and was allowed, only after protesting, to move up one year in level to a course he had already taken. Mr. Nathan Hanna and his family were intentionally deprived of all information regarding advanced programs offered in Pinellas County and Pasco County Schools and were intentionally misled regarding placements to those programs which they later attempted to enroll Mr. Nathan Hanna in.

## XXXVIII.

On August 24, 1995 Mr. Nagy Abdalla, Mrs. Paulette Hanna, and Mr. Nathan Hanna met with Mr. Don Driskell, the International Baccalaureate Program coordinator at St. Petersburg High School, in Mr. Driskell's Office. The plaintiffs explained to Mr. Driskell the exact academic standard and level of Mr. Nathan Hanna including his grades and the courses he was taking. The plaintiffs inquired with Mr. Driskell regarding the possibility of placing Mr. Nathan Hanna into the International Baccalaureate Program. Mr. Driskell inquired with Mr. Nathan Hanna regarding criteria and other information, determined that Mr. Nathan Hanna was eligible and qualified to enter the International Baccalaureate Program, and stated that he would happy to accept Mr. Nathan Hanna into the International Baccalaureate Program as soon as Mr. Nathan Hanna submitted the I.B. application, some teacher recommendations, and previous school grades. One week later, however, after receiving the requested paperwork, Mr. Driskell, by letter, informed the plaintiffs that he had changed his mind regarding Mr. Nathan Hanna's eligibility for the program and denied Mr. Nathan Hanna admission. The plaintiffs unsuccessfully attempted, in several ways, to have Mr. Nathan Hanna enrolled in the International Baccalaureate Program. Those who participated in the *Racist Religious Conspiracy* against the plaintiffs, however,

secured Mr. Nathan Hanna's exclusion from the International Baccalaureate Program.

## XXXIX.

During his senior year in high school, the 1996-1997 school year, Mr. Nathan Hanna applied for federal student financial aid through a *F.A.F.S.A.* (Free Application for Federal Student Aid) application that was to be processed by the Department of Education in Washington. Mr. Nathan Hanna received several correspondence from the department informing him that the application would not be processed if he did not have a social security number and that he would not be granted access to federal aid without a social security number. Mr. Nathan Hanna was discriminated against and was denied any federal student aid. In spite of all the efforts of certified correspondence between the plaintiffs and the Department of Education in Washington, the plaintiffs' correspondence was always intercepted and responded to by Mr. William J. Ryan (Director, training and program information division), who appears to be a person without the jurisdiction, qualifications, or education to handle the matter. Mr. Ryan cited certain laws as an excuse for his actions of refusing to process Mr. Nathan Hanna's application for federal student aid. When the plaintiffs examined the law they found that it was to the favor of Mr. Nathan Hanna and explained to the Department of Education that the absence of a social security number could not be utilized as a legal reason or excuse to deny the process of his application or to deny him equal access to federal funds. The same person continued to respond to the plaintiffs' correspondence with the same exact excuse. Mr. Nathan Hanna was never granted federal aid for college and he was denied equal access and use of federal assistance for his education.

## XXXX.

As a result of their correspondence with the Department of Education in Washington, Mr. Nagy Abdalla and Mr. Nathan Hanna sent several certified correspondence to the Social Security

Administration, approximately between 1996 and 1997, inquiring about the status of Mr. Nathan Hanna's social security number, if there was any. The Social Security Administration, through Mr. C.F. Coulter and Mr. Charles H. Mullen, responded to the plaintiffs by stating that without a newly submitted application for a social security number they would not be able to find out if Mr. Nathan Hanna had any social security number. The Social Security Administration also enclosed in their correspondence an application already marked to state that a previous social security number had been issued for the applicant, Mr. Nathan Hanna, and also marked that he was re-applying for a social security number. They requested that Mr. Nathan Hanna complete the remainder of the application and that he place his signature upon it. Mr. Nathan Hanna and Mr. Nagy Abdalla considered the application to be nothing more than an attempt to cover up the Social Security Administration's involvement and participation in this *Racist Religious Conspiracy*.

The correspondence continued from both sides, the plaintiffs and the Social Security Administration, with great persistence from the Social Security Administration in refusing to provide the plaintiffs with the truth: that Mr. Nathan Hanna did not have a social security number and had never been issued a social security card. When Mr. Nagy Abdalla called the Social Security Administration on August 29, 1996, inquiring about the social security status of Mr. Nathan Hanna, he was told, by the social security office over the phone, that there was a social security number, issued to Mr. Nathan Hanna, "yesterday" (August 28, 1996; the day before the call). The Clerk even gave the number to Mr. Nagy Abdalla. After this information was stated over the phone there were a number of prolonged interruptions, disturbances, and interferences in the conversation, created by other employees in the social security office, and the clerk began to ask irrelevant questions to divert from the subject and finally had to change the information she had previously stated to Mr. Nagy Abdalla, stating that the social security number had been issued to Mr. Nathan Hanna long before the date she had given. When Mr. Nagy Abdalla inquired about the date of issuance of this number the clerk could not identify the date or answer the question

and continued to change the subject numerous times, refusing to answer the question. The call was finally terminated.

## XXXXL

Mr. Nathan Hanna submitted an application for scholarships to the Pinellas County Education Foundation (mailed on January 28, 1997 and received on January 29, 1997) c/o Ms. Deborah Stone, the Education Foundation Scholarship Advisor. Pursuant to instruction printed in the scholarship application, Mr. Nagy Abdalla called the office to inquire about the receipt of Mr. Nathan Hanna's application and whether or not there were any results regarding this application. Ms. Deborah Stone  told Mr. Nagy Abdalla, over the phone, that they had just received the money and that Mr. Nagy Abdalla would have to call within one month in order to be informed of the results. Ms. Stone was overly friendly and cooperative. When Mr. Nagy Abdalla called after the thirty days had elapsed the same Ms. Stone, with the same overly friendly demeanor, informed Mr. Nagy Abdalla that Mr. Nathan Hanna's application had been denied because Mr. Nathan Hanna had failed to provide his grades. This was used as an excuse in spite of the fact that application clearly stated that students should not attach report cards or grade transcripts and that these documents would be requested later, if needed. Ms. Stone not only failed to inquire about Mr. Nathan Hanna's grades but also made sure that Mr. Nathan Hanna's application would be kept long enough in her office, without contacting Mr. Nathan Hanna, his school, or his parents, until the money would run out. This was done in order to cripple Mr. Nathan Hanna's efforts to continue his education, in the hopes of undermining, damaging, or even preventing Mr. Nathan Hanna's college education as part of the ***Racist Religious Conspiracy*** being coordinated against the plaintiffs. That year nine-hundred and seventy students were granted a variety of scholarships by the Pinellas County School Student Financial Aid. The valedictorian of Lakewood High School, Mr. Nathan Hanna, was not among these students. Attempts to investigate the evident subversion of Mr. Nathan Hanna's educational interests in this matter were prevented by Mr. John

Bowen, who actively assisted in covering up any evidence of the crimes committed against Mr. Nathan Hanna.

## XXXXII.

This campaign against Mr. Nathan Hanna, that was intended to prevent him from receiving any form of financial aid for college, was conducted not only by and through the Department of Education and other governmental agencies, but also by the United States Postal Service, who played an integral role in the campaign to prevent Mr. Nathan Hanna from receiving financial aid for college by tampering with, mis-delivering, losing, delaying, etc. the plaintiffs' mail.

The United States Postal Service intentionally committed several crimes against the plaintiffs (from 1995 until the present day), including switching the plaintiffs' mail, several times, with the mail for another house across the street (5401 11th Ave. N.). When the plaintiffs returned the mis-delivered mail to the Crossroads Station Post Office they were assured by the mail carrier that there had been mail for them on the day they received the mis-delivered mail. The post office, however, failed to return the plaintiffs' mail. Mr. Chriss Arbisi and Ms. Maurene Gray, who rented the home for only a short time, actively participated in this *Racist Religious Conspiracy* by intentionally stealing the plaintiffs' mail and constantly monitoring the plaintiffs' activities.

The United States Postal Service continued to insist that no problem existed and that they had no intention of correcting anything, even though the plaintiffs had gathered several substantial pieces of evidence and had confronted Mr. Arthur Pelletier, the Crossroads Station manager, Ms. Carol Jones, from the Crossroads Station Post Office, and the Postmaster General in Washington, D.C. The Postal Service found their method of retaliation and participation in this *Racist Religious Conspiracy* through the fabrication of information regarding legal mail between the City of St. Petersburg and the plaintiffs, which allowed the City of St. Petersburg to illegally

proceed with matters regarding city ordinances in the hopes of forcing the plaintiffs into disposing of evidence of criminal activities conducted against them by the participants in this *Racist Religious Conspiracy*. These actions by the Postal Service allowed the City of St. Petersburg to proceed with illegal proceedings against the plaintiffs and place false liens on the plaintiffs' property, in order to assist in financially weakening and destroying the plaintiffs'. The United States Postal Service also stole a check, which was supposed to pay for a post office box Mr. Nagy Abdalla had had in Jersey City, NJ for more than ten years. This was done to illegally close the post office box and intentionally dispose of Mr. Nagy Abdalla's mail by returning it to the sender or simply having it disappear. This was done while Mr. Nagy Abdalla was unlawfully incarcerated in the Pinellas County Jail.

## XXXXIII.

The plaintiffs have been targeted by the Jewish criminal community and their dogs, their connections, their associates, et al., not only to destroy the plaintiffs physically but also to exhaust the plaintiffs financially. The plaintiffs' businesses have been targeted for destruction one after another, even when Mr. Nagy Abdalla chose to conduct his businesses under the names of other members of his family. Mr. Nagy Abdalla rented a concessions department in McCrory Department Store in Dolphin Village, St. Pete Beach, FL from 1993 through 1994. The Department Store was managed by Mr. George Latzo, who was occasionally assisted by his wife, Ms. Rose Ann Latzo. The region manager for this area was Mr. Dan McKnabb, whose spouse was a member of the State Attorney's Office. Each of these individuals participated in the *Racist Religious Conspiracy* against the plaintiffs in a variety of ways. With the instruction and the assistance of the ex-governor of Pennsylvania, Mr. Casey, who used to call Mr. George Latzo on a daily basis to receive the report of Mr. Latzo's criminal activities against Mr. Nagy Abdalla's business. Mr. George Latzo, et al. conducted a boycott campaign, a systematic theft of merchandise, continuos slandering of the business's reputation among clientele, and more against

Mr. Nagy Abdalla and his business. Under the deceptions, threats, and intentionally intimidating actions of Mr. George Latzo, Mr. Nagy Abdalla was often forced to work in the McCrory store for free. Mr. George Latzo also attempted, numerous times, to create business difficulties for Mr. Nagy Abdalla between Mr. Nagy Abdalla and his clientele, between Mr. Nagy Abdalla and McCrory employees and personnel, and others. Mr. George Latzo used to instruct Mr. Nagy Abdalla to repair electrical wiring and switches for the McCrory store while, at the same time, he would report Mr. Nagy Abdalla's work to the fire department inspectors, stating that Mr. Nagy Abdalla did not have a license to perform electrical work. Mr. George Latzo also created difficulties with the financial transactions of Mr. Nagy Abdalla's business. Mr. George Latzo also spied and closely monitored Mr. Nagy Abdalla's and the other plaintiffs' activities and reported them to his criminal associates in this *Racist Religious Conspiracy*. Mr. George Latzo used to threaten and intimidate Mr. Nagy Abdalla's employees in order to force them to quit their jobs, so that Mr. Nagy Abdalla would be forced to work seven days a week for a total of eighty hours per week, in order to destroy Mr. Nagy Abdalla's business and exhaust his mental and physical ability to conduct and maintain his business. Mr. George Latzo intentionally incited several acts of theft against Mr. Nagy Abdalla by hiring teenage drug-addicts to work for the McCrory store and verbally bringing to their attention how valuable Mr. Nagy Abdalla's merchandise was and how easily the merchandise could be lost, since none of it was inventoried. Mr. George Latzo also covered up and participated in several instances of theft by falsifying police reports after the thefts were reported and investigated by Sargeant Bentley, of the St. Pete Beach Police Department. Mr. George Latzo effected the falsification of these reports with the assistance of Mr. "Charlie," a former McCrory manager, by acting to change the police officer's conclusion to shoplifting, in lieu of her initial conclusion of theft, in order to protect McCrory stores and Mr. George Latzo from any liability or responsibility. With the assistance of Mr. Robert Sandberg, from the real-estate manager's office for Dolphin Village Shopping Center, Mr. George Latzo planned and executed the towing of Mr. Nagy Abdalla's twenty-six foot U-haul truck, which was being used as Mr. Nagy Abdalla's business storage area (containing merchandise and business equipment)

Page 115 of 152

and which was parked behind the McCrory store, on December 31, 1993. The towing of the truck destroyed almost the entire stock of Mr. Nagy Abdalla's business and caused Mr. Nagy Abdalla a huge financial loss that eventually proved fatal to his business. This towing was also timely carried out for the purpose of creating as much psychological harm as possible to Mr. Nagy Abdalla and the other plaintiffs during the holiday season. Mr. George Latzo and Mr. Dan McKnabb campaigned against Mr. Nagy Abdalla in the McCrory administration to have his business agreement with McCrory stores terminated. Mr. Nagy Abdalla filed several complaints with McCrory stores regarding the criminal activities of Mr. George Latzo and Mr. Dan McKnabb and gave McCrory stores three days to remove Mr. George Latzo from the store or to build a security divider around Mr. Nagy Abdalla's concession area. After the three days elapsed, with no response or actions from McCrory stores, Mr. Nagy Abdalla decided to prevent further loss and risk of physical attempts on his life and financial well being by closing his business. After Mr. Nagy Abdalla's departure Mr. Robert Sandberg was promoted to a higher position as a reward for his participation in this *Racist Religious Conspiracy*.

In 1993 the participants in this *Racist Religious Conspiracy* intentionally created an oil spill on St. Pete Beach, for the purpose of discouraging tourists and other visitors to the area from visiting the beach and patronizing the area businesses, in another plot to destroy Mr. Nagy Abdalla's business. The oil spill had an extremely negative affect on Mr. Nagy Abdalla's financial well being and assisted in destroying his business.

Mr. Jawdett Rubaii handled a 1994 civil action against the Dolphin Village Shopping Center management and S&R Towing and Recovery, Inc. regarding the unlawful towing of Mr. Nagy Abdalla's truck and the tremendous damage inflicted upon the contents and upon the truck itself. Mr. Jawdett Rubaii used his influence as a plaintiff's attorney to delay this action for years so that Mr. Nagy Abdalla would never receive compensation for the losses intentionally inflicted upon his business and to prevent Mr. Nagy Abdalla from securing his financial ability to recover from

the damage, in spite of the fact that Mr. Nagy Abdalla telephoned Mr. Jawdtt Rubaii's office daily, for months, to inquire on the status of the case. In each and every call Mr. Nagy Abdalla was told that Mr. Jawdett Rubaii was not in his office and though Mr. Nagy Abdalla continued to leave messages for Mr. Rubaii none of these messages was ever granted a response.

## XXXXIV.

In 1992 Mr. Nagy Abdalla had opened another retail gift shop on the Radison Boardwalk at Sand Key Beach, FL. Here, also, Mr. Nagy Abdalla was targeted through a peculiar oil spill and the red tide, both which discouraged tourism and discouraged visitors from patronizing the area businesses. These specially contrived conditions eventually led Mr. Nagy Abdalla's business to financial ruin. Even though Mr. Nagy Abdalla had placed his business under the name of another family member it was still intentionally targeted and eventually destroyed as a part of this *Racist Religious Conspiracy*.

## XXXXV.

On February 26, 1993 Mr. Nagy Abdalla and Mrs. Paulette Hanna rented an apartment in Palm View Garden Apartments on 54th Ave. S., St. Petersburg, FL. The plaintiffs continued to live there under a lease for a period of seven months The maintenance personnel, under the supervision of the management office, regularly entered the plaintiffs' apartment when the plaintiffs were not present and observed, examined, and literally spied on the plaintiffs' property, including their clothes, refrigerator contents, etc., as well as their personal files and documents. The plaintiffs had to replace the lock for the apartment in order to prevent these and other possible intrusions. This act resulted in retaliation from the maintenance personnel, who began to steal the plaintiffs' mail. The plaintiffs were also told, by the management, that their lease would be automatically renewed, "probably" without any increase in the rent. The plaintiffs were

shocked to find that the management office increased their rent upon the renewal of the lease. The plaintiffs continued to pay the rent in a timely fashion and contacted the office several times regarding the unexpected increase in rent. The office manager attempted to create a problem with her unreasonable and unnecessary insults and rude behavior. When the plaintiffs sent their rent check by certified mail the Investment/Property Manager, Ms. Mauri Rooks-Gordillo, an employee of Balcor Property Management, Inc., received the payment, held the check without cashing it, and filed a case in circuit court to evict the plaintiffs based on a failure to pay rent while she had the check in her possession. She also encouraged the criminal gangs in the neighborhood to vandalize the plaintiffs' two vehicles. The hood ornament on the plaintiffs' Cadillac was stolen and the plaintiffs' other car was damaged, by the use of hammers or similar devices, on both rear doors. The maintenance personnel, under the supervision of the management, continued to open the plaintiffs' apartment door and continued to enter the plaintiffs' apartment, hoping to create as many problems as possible. The maintenance personnel also caused some form of damage to the hot water system, which started to leak hot water into the plaintiffs' apartment. Though the office received several notifications and complaints regarding the leak they never acted to have the problem repaired. The leakage increased and soaked the carpets in the living room, the hallway, and the two bedrooms, and the plaintiffs were forced to live in an apartment with wet carpet for several days. The plaintiffs were finally forced to move out of the apartment after having endured significant damage to their personal belongings, such as furniture, books, clothes, toys, etc.

The plaintiffs took up the burden of hiring Mr. Jawdett Rubaii in this matter and it was handled by counselor Noel White and Mr. Jawdett Rubaii. The plaintiffs attended a 1:00 P.M., April 5, 1995 meeting at the Office of Kanabay & Kanabay Court Reporters, Feather Sound Square, 2325 Ulmerton Road, Clearwater, Florida . When Mr. Nagy Abdalla and his wife, Mrs. Paulette Hanna, arrived at the complex of the office there were two maintenance men from Palm View Apartments waiting in a hidden area outside the office, directly in the path of Mr. Nagy Abdalla and Mrs.

Paulette Hanna. Luckily there were two other individuals who had arrived at the parking lot who were walking the same way. The two men disappeared after Mr. Nagy Abdalla and Mrs. Paulette Hanna passed them without incident. When Mr. Nagy Abdalla and Mrs. Paulette Hanna informed Mr. Jawdett Rubaii of the attempted ambush Mr. Jawdett Rubaii completely changed the subject and refused to address the issue. A judgement was eventually entered against the plaintiffs for eviction. The plaintiffs, however, had already begun the process of moving before the judgement was rendered. Mr. Jawdett Rubaii also coerced the plaintiffs into dropping their counter-claim regarding the damage incurred upon their personal property caused by the leak and the unhealthy environment in the apartment.

## XXXXVI.

On November 2, 1993 the plaintiffs moved to Sunset Place Apartments where they rented a two bedroom apartment. Mr. Nagy Abdalla signed a lease and paid the manager, Ms. Margaret Brooks (an employee of Hunter Management Company, Inc.), of the complex the full amount required in the lease. The property manager, Ms. Margaret Brooks, insisted that Mrs. Paulette Hanna also sign the lease. Before Mrs. Paulette Hanna was able to sign the lease the plaintiffs were targeted by teenage gangs in the neighborhood, who tried to vandalize the plaintiffs' car. The plaintiffs were also targeted by neighbors (whom they did not know) who harassed, insulted, and threatened the plaintiffs regularly. The plaintiffs continued to pay the rent in a timely fashion but the criminal campaign against them worsened and an attempt was made to tow/steal the plaintiffs' limousine from the parking lot of the apartment complex. When Mr. Nagy Abdalla inquired and proceeded to stop the towing, the tow-truck driver, with the assistance of Ms. Brooks, extorted twenty-five dollars from Mr. Nagy Abdalla. The same tow-truck driver returned two days later and physically assaulted Mr. Nagy Abdalla under the supervision and the participation of the management office. Because the management office felt liable for the assault they proceeded with an eviction complaint in court against the plaintiffs. Mr. Jack White handled

a deposition conducted at the office of the attorney for Sunset Place Apartments. At this deposition Mr. Jack White instructed Mr. Nagy Abdalla to answer a number of private questions, put forth by the attorneys for Sunset Place Apartments, that were not related to the issues at hand (such as which schools the Hanna children went to) and which Mr. Nagy Abdalla refused to answer. Mr. Jack White attempted to coerce Mr. Nagy Abdalla and Mrs. Paulette Hanna into answering irrelevant and inappropriate questions and instructed Mr. Abdalla to answer questions, even after objecting to some of them. The attorney for Sunset Place Apartments, after inquiring about the schools the Hanna children attended, and after being refused the information, covered his face with his notebook and whispered to Ms. Margret Brooks, the apartment manager, "Dixie Hollins," meaning Dixie Hollins High School in St. Petersburg, FL. The plaintiffs felt threatened from their experiences and so purchased a house (at 1101 54th St. N., St. Petersburg, FL where they now reside). The plaintiffs were also forced to sell their limousine. During the plaintiffs' movement from their apartment at Sunset Place Apartments some of their furniture was vandalized and damaged and several boxes of their belongings were stolen. The plaintiffs were also falsely accused of damaging the apartment.

## XXXXVII.

The plaintiffs moved from Elizabeth, NJ to Holiday, Florida in August, 1990. They rented the home of a family friend, Mr. Usama Youseff, in Holiday Lake Estates. Their residence at this home secured some semblance of safety for the plaintiffs, in spite of the campaign still being conducted against the Hanna children in their schools to vandalize their educations, on the school buses, and even by police officers who intended to arrest them and charge them with crimes that had not taken place. The campaign arose to such a level that, one night, there was an attempt to attack the plaintiffs' home and the members of the Hanna family. The attack was supposed to be conducted at approximately two-thirty in the morning by four young men, appearing to be members of a military group, who drove a brand-new, full-sized Chevrolet

(Impala or Caprice), and who cruised around the plaintiffs' home several times before police and other authorities began to chase them. There were also several other attempts on the plaintiffs' lives including an attempt to poison the plaintiffs and an attempt to murder or injure a member of the Hanna family by shooting an arrow at them while they were swimming in the family pool. Actions were finally taken to forcibly remove the plaintiffs from the house by murdering Mr. Usama Youseff in Jersey City, NJ. Problems were also created by the real estate agent attempting to sell the house after Mr. Youseff's untimely death. The real-estate agent was successful in creating problems and convinced Mrs. Youseff to file a complaint for eviction in the Pasco County Court. The judge who handled the case, Judge William B. Sestak, coerced and threatened Mr. Nagy Abdalla to move out of the house, and scheduled a hearing to take place some days later, before he had even reviewed the case. During the court procedures the plaintiffs' evidence was stolen from the file. The plaintiffs immediately moved out of the house because of the Judge's threat and, at the next hearing, the Judge handed control over the property to the owner because he considered the property to be a vacant property. This was an illegal eviction designed and carried out for the purpose of physically and financially exhausting the plaintiffs, especially since Mr. Youseff owed the plaintiffs money which they were collecting through the rent. After the plaintiffs had moved out on or about November 2, 1993, the property was taken away from Mrs. Youseff by her attorney and the bank.

### XXXXVIII.

In 1982 the plaintiffs started their lives in the United States of America as a united family in a small one-bedroom apartment in Jersey Heights, NJ in a building (located at 620 Summit Ave., Jersey City, NJ) owned by a Polish Jewish man, Mr. Kevelson, owner of Kevelson Enterprises (50 Buckingham Rd., West Orange, NJ). Even though the apartment was under rent control the plaintiffs had to rent the apartment for approximately three times as much as

the previous tenant had paid. The plaintiffs endured abuse in the neighborhood stores and general harassment directed to their first-floor apartment's window. The Hanna children had to be enrolled in a private school and the plaintiffs were forced to pay the tuition in full because the zoned public schools in the neighborhood were unsatisfactory. The plaintiffs had to endure abuse from the landlord such as a lack of heating and hot water in winter and substandard, inhumane conditions such as water dripping from the ceiling during rainstorms. The plaintiffs reported the conditions to the landlord and the superintendent numerous times but the conditions were ignored because of the cost of correcting them. The plaintiffs finally had to report the problem to the housing authority, which resulted in a case in the local court. At this case it was discovered that the manual labor the landlord had been using was neither qualified nor licensed to perform the jobs to which they had been assigned. The landlord's son used to bring the laborers and knock on the plaintiffs' apartment door to do unnecessary repairs at inconvenient times, without appointments. During one of these incidents money was stolen from atop Mr. Nagy Abdalla's desk. Mrs. Paulette Hanna was dragged to the court several times, with her two young children, to satisfy notices of hearings and she was threatened by a municipal judge that her two infant children might be taken from her because she could not keep them quite during the long hours of waiting, in the courtroom, for her name to be called.

Between 1993 and 1994, Mr. Nagy Abdalla had to work as a blue-collar laborer for White Oak ice cream, inc. The Jewish owner, Mr. Herby Armel, and his wife, Ms. Gloria Armel, used to physically and financially abuse Mr. Nagy Abdalla by forcing Mr. Nagy Abdalla to perform excessive amounts of labor and by ordering Mr. Nagy Abdalla to work for overtime hours for which he was never paid. The owner also occasionally physically and verbally assaulted Mr. Nagy Abdalla. When Mr. Nagy Abdalla applied for union membership the owner fired Mr. Nagy Abdalla because Mr. Nagy Abdalla refused to work any extra hours for free. When Mr. Nagy Abdalla pled to the union there was a meeting scheduled, which was

attended by the owner, his attorney, Mr. Nagy Abdalla, and the local Teamster's Union representative. At this meeting both sides presented their version of events and the owner of the ice-cream company was instructed by both his attorney and the union representative to reinstate Mr. Nagy Abdalla and upgrade his salary pursuant to the union contract. Mr. Nagy Abdalla was then targeted by the Jewish owners of the company, who ordered Mr. Nagy Abdalla, on numerous occasions, to travel to and attempt to sell ice-cream to stores in extremely dangerous neighborhoods, at dangerous times of the day, and with large sums of money on his person. The majority of the stores Mr. Nagy Abdalla went to did not need any ice-cream and stated that they had never called the company, contrary to what the owners had stated to Mr. Nagy Abdalla.

Finally, on May 29, 1984, there was a pre-meditated accident created on the job against Mr. Nagy Abdalla, whose goal was to murder Mr. Nagy Abdalla. The person who caused the accident was arrested by the New York Police Department and, on the way to the police station, this person supposedly escaped from the police cruiser. Though a warrant was issued for the person's arrest he was never arrested or found. Mr. Nagy Abdalla, as a result of this accident, was injured, spent several days in the hospital, and became disabled, preventing him from properly performing his job. As a result of this accident Mr. Nagy Abdalla had to undergo medical tests and procedures for years afterward. Mr. Nagy Abdalla went through the legal procedure of workman's compensation but the compensation court case was never resolved, nor did Mr. Nagy Abdalla, after the first two or three months after the accident, receive his workman's compensation, as was/is his right.

## XXXXIX.

In 1985 the plaintiffs escaped the campaign of abuse and mistreatment being conducted against them in Jersey Heights, Jersey City, NJ and were forced to move to Edison, NJ. There

they payed almost one-thousand dollars rent per month, plus the expense of daily traveling from Edison, NJ to Manhattan, NY, plus the cost of the general wear on the plaintiffs' limousine. The apartment complex was owned and managed by a Jewish Israeli group who targeted any arabs with excessively high rent, beyond that paid by other tenants. Even though the rent had been initially set extremely high the lease renewal agreement required a higher monthly rent, which the plaintiffs refused to pay. The plaintiffs decided to move out.

## L.

In or about February, 1986, the plaintiffs purchased a vacant lot in the Sunset Estates Development, Price Township, the Pocono Mountains, Monroe County, Pennsylvania. They proceeded to construct a home on the vacant lot and moved in on or about March, 1986.

The plaintiffs had to go through several county departments to re-test the soil and have it approved for an underground sewer system instead of a sand mountain, which is extremely unhealthy and polluting to the environment. The plaintiffs were finally successful in their attempts to have the lot approved for an underground sewage system, which they then constructed successfully. The underground system do not leak nor could it have been considered a health hazard, unlike a sand mountain. The sand mountain was the only way for the local lot owner's associations to threaten, intimidate, and control every lot owner in the area, because each and every sand mountain leaks, in violation of local health rules and regulations.

The plaintiffs were spotted by the criminal Jews and became well known to the Pennsylvania communities. They were targeted by the criminal Jews and their dogs in a campaign of hate, which included attempts on their lives conducted from 1986 to 1990. The Sunset Estates Lot Owner's Association members (Mr. Anthony Gragnoniello, Mr. Nick

Amatrudi, Ms. Ellen Krause, Mrs. Susan Sarageno, Mr. Robert Deller, Mrs. Tina M. Deller, and Mr. Barry Moore) led by Mr. Michael A. Sarageno, the president of the association, and their attorney, Mr. Alan Vican, launched and conducted the local campaign of hate against the plaintiffs. Mr. Nagy Abdalla and the Hanna family experienced numerous instances where their vehicle had been tampered with, in the hopes of engaging them in dangerous accident on the mountain roads. There were also several attempts to burn down the plaintiffs' home at night while the plaintiffs slept within. Several attempts to threaten and intimidate the plaintiffs were made, including the shooting of a number of hunting arrows onto the plaintiffs' property with threat messages, emblazoned with swastikas, attached. There were also several attempts on the plaintiffs' health and well being through medical channels. There were several attempts to murder the plaintiffs, attempts on the children's safety and well-being in their schools by school personnel and by Mr. Michael Sarageno's adopted son, plots to sabotage the children's educations, and murders committed against the plaintiffs' neighbors. Several incidents on the roads, with other cars, were intentionally contrived in the hopes of engaging the plaintiffs in accidents which could have thrown their car over mountain cliffs. Hate was spread among the neighbors to encourage them to engage in acts of racial hatred against the plaintiffs. The plaintiffs had to move from their home a number of times in order to avoid problems but they ended up having to return to their home, in the hopes that the atmosphere could have calmed while they were gone.

The plaintiffs resisted the corruption and the drug dealing of the Sunset Estates Lot Owner's Association. The plaintiffs actively defended themselves against legal actions taken against them, by the Sunset Estates Lot Owner's Association between 1986 and 1990, in the courts. The plaintiffs legally won by default but Ms. Joyce A. Reese, Prothonotary; Ms. Robin Rodenhaussen, head of Prothonotary; and Ms. Joyce L. Stoddard, the District Court Administration, refused for months, in spite of the plaintiffs' constant requests, to do their duty and issue a court order granting the plaintiffs' the judgement by default. The plaintiffs

purchased a second lot in the development and intended to develop it. Because they could not stand their defeat in the courts the Sunset Estates Lot Owner's Association, with their president Mr. Michael Sarageno and their Jewish connections and co-participants in this *Racist Religious Conspiracy,* took it upon their shoulders to personally and illegally take all actions necessary to remove the plaintiffs from their own home.

The Sunset Estates Lot Owner's Association and the president, Mr. Michael Sarageno, plotted to murder Mr. Nagy Abdalla. On September 30, 1989 an incident was created with Mr. Paul Miskinis, who intentionally blocked Mr. Nagy Abdalla's path with his truck when Mr. Nagy Abdalla was coming home with his children in the plaintiffs' car. This incident was intended to create a fight between Mr. Nagy Abdalla and Mr. Miskinis. Mr. Nagy Abdalla attempted, numerous times, to peacefully drive home and not become involved in any problems. Mr. Nagy Abdalla was finally successful in reaching his home after Mr. Miskinis, with his truck, almost engaged Mr. Nagy Abdalla in an accident as part of his harassment on the road. Mr. Michael Sarageno came, driving his pick-up truck, from his home all the way to the plaintiffs' property, carrying his gun in his hand, and shot at Mr. Nagy Abdalla while Mr. Nagy Abdalla was standing on his own front porch. Mr. Nagy Abdalla ran in the house, got his hunting shotgun, and went atop the cliff behind his house to observe Mr. Sarageno, who had driven to Mr. Miskinis's house and began to shoot at Mr. Nagy Abdalla and the plaintiffs' property, but was unsuccessful in injuring Mr. Nagy Abdalla or any other member of the Hanna family. The plaintiffs called the Pennsylvania state police, who were specifically instructed to arrest Mr. Nagy Abdalla and "throw the book at him" because he had survived an attempt on his life and had become a dangerous witness. The police officers who came to Mr. Nagy Abdalla's home unlawfully confiscated his shotgun and illegally arrested him. Corporal John Hudson was the officer in charge of the illegal actions taken against Mr. Nagy Abdalla by the Pennsylvania state police, even though he was off duty when he came to the police station to interrogate Mr. Nagy Abdalla. Officer John Hudson was fully informed that this incident was an attempted murder on Mr. Nagy Abdalla's life and that Mr. Nagy

Abdalla had followed the same exact procedure he had been told to follow by the police in a situation where someone was attempting to take his life. Mr. Nagy Abdalla had fired only two warning shots in the air, as he had been instructed, in order for the intruder, Mr. Michael Sarageno, to cease shooting at Mr. Nagy Abdalla and at the plaintiffs' home. Officer John Hudson decided to put Mr. Nagy Abdalla in jail and charge him with aggravated assault, simple assault, recklessly endangering, and terroristic threats. Mrs. Paulette Hanna, who did not have a driver's license, was left with her two children in their isolated mountain home. Mr. Nagy Abdalla's bail was decided by Justice Henry McCoal, a Pocono magistrate, and was set for the amount of fifteen thousand dollars cash. Mr. Nagy Abdalla spent several days in the Monroe County Jail until he was able to gather the fifteen thousand dollars cash for bail. The bail was posted with Justice Marjorie Shumaker on October 6, 1989. Mr. Nagy Abdalla endured the financial exhaustion of hiring an attorney to represent him in this matter, a matter which had been totally fabricated, was grossly illegal, and merely another action taken against a member of the Hanna family as part of this *Racist Religious Conspiracy*. Mr. Nagy Abdalla paid two thousand dollars to the law firm of O'Malley, Walker, and Jensen. Officer John Hudson requested continuances twice during the course of the illegal proceedings, presided over by Magistrate Marjorie Shumaker, against Mr. Nagy Abdalla. Pursuant to the Pennsylvania Rules of Criminal Procedure Officer Hudson had exhausted his right to request continuances and a third request on his part would have been considered a failure on his part and would have resulted in the dismissal of the charges against Mr. Nagy Abdalla. The law firm of O'Malley, Walker, and Jensen, however, who had already obtained their two-thousand dollar payment to defend Mr. Nagy Abdalla, worked against Mr. Nagy Abdalla as willing participants of this *Racist Religious Conspiracy*. When the third hearing came, and Officer John Hudson did not appear, Mr. O'Malley, Mr. Walker, and Mr. Jensen requested a continuance instead of asking the magistrate to drop the charges based on the default of Officer Hudson. Mr. O'Malley, Mr. Walker, and Mr. Jensen worked in the favor of those who coordinated this *Racist Religious Conspiracy* and continued to delay the matter as long as possible, coercing Mr. Nagy Abdalla and his family to move out of the area. Some days after the plaintiffs moved to Elizabeth,

NJ, on January 23, 1990, a hearing was held in the magistrate's office by the residing magistrate, Mr. John Whitesell (Ms. Shumaker's successor), which Mr. O'Malley, Mr. Walker, and Mr. Jensen attended. The plaintiffs, Officer John Hudson, Michael Sarageno, and several of the plaintiffs' neighbors attended. No legal hearing took place, nor were any legal procedures observed or conducted. The entire matter was a covert effort cooperatively executed by Mr. O'Malley, Mr. Walker, Mr. Jensen, Mr. Michael Sarageno, Mr. John Whitesell, the Pennsylvania State Police, et al., by order of the leaders of this *Racist Religious Conspiracy*, to permanently and illegally remove the plaintiffs from their own home and property. Mr. O'Malley, Mr. Walker, and Mr. Jensen were mediators in this off-the-record negotiation. They suggested that the plaintiffs leave and not return to their property without a Pennsylvania State Police escort and without informing magistrate Whitesell and the Pennsylvania State Police before attempting to return. Mr. Nagy Abdalla was coerced by Mr. O'Malley, Mr. Walker, and Mr. Jensen into signing this agreement, which Mr. O'Malley co-signed. Officer John Hudson informed Mr. Nagy Abdalla that, pursuant to this agreement, the charges against him were to be put on hold for five years before they were to be dropped and that any violations of the agreement or any crimes committed by Mr. Nagy Abdalla within this time limit would result in the inception of proceedings on the new charges as well as the old ones. Officer John Hudson escorted the plaintiffs, in his cruiser, to the plaintiffs' property, where they collected some clothes and personal belongings, placed them in their car, and left their home. The property was left with a large amount of personal belongings, with the shed also storing tools and building equipment. With the supervision of the Pennsylvania State Police and Justice Whitesell, and their cooperation in revealing the information that the plaintiffs would not be returning to their property, the plaintiffs' property and home were broken into and every item of their personal belongings, tools, equipments, building supplies, limousine parts, appliances, etc. were stolen. The home was vandalized and finally burned to the ground by an act of arson August 8, 1991. The Pennsylvania State Police refused to conduct any investigation, or even file a report, and made illegitimate and poor excuses issued solely for the purpose of covering up the criminal activities committed against the plaintiffs and protecting the criminals who conducted and

participated in this *Racist Religious Conspiracy* against the plaintiffs, including the Swiftwater Pennsylvania State Police, the Sunset Estates Lot Owner's Association, and the law firm of O'Malley, Walker, and Jensen. All these acts were committed against the plaintiffs under then Governor Casey, and under then (and current) Senator Arlen Spector.

In spite of all the damage and loss inflicted upon the plaintiffs' home, property, personal belongings, etc. the plaintiffs' insurance company, *Aegis Security Insurance Company*, refused to honor the plaintiffs' homeowner's insurance policy and pay the plaintiffs any amount of the coverage for the loss, in spite of the plaintiffs' numerous demands that the insurance company honor their policy. This was done in order to secure the goals of this *Racist Religious Conspiracy* by preventing the plaintiffs from ever returning to their property in Pennsylvania or allowing them to recover from this disaster.

## LL.

The plaintiffs had to move from Pennsylvania after the illegal eviction from their own home and property and after enduring constant harassment from several participants of the *Racist Religious Conspiracy* being conducted against them. On December 26, 1989 the plaintiffs rented an apartment in a run-down neighborhood in Elizabeth, NJ. The plaintiffs, while residing in this apartment, sent out complaints regarding how they had been treated by the justice system and the law enforcement authorities in Monroe County, Pennsylvania to several authorities in Washington, including then President George Bush and then U.S. Attorney General Richard Thornburg. In retaliation for these complaints the plaintiffs were surveilled, their apartment was broken into (for the purpose of spying and stealing documents), and they were forced to endure other forms of retaliation. The plaintiffs also received several verbal threats from police officers, for example when Mrs. Paulette Hanna was told by one police officer (who was accompanied by two other police officers), outside a neighborhood supermarket, that it was "a good night for a murder"

(when Mrs. Paulette Hanna had not engaged the officer, whom she did not know, in conversation). The plaintiffs also experienced a late night police visitation by two officers, who came in response to a disturbance call, were prepared for violence or a possible murder, and who insisted that the call had been made from the plaintiffs' telephone when the plaintiffs had been sleeping for several hours. Mrs. Paulette Hanna, who was then pregnant, was shot at one evening while she was walking the family dog. Mrs. Paulette Hanna, while approaching her apartment building, heard what sounded like a large explosion and then the sound of a car screeching its tires and racing away. Minutes later, after Mrs. Paulette Hanna had entered her apartment building and her apartment, five police cruisers, with their lights on, arrived and stopped on the street. Several Police officers then began to search the ground, around the area where Mrs. Paulette Hanna had been walking and had heard the noises, with flashlights. The officers spent nearly one-half hour searching and then left.

In the first half of 1990 Mr. Nagy Abdalla became extremely ill, due to a glandular stone growing in his saliva gland. Mr. Nagy Abdalla was told he needed surgery to remove the stone and the gland. He went to several medical experts in a local hospital and they determined that surgery was necessary and that it must be conducted by a specialist. Mr. Nagy Abdalla was referred to a Jewish doctor who, while Mr. Nagy Abdalla was waiting in the waiting room, was fighting with the hospital over the phone. The doctor was enraged because Mr. Nagy Abdalla, a person who needed immediate surgery but who did not have medical insurance, was referred to him by hospital. The doctor informed Mr. Nagy Abdalla that such a surgery would cost approximately two-thousand eight-hundred dollars and he never asked or engaged in any conversation regarding how Mr. Nagy Abdalla would like to pay the bill. The doctor merely stated that Mr. Nagy Abdalla could take a medicine, which he prescribed, and that Mr. Nagy Abdalla would most likely get better. The doctor instructed Mr. Nagy Abdalla to pay the secretary eighty-four dollars, in cash, for his consultation and gave Mr. Nagy Abdalla a prescription. When Mr. Nagy Abdalla went to the pharmacy to fill out his prescription, and told the pharmacist about his condition, the

Page 130 of 152

pharmacist informed Mr. Nagy Abdalla that he would die without surgery. The pharmacist referred Mr. Nagy Abdalla to an arab doctor, to whom Mr. Nagy Abdalla went directly, who admitted Mr. Nagy Abdalla to the hospital immediately. The next day the doctor performed the necessary surgery and the procedure cost Mr. Nagy Abdalla only seven-hundred dollars. The doctor also stated to Mr. Nagy Abdalla that he had been approximately twenty-four to thirty hours away from death induced by blood poisoning.

The plaintiffs were monitored by the local police during the time they lived in Elizabeth, NJ. Police cruisers used to follow Mrs. Paulette Hanna while she walked the Hanna children back and forth from school every day. The plaintiffs' limousine, which was their sole source of income, was hit and damaged in the passenger side door, while it was parked outside the apartment building overnight, shortly after it had received a complete body restoration and re-painting. There were also several attempts to steal the plaintiffs' limousine.

LII.

The plaintiffs were forced from their home in Pennsylvania, fearing for their lives and the lives of their children. They rented a house in Greenville, NJ, through a family friend, in 1988 or 1989. They moved into the house and left their property in Pennsylvania. The plaintiffs found it necessary to enroll their children in a Catholic School, *Our Lady of Mercy*, and endure the financial exhaustion of paying tuition because the public school zoned for their neighborhood was unsatisfactory. The plaintiffs payed the tuition, for both children and for the entire year, up front and in advance. A few months later the principle, a Jewish nun, began creating problems through her rudeness and extremely abnormal behavior. She manipulated another parent to physically assault Mr. Nagy Abdalla, who wrestled Mr. Nagy Abdalla to the ground in front of the main door of the school. She and her assistant also videotaped the plaintiffs several times when they went to pick up their children from the school. She pushed a police officer to pull over Mr. Nagy Abdalla

on the road, check his papers, and ask him why he was "bothering" the Sister. She also personally saw to it that the Hanna children were no longer allowed to attend the school, especially after Mr. Nagy Abdalla had filed a police report regarding the physical assault against him that occurred on *Our Lady of Mercy* school grounds. She further refused to refund the plaintiffs' tuition so that the children would not be able to go to another private school in the area. The Hanna children were forced to attend the local public school against their best interests and to the detriment of their educations. The owners of the house the plaintiffs had rented abruptly asked the plaintiffs to leave, for no apparent reason, and the plaintiffs were forced to move back to their home in Pennsylvania.

## LIII.

Correspondence was initiated by the plaintiffs (by  letters, official complaints, phone calls, faxes, etc) regarding all the crimes committed against them in this *Racist Religious Conspiracy* by members and employees of the Pinellas County justice system, the Pinellas County State Attorney's Office (including State Attorney Bernie McCabe and various assistant state attorneys), the Pinellas County Public Defender's Office (including Public Defender Bob Dillinger, Assistant Public Defender Violet Assaid, and Assistant Public Defender Anthony Clifton), the Pinellas County Sheriff's Office (including Sheriff Everett Rice), the Pinellas County Jail (including Major Kenneth Remming and his secretary, Kathy Belveille), the St. Petersburg Police Department (including Chiefs Darrel Stephens and Goliath Davis), the Pinellas County education system (including Commissioners Frank Brogan and Tom Gallagher and the Pinellas County School Administration), the Department of Highway Safety and Motor Vehicles, the Pinellas County Clerk of the Circuit Court (including Ms. Karleen F. DeBlaker), private individuals, et al. These correspondence were directed or responded to the aforementioned as well as the following:

*Florida Attorney General Robert Butterworth, Florida Governor Lawton Chiles, Lt. Governor Buddy McCay, Florida Governor Jeb Bush, Lt. Governor Frank Brogan, The United States

Department of Education, U.S. Secretary of Education Mr. Richard Riley, The United States Justice Department, U.S. Attorney Generals Janet Reno and Richard Thornburg (including Assistant director Robert A. Strader, Executive Officer Pamela A. Spraker, and Ms. Diance C. Roberts), The Federal Bureau of Investigation, the Director of the Federal Bureau of Investigation Louis Freeh, and the Director of the Pinellas County branch of the Federal Bureau of Investigation Fred Eschweiler.

*The members and employees of the Pinellas County Schools administration: Mr. Howard Hinesley, Ms. Barbara J. Crockett, Ms. Andrea M. Thacker, Mr. Lee Benjamin, Ms. Lucile O. Casey, Ms. Corinne Freeman, Ms. Susan Latvala, Ms. Linda S. Lerna, Ms. Jane Gallucci, Mr. John Bowen, Mr. Jack R. Lamb, Ms. Catherine A. Fleeger, Marion H. Plichieinski, Mr. Lewis Williams, Mr. William Grey, Ms. Susan Bailey, Ms. Barbara Poanessa, Mr. Walter Hall, Mr. Tom Petit.

*The members of the Pinellas County Commission: Robert B. Stewart, Barbara Sheen Todd, Calvin D. Harris, Sallie Parks, and Steve Seibert.

*The members of the St. Petersburg Code Enforcement Board: William Bartlett, Sandy Bozeman, Jim Bedinghaus, Edward Vehling, Shirley Rigo, Eddie Roberson, Rene Robinson, and George Horstman.

*The members of the Florida Judicial Qualifications Commission: James Wolf, Dale Sanders, Curtis Richardson, Michael Nachwalter, Frank Kayney, Patricia Heffner, Lenard Haber, Thomas Freeman, and Miet Bernstein.

*The Florida Bar, including President Howard Coker and his assistant, Ms. Lindy Boggs.

*Pinellas County Court Administrators Ms. Vivian Brush and Mr. William J. Lockhart, and all

Pinellas County Administrative assistants, including Ms. Kathy Harrington.

*Pinellas County Judges, including Chief Judge Susan F. Schaeffer, Walter A. Fullerton, Nelly M. Khouzam, R. Timothy Peters, Paul Levine, William Overton, Patrick Caddell, Philip Federico, Douglas W. Baird, Peter Ramsberger, Thomas Freeman, Dee Anna Farnell, Owen S. Albriton, Thomas Penick, Robert Morris, Myra Scott McNavy, and others. Complaints were also sent to a number of Judicial Assistants, including Ms. Jackie Jackson (assistant to Judge R. Timothy Peters) and "Melinda" (Judicial Assistant to Judge Paul Levine).

*The Department of Health and Human Services, including Secretary Donna Shalala

*The Florida Department of Highway Safety and Motor Vehicles, including Executive Director Fred Dickenson, Assistant deputy Director Joe McCaskill, Mr. Larry Pulstor, Mr. John G. Bradford, Ms. Debra Barker, and Ms. Kathy Wick.

*Members of the United States Congress.

*Several Presidents of the United states of America, including George Herbert Walker Bush and William Jefferson Clinton.

Many of these complaints were ignored, other were simply returned with all exhibits and documents attached, and others were granted nothing more than contrived excuses designed to illegally avoid involvement. These actions, or rather the lack of any action at all, intentionally protected the criminals and allowed this *Racist Religious Conspiracy* to continue unabated.

The plaintiffs' complaints, though always formally ignored or otherwise discarded, have always been met with violent retaliation and other crimes of hate directed against them by the participants

Page 134 of 152

in this **_Racist Religious Conspiracy_**. Among the most highly favored methods of retaliation came through the Pinellas County Justice System and were committed by many of the previously noted defendants, as well as:

   *Other members and employees of the Pinellas County State Attorney's Office, including Mr. Joseph Montrone, Ms. Patricia A. Blackburn, Mr. Robert Angus Williams, and Ms. Rhonda E. Stringer .

   *Other employees of the Pinellas County Clerk of the Circuit Court, including Ms. Felicia Wilson, Ms. Saundra K. Caldwell, Ms. Aida R. Trippett, and Ms. Barbara Hubbard.

## LIV.

   The participants in this **_Racist Religious Conspiracy_** who committed, supervised, encouraged, or otherwise, through action or inaction, brought about or allowed the commission of crimes against the plaintiffs to exist, continue, and escalate were driven by the hatred and intolerance of Jewish ideologies. For millennia, those who follow Jewish principles have lied, deceived, brainwashed, etc. the human race into believing that the Jewish people are innocent and righteous victims and who, being the chosen people of the God, are the most honest and upright peoples. The human race has been conditioned, over the course of thousands of years, to accept and honor Jewish ideals for the purpose of:

   *Generating sympathy for those who hold Jewish beliefs in order to safeguard their characteristic (and continued) covert economic, cultural, and moral vandalism of the nations in which they live.

   *Generating, in all peoples, a subconscious aversion to criticism of Jewish beliefs and ideals

in order to maintain the existence and propagation of Jewish principles, and criminal acts committed in support of those principles.

*Generating, in all peoples, psychologically conditioned reactions supporting and encouraging hatred, violence, and criminal acts against all who criticize and otherwise oppose (in the past, present, and future) Jewish beliefs, principles, acts, etc.

*Generating conditions of social chaos to facilitate acts of cultural, moral, and economic vandalism designed to effect the destruction of other nations in order to achieve the new world order based on the Jewish principle that Israel must be the only power in the world.

The criminal acts committed by participants in this *Racist Religious Conspiracy*, committed over the course of many years, caused irreversible harm to the plaintiffs, to the truth, to the United States of America, and to all peoples of the world. Those who participated in this *Racist Religious Conspiracy*, through action or inaction, directly benefitted from their behavior through Jewish rewards.

We, the plaintiffs, hold the Jewish God (the Devil, otherwise known as Mr. Lucifer), his children the Jewish people, Jewish dogs, and Jewish principles responsible for all harm caused to us in the commission of this *Racist Religious Conspiracy* against us.


## CONCLUSION

The assertions contained in paragraph **III.** and paragraph **LIV.** are reasserted and incorporated herein by reference.


Page 136 of 152

The cases mentioned in this complaint, as part of this *Racist Religious Conspiracy*, include, but are not limited to, CRC 99-00685 DLANO-5, CTC 98-37585 MMANO, CTC 98-449001 VASP, CTC 98-638804 VASP, CTC 95-18087 MMANO-H, CTC 95-18086 MMANO-H, CRC 95-10560 CFANO, CRC 97-05017 CFANO, CRC 97-05022 CFANO, CRC 97-05023 CFANO, CTC 97-03143 MMANO-F, CTC 98-955262 VASP-H, CTC 98-955263 VASP-H, CTC 98-955264 VASP-H, CTC 98-955265 VASP-H, CTC 98-955266 VASP-H, CTC 98-955267 VASP-H, CTC 98-955268 VASP-H, CTC 98-955269 VASP-H, CTC 98-955270 VASP-H, case no. 93-6575-39, case no. 94-001158-CO-054, case no. 93-140-CC-O, OTN C160157-4 and Complaint #C-114-89, Case no. 98-4726-CI-8, Case no.98-4226-CI-8, 3695 Civil 1991, 1438 Civil 1988, and all other actions related and/or consolidated, etc.

Though the crimes and events detailed herein clearly illustrate and prove the assertions of the plaintiffs, there are still a multitude of crimes committed against the plaintiffs, which have not been detailed within this complaint. The plaintiff/s reserve the right to, at any time, supplement and/or amend this complaint to include any further crimes, defendants, etc.

Wherefore, the plaintiffs request this court to enter its judgement, including any other judgements to which the plaintiffs are entitled, against the defendants for all requested relief, including all costs and legal fees, and demands trial by federal jury.

## RELIEF SOUGHT

We, the plaintiffs, Mr. Nagy Z. Abdalla, Mrs. Paulette R. Hanna, Mr. Nathan T. Hanna, Mr. Shannon K. Hanna, and Mr. Jasen E. Hanna, hereby request from this court the following relief:

That this court allow the plaintiffs to draw the judgement to their favor as follows:

**(1)** This is a legal declaration to all people of the United States of America of the following:

(a)(1) Judaism is a highly organized satanic cultist ideology (not a religion) that worships Mr. Lucifer, a.k.a. Satan, a.k.a. the Devil as a God.

(a)(2) The Old Testament God, who spoke to Moses; who refused to declare his name; who led the Jewish people out of the land of Egypt; who murdered and ordered the murder of multitudes of human beings, animals, and even children and continues to do so until this very day; who ordered the building of Noah's Ark and destroyed nearly all life on earth with a deluge; who dictated the ten commandments; who ordered the building of the Ark of the Covenant; who ordered sacrifices and a constant stream of fresh blood on, around, and under his altars; who has restrained the Jewish people with his covenant, etc. is none other than Mr. Lucifer, a.k.a. Satan, a.k.a. The Devil.

(b) The Jewish people are the children and the followers of Mr. Lucifer, a.k.a. Satan, a.k.a. The Devil, and not the children of our Father who is in Heaven. Judaism's purpose is to fulfill the will of Mr. Lucifer here on earth.

(c)(1) The Jewish communities, societies, groups, etc. are racist political cultist organizations who work against one another, against all non-Jewish peoples, and against all countries except Israel, in the interests of Israel; they are political, cultist (not religious), organizations. The Jewish people are not a race and cannot be given the privileges and immunities of that label. A belief in Judaism and Jewish ideologies does not grant an individual status as a member of a race, just as an adherence to any other belief system does not grant one status as a member of a race.

**Page 138 of 152**

(c)(2) The expressions *criminal jew* and *jewish dog* are proper terms, utilized due to the fact that the Jewish peoples stood in front of Pilate, the Roman governor, demanded the crucifixion of Jesus Christ, and asked for his blood to be on them and on their children. *Jewish dog* is an expression used by Christ himself and, therefore, is considered proper terminology for any party to use, based on ideological disagreement with and rejection of the tenets of Judaism. Use of these terms for the purpose of description of facts shall not be considered racial slander and will not make the speaker subject to criminal or civil liability, or a target of retaliation by any party, agency, governmental department, etc.

(d)(1) The arrest, charge, trial, conviction, and execution of Jesus Christ was an illegal, unjustifiable, etc. barbaric Jewish crime committed against the human race and our Father who is in heaven, his will, and his plan. It has no other justification or purpose, whether examined under moral or any legal standards. The only purpose of this act, committed by the Jewish people, is to secure the colonization of earth under the leadership of Mr. Lucifer, the father of the Jews and the father of Jewish ideology.

(d)(2) The Christian Creed currently represents, not historical truths, but, rather, deceptions and falsifications, contrived as diversions from real truths, which have taken shape in the statement that Christ was crucified under Pontius Pilate, while failing to mention the actual accusers and prosecutors. A court order is directed to the Christian Churches to state in the Christian Creed the following fact and truth: Jesus Christ was arrested, charged, tried, convicted, humiliated, tortured, and sentenced to death by crucifixion in the highest Jewish Court in the land, by the highest Jewish priest and the Jewish elders in Israel. In spite of Roman opposition to this judgement and sentencing the Jews and their dogs, by the leadership of the highest priest and the Jewish elders, insisted on the death of Jesus Christ by crucifixion. This amendment to the Christian Creed is a reflection of historical truth and is not directed for the purpose of actively altering Christian religious beliefs and does not infringe upon the separation

of church and state.

(e)(1) No Jewish person, as previously defined, can hold any position in or related to the American justice system.

(e)(2) All such persons are to be immediately removed from such positions upon service of this judgement to the governing bodies that regulate their employment or they are to immediately resign their positions upon service of this judgement to the individuals themselves. Any person, asked to comply with this decision, who willfully fails to do so after being made aware of this judgement, shall be held in contempt of this court until such time as they choose to comply with this judgement.

(f)(1) Any person, organization, group, business, etc. that has lost life, liberty, or property as a result of any judgement in a court of law or action by a law enforcement agency or entity where a Jewish person holds an office or has any mode of access, shall have the right to have the judgement reversed and/or recompense granted based on these facts.

(f)(2) Any agreement, contract, promise to assist, etc. between any party and a Jewish, or partially Jewish, party, whether an individual, group, business, state, other entity, etc, initiated or taking effect before or during this civil action may be declared null and void.

(f)(3) Any Christian person has the right to demand, and all Christian congregations have the right to remove any Jewish, or partially Jewish person, from any position in the Christian Church. All such persons, falling under the jurisdiction of this decision and subject to such requests, must immediately remove themselves from office. Such process shall be conducted without civil or criminal liability on the part of the party who requests such removal. Any person, asked to comply with this decision, who willfully fails to do so after being made aware

of this judgement, shall be held in contempt of this court until such time as they choose to comply with this judgement.

(f)(4) Any person has the right to demand the removal of any Jewish, or partially Jewish person, from any position in the American justice system, from other law enforcement agencies and entities, or from any position in the American system of government. All such persons, falling under the jurisdiction of this decision and subject to such requests, must immediately remove themselves from office. Such process shall be conducted without civil or criminal liability on the part of the party who requests such removal. Any such person, asked to comply with this decision, who willfully fails to do so after being made aware of this judgement, shall be held in contempt of this court until such time as they choose to comply with this judgement.

(f)(5) Any person has the right to demand the removal of any Jewish, or partially Jewish person, from any position in the American public education system. All such persons, falling under the jurisdiction of this decision and subject to such requests, must immediately remove themselves from office. Such process shall be conducted without civil or criminal liability on the part of the party who requests such removal. Any such person, asked to comply with this decision, who willfully fails to do so after being made aware of this judgement, shall be held in contempt of this court until such time as they choose to comply with this judgement.

(f)(6) Any non-Jewish person, accused of any crime or subject to any legal action against them, has the right to refuse to be arrested, detained, subject to trial, sentenced, incarcerated, etc. when any Jewish or partially Jewish person is involved, either directly or indirectly, in such action/ process against them.

(g) The Jewish people have the right to worship whoever they wish, pursuant to the Constitution of the United States of America, but they do not have the right to force, coerce,

etc. non-Jewish peoples into believing or being subjected to the laws of Judaism and they have no right to sacrifice the lives of human beings, Jewish or none Jewish, in the fulfillment of the ideals of their cultist beliefs.

(h) No Jewish person can falsely renounce, or falsely convert from, Judaism to gain immunity from this judgement.

(i) Judaism, the Jewish people, and the Jewish God (Mr. Lucifer, a.k.a. Satan, a.k.a. The Devil) are anti-Christ, anti-Christians, anti-life and violently opposed to all non-Jews and non-Jewish religions.

(2) The following relief is hereby granted:

(a) The defendants, jointly and severally, in their individual and official capacities, are liable and responsible for the cumulative sum of five-hundred million dollars per day since May 12, 1982 until the date judgement is rendered in favor of the plaintiffs and to be paid to the plaintiff/s, as well as an additional lump sum of fifty-million dollars for each plaintiff plus all expenses and losses (attached). All recompense is to be collected from any public or private funds, property, interests, other financial assets, etc.

(b) The plaintiffs, their agent/s, representative/s, etc. shall have the right to conduct further investigation/s in order to identity other participants and agents of the acknowledged *Racist Religious Conspiracy* against the plaintiffs and to bring them to justice using all legal means necessary to do so.

(c) Any person, department, agency, business, etc. that refuses, delays, hinders, obstructs, or fails to cooperate fully, in any way, with the plaintiff/s in executing this judgement, or with the

general execution of this judgement, shall be held in contempt of court until such time as their cooperation is given.

(d) All federal and/or state prosecutors shall file full and complete criminal charges against all participants of this *Racist Religious Conspiracy* who have committed criminal acts against any and/or all of the plaintiffs in the furtherance of such conspiracy and prosecute them fully, with the express recommendation, by the plaintiffs, that any and all forms of incarceration or punishment incident to a lawful conviction be withheld.

(e) Those participants in this *Racist Religious Conspiracy* found to be liable under this judgement shall not hold any position in or relating to the American justice system, shall not hold any position in or relating to American law enforcement agencies, nor shall they be allowed the privilege of practicing law within the United States of America. Furthermore a restraining order is in effect limiting the presence of all liable participants to a minimum distance of at least one county from any residence/s or property/s of, as well as the bodies of, any and/or all of the plaintiffs.

(f) The immediate termination of the ongoing, and the prohibition of any further, surveillance, stalking, monitoring, spying, video or audio-taping, or other forms of surveillance conducted upon the plaintiffs, their residence, their places of business, their schools, etc. is hereby ordered.

(g) Any fines, court costs, forms of restitution, or orders or instructions, by any authority, state, county, city, or otherwise, against any of the plaintiffs as a part of this *Racist Religious Conspiracy* is rendered void and null. For any unusual costs, expenses, financial losses, etc. experienced by the plaintiffs and arising from the activities of the participants, whether knowingly or unknowingly, in this *Racist Religious Conspiracy*, the plaintiffs shall be

reimbursed by said participants.

(g)(1) The judgement in case no. 98-007002CI-008 against Mr. Nagy Abdalla and Mrs. Paulette Hanna for the entire amount which appears to have been ordered by the court in favor of the plaintiffs in that matter, Auto-Owners Insurance Company as a subrogee of Harvard Jolly Clees Toppe Architects, P.A., and Harvard Jolly Clees Toppe Architects, P.A., Individually, is to be satisfied by the Kenneth City Police Department, the Kenneth City Police Chief, in his individual and official capacity, and the police officers, in their individual and official capacities, who are responsible for forcing and creating the auto accident from which the case stemmed. The same individuals and officials will be responsible for replacing or compensating the plaintiffs in this case for the loss of their vehicle and it's contents plus any and/or all interest and expenses.

(g)(2) The St. Petersburg Police Department, the former St. Petersburg Chief of Police Darrel Stephens, in his individual and official capacity, and all officers, in their individual and official capacities, who participated in the incident occurring on March 20, 1997 on the plaintiffs' property are to reimburse the plaintiffs for, or directly pay when applicable, all medical bills, expenses, the cost for the ambulance, etc. as well as the cost of bail for the plaintiffs. They shall also reimburse the plaintiffs for any unusual expenses arising or occurring due to their illegal activities against the plaintiffs.

(g)(3) Sister Patricia Caulfield, Ms. Callahan, and Bishop Robert Lynch, in their individual and official capacities, are responsible for and shall reimburse the plaintiffs for all medical expenses and all other expenses or costs arising from their negligence and criminal activities committed against Mr. Jasen Hanna, including the poisoning of Mr. Jasen Hanna under their supervision, and the kidnapping of Mr. Jasen Hanna by the Department of Children and Families, that occurred under their supervision and with their participation and assistance.

(g)(4) Sister Joseph Hukle, Sister Patricia Caulfield, and Bishop Robert Lynch in their individual and official capacities, are responsible for and shall reimburse the plaintiffs and the Department of Children and Families, or any other governmental agency involved, for all medical expenses and all other expenses or costs arising from the poisoning of Mr. Shannon Hanna by the covert and intentional subjection of Mr. Shannon Hanna to illegal narcotics at the office of Sister Joseph Hukle at St. Jude Cathedral School.

(g)(5) Mr. John Downing, Mrs. Angela Downing, Mr. Christopher Downing, Mr. Joseph Downing, all other participating members of the Downing family, and Mr. Daniel Vinciguerra shall be responsible for the cost of replacing the two trees they slaughtered on the section of the plaintiffs' property bordered by Eleventh Ave. N with two trees of equal size and shall be responsible for the cost of removing the remains of the dead trees, regardless of whether the plaintiffs decide to remove the remains and replace the trees. The aforesaid shall also be responsible for replacing the windshield of the plaintiffs' car, which they intentionally destroyed with a golf club for the purpose of vandalism.

(g)(6) Mr. John Downing, Mrs. Angela Downing, Mr. Christopher Downing, Mr. Joseph Downing, and all other participating members of the Downing family shall be responsible for the cost of cleaning and re-coating the plaintiffs' driveway from the white paint thrown on the plaintiffs' driveway for the purpose of vandalism. The aforesaid shall also be responsible for cleaning and re-painting the plaintiffs' car from the white paint thrown on the plaintiffs' car for the purpose of vandalism.

(g)(7) Mr. Daniel Vinciguerra, his parents, Mr. And Mrs. Vinciguerra, and other assisting individuals shall be responsible for the exact cost of the damage they caused to the plaintiffs' station wagon by kicking and beating various parts of the car, which incurred large dents and significant cosmetic damage. The aforesaid shall also be responsible for the cost of the

replacement of the rear windshield of another of the plaintiffs' vehicles, which they intentionally damaged by throwing a brick at it. The aforesaid shall also be responsible for the cost of cleaning and re-painting the sections of the plaintiffs' vehicle which they vandalized with eggs and other materials.

(g)(8) Mr. Richard Tuten shall be responsible for the cost of replacing the trees and other vegetation he destroyed on the plaintiffs' property with trees and vegetation of equal size and shall be responsible for the cost of removing the remains of any dead trees and plants on the plaintiffs' property, regardless of whether the plaintiffs decide to remove the remains and replace the vegetation.

(g)(9) Mrs. Kristina Tuten, Officer Charlie Barnes, Officer Richard Crater, Mr. John Downing, Ms. Joanne Pavese, etc. shall be prosecuted for perjuring themselves on the witness stand in an effort to unlawfully incriminate Mr. Nagy Abdalla and Mrs. Paulette Hanna.

(g)(10) Mr. John Downing, Mr. Christopher Downing, Mr. Raymond White, and Mrs. Susan White shall be prosecuted for perjuring themselves on the witness stand in an effort to unlawfully incriminate Mr. Nagy Abdalla.

(g)(11) The board members of the Sunset Estates Lot Owner's Association, Sunset Estates Lot Owner's Association, the Attorneys of the Sunset estates Lot Owner's Association (including Mr. Alan Vican), and the Clerk and administration of the Monroe County Circuit Court mentioned in this complaint are responsible to satisfy any judgement, lien, fine, penalty, etc. placed upon the plaintiffs or any of the plaintiffs' properties in Monroe County Pennsylvania.

(g)(12) *Aegis Security Insurance Company* shall immediately reimburse the plaintiffs for the loss of their Pennsylvania home, pursuant to the homeowner's insurance policy, for the full

Page 146 of 152

coverage of the home, plus the cost of replacement, plus twenty five percent multiple annual interest from the day the claim was filed until the date judgement is rendered. Failure to comply with this judgement, within seven days from the receipt of the judgement, shall render *Aegis Security Insurance Company* in contempt of court.

(g)(13) Lake Timber Limited Partnership (D/B/A Palm View Apartments) shall immediately reimburse the plaintiffs for damage its employees and agents intentionally incurred upon the plaintiffs property and personal belongings, resulting from the damage inflicted by the intentionally created water leak in the plaintiffs' apartment. Failure to comply with this judgement, within seven days from the receipt of the judgement, shall render Lake Timber Limited Partnership (D/B/A Palm View Apartments) in contempt of court.

(g)(14) Hunter Management Company, Inc. and/or the owners or proprietors of Sunset Place Apartments shall immediately reimburse the plaintiffs for all costs and losses incurred by the unlawful eviction of the plaintiffs from their apartment.

**(3)** (a) All criminal legal matters against Mr. Nagy Z. Abdalla and/or his alias, John N. Hanna, are hereby declared null and void due to their illegality and their nature as part of an illegal *Racist Religious Conspiracy* directed against him.

(b) The instances where Mr. Nagy Z. Abdalla (a.k.a John Hanna) has spent time incarcerated in county or state facilities are hereby declared to have been unconstitutional and unlawful incarcerations. These incarcerations are declared part of a *Racist Religious Conspiracy* and their purpose is acknowledged to have been the fulfillment of a campaign of extortion, criminal terrorism, abduction, hostage taking, abuse, physical and psychological torture, attempted murder, etc., all conducted for the purpose of unlawfully depriving Mr. Nagy Abdalla of his constitutional rights.

(c) Any labor endured by Mr. Nagy Abdalla, while incarcerated in County or State facilities, are considered to have been forms of unlawful and unconstitutional instances of the unlawful subjection of a citizen of the United States of America to involuntary servitude.

(d)(1) Any warrants, arrests, detentions, accusations, charges, court proceedings, orders, judgments, sentences, incarcerations, losses of liberty or property, etc., or the execution of any of the aforementioned, before, during, or after this civil action, against Mr. Nagy Z. Abdalla (a.k.a. John Hanna) are considered to be part of the *Racist Religious Conspiracy* against him and are subject to this civil action. Furthermore, whoever participates in, or makes themselves a party to, such actions shall be declared a defendant in this civil action by supplementation.

(d)(2) The confirmation and affirmation of the appeal judgement in favor of Mr. Nagy Z. Abdalla (a.k.a. John Hanna) and the acknowledgment of and enforcement of all relief sought granted in the decision of the Second District Court of Appeals in appeal no. 97-04347 (consolidated with 97-04342) is hereby acknowledged and ordered.

(d)(3) Mr. Nagy Abdalla's (a.k.a. John Hanna) records are to be cleared from all false criminal convictions and all *not guilty* verdicts on his behalf, including verdicts intentionally deleted, are to be recorded clearly, immediately, and in conformity with the law.

(e) Mr. Nagy Z. Abdalla's driver's licence is hereby confirmed and acknowledged to be valid. The licence is acknowledged to be in good standing and Mr. Abdalla has the right to drive on any road, street, or highway, etc. in the United States of America.

(f) All criminal legal matters against Mrs. Paulette R. Hanna, are hereby declared null and void due to their illegality and nature as part of an illegal *Racist Religious Conspiracy* directed against her.

**Page 148 of 152**

(g) The instances where Mrs. Paulette R. Hanna has spent time incarcerated in county, state, or mental health facilities are hereby declared to have been unconstitutional and unlawful incarcerations. These incarcerations are declared part of a *Racist Religious Conspiracy* whose purpose was the fulfillment of a campaign of extortion, criminal terrorism, abduction, hostage taking, abuse, physical and psychological torture, attempted murder, etc., all conducted for the purpose of unlawfully depriving Mrs. Paulette Hanna of her constitutional rights.

(h) Any labor endured by Mrs. Paulette Hanna, while incarcerated in County or State facilities, are considered to have been forms of unlawful and unconstitutional instances of the unlawful subjection of a citizen of the United States of America to involuntary servitude.

(i)(1) Any warrants, arrests, detentions, accusations, charges, court proceedings, orders, judgments, sentences, incarcerations, losses of liberty or property, etc., or the execution of any of the aforementioned, before, during, or after this civil action, against Mrs. Paulette R. Hanna are considered to be part of the *Racist Religious Conspiracy* against her and are subject to this civil action. Furthermore, whoever participates in, or makes themselves a party to, such actions shall be declared a defendant in this civil action by supplementation.

(i)(2) The confirmation and affirmation of the appeal judgement in favor of Mrs. Paulette Hanna and the acknowledgment of and enforcement of all relief sought granted in the decision of the Second District Court of Appeals in 97-04342 (consolidated with appeal no. 97-04347) is hereby acknowledged and ordered.

(i)(3) Mrs. Paulette R. Hanna's records are to be cleared from all false criminal convictions and all *not guilty* judgements on her behalf, including judgements intentionally deleted, are to be recorded clearly, immediately, and in conformity with the law.

(j) Mrs. Paulette Hanna's driver's licence is hereby confirmed and acknowledged to be valid. The licence is acknowledged to be in good standing and Mrs. Paulette Hanna has the right to drive on any road, street, or highway, etc. in the United States of America.

(k) All criminal legal matters against Mr. Shannon K. Hanna, are hereby declared null and void due to their illegality and nature as part of an illegal *Racist Religious Conspiracy* directed against him.

(l) The instances where Mr. Shannon K. Hanna has spent time incarcerated in County or State facilities were unconstitutional and unlawful incarcerations. These incarcerations are declared part of a *Racist Religious Conspiracy* whose purpose was the fulfillment of a campaign of extortion, criminal terrorism, abduction, hostage taking, abuse, physical and psychological torture, attempted murder, etc., all conducted for the purpose of unlawfully depriving Mr. Shannon Hanna of his constitutional rights.

(m) Any labor endured by Mr. Shannon Hanna, while incarcerated in County or State facilities, are considered to have been forms of unlawful and unconstitutional instances of the unlawful subjection of a citizen of the United States of America to involuntary servitude.

(n)(1) Any warrants, arrests, detentions, accusations, charges, court proceedings, orders, judgments, sentences, incarcerations, losses of liberty or property, etc. or the execution of any of the aforementioned, before, during, or after this civil action, against Mr. Shannon K. Hanna are considered to be part of the *Racist Religious Conspiracy* against him and are subject to this civil action. Furthermore, whoever participates, or makes themselves a party to, such actions shall be declared a defendant in this civil action by supplementation.

(n)(2) Mr. Shannon K. Hanna's records are to be cleared from all false criminal convictions.

**Page 150 of 152**

(o) Any and all present or future criminal legal matters against Mr. Nathan T. Hanna or Mr. Jasen E. Hanna, are hereby declared null and void due to their illegality and nature as part of an illegal *Racist Religious Conspiracy* directed against the plaintiffs.

**(4)** The civil and criminal cases, against the plaintiff/s, mentioned in this complaint, are part of this *Racist Religious Conspiracy*, have no legal or legitimate purpose, and are therefore declared null and void. These cases include, but are not limited to, CRC 99-00685 DLANO-5, CTC 98-37585 MMANO, CTC 98-449001 VASP, CTC 98-638804 VASP, CTC 95-18087 MMANO-H, CTC 95-18086 MMANO-H, CRC 95-10560 CFANO, CRC 97-05017 CFANO, CRC 97-05022 CFANO, CRC 97-05023 CFANO, CTC 97-03143 MMANO-F, CTC 98-955262 VASP-H, CTC 98-955263 VASP-H, CTC 98-955264 VASP-H, CTC 98-955265 VASP-H, CTC 98-955266 VASP-H, CTC 98-955267 VASP-H, CTC 98-955268 VASP-H, CTC 98-955269 VASP-H, CTC 98-955270 VASP-H, case no. 93-6575-39, case no. 94-001158-CO-054, case no. 93-140-CC-O, OTN C160157-4 and Complaint #C-114-89, Case no. 98-4726-CI-8, Case no.98-4226-CI-8, 3695 Civil 1991, 1438 Civil 1988, and all other actions related and/or consolidated, etc.

–End of Complaint–

Complaint Affidavit on the following page

Page 151 of  152

## Complaint Affidavit

We, the plaintiffs, Mr. Nagy Z. Abdalla (a.k.a. Mr. John N. Hanna), Mrs. Paulette R. Hanna, Mr. Nathan T. Hanna, Mr. Shannon K. Hanna, and Mr. Jasen E. Hanna (signed by his parents), hereby testify, under oath, that all the information in this complaint is true and correct to the best of our ability and knowledge.

| Name | Signature |
|------|-----------|
| Mr. Nagy Z. Abdalla | *Nagy Z Abdalla* |
| | DL A101757778912532 N.J |
| Mrs. Paulette R. Hanna | *Paulette Hanna* |
| | DL H500-6650-644-0 FL |
| Mr. Nathan T. Hanna | *Natn* |
| | ID 600 860 2867 865018 U.F |
| Mr. Shannon K. Hanna | *Shannon H* |
| | H500 7918 2208-0 FL |
| for Mr. Jasen E. Hanna | *Jasen Hanna* |
| | By mother, Paulette Hanna |

Sworn to and subscribed before me this _14_ day of _Aug_ 1999 by Mr. Nagy Abdalla, Mrs. Paulette R. Hanna, Mr. Nathan T. Hanna, Mr. Shannon K. Hanna, and Mr. Jasen E. Hanna (his parents), who are personally known to me and also presented their I.D.'s as identification and who did take an oath.



ATEF AZIZ
MY COMMISSION # CC 775364
EXPIRES: 10/19/2002
1-800-3-NOTARY   Fla. Notary Services & Bonding Co

Notary Public, State of Florida

**Page 152 of 152**

# Exhibit 1.

Amendments I, IV, V, VI, VIII, XIII, and XIV of
the Constitution of the United States of America

4 pages total

This exhibit submitted by the plaintiffs

UNITED STATES CONSTITUTION

Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State.

Section 4.  The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.

## ARTICLE V

The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress;  Provided that no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate.

## ARTICLE VI

[1]  All Debts contracted and Engagements entered into, before the Adoption of this Constitution shall be as valid against the United States under this Constitution, as under the Confederation.

[2]  This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

[3]  The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.

## ARTICLE VII

The Ratification of the Conventions of nine States shall be sufficient for the Establishment of this Constitution between the States so ratifying the Same.

ARTICLES IN ADDITION TO, AND AMENDMENT OF, THE CONSTITUTION OF THE UNITED STATES OF AMERICA, PROPOSED BY CONGRESS, AND RATIFIED BY THE LEGISLATURES OF THE SEVERAL STATES PURSUANT TO THE FIFTH ARTICLE OF THE ORIGINAL CONSTITUTION.

## AMENDMENT I   [1791]

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

## AMENDMENT II   [1791]

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

AMENDMENT III   [1791]

No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law.

AMENDMENT IV   [1791]

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

AMENDMENT V   [1791]

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

AMENDMENT VI   [1791]

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

AMENDMENT VII   [1791]

In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

AMENDMENT VIII   [1791]

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

AMENDMENT IX   [1791]

The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.

AMENDMENT X   [1791]

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

AMENDMENT XI   [1798]

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

**AMENDMENT XII   [1804]**

The Electors shall meet in their respective states and vote by ballot for President and Vice–President, one of whom, at least, shall not be an inhabitant of the same state with themselves; they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice–President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice–President, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate;—The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted;—The person having the greatest number of votes for President, shall be the President, if such number be a majority of the whole number of Electors appointed; and if no person have such majority, then from the persons having the highest numbers not exceeding three on the list of those voted for as President, the House of Representatives shall choose immediately, by ballot, the President.  But in choosing the President, the votes shall be taken by states, the representation from each state having one vote; a quorum for this purpose shall consist of a member or members from two-thirds of the states, and a majority of all the states shall be necessary to a choice. And if the House of Representatives shall not choose a President whenever the right of choice shall devolve upon them before the fourth day of March next following, then the Vice–President shall act as President, as in the case of the death or other constitutional disability of the President.—The person having the greatest number of votes as Vice–President, shall be the Vice–President, if such number be a majority of the whole number of Electors appointed, and if no person have a majority, then from the two highest numbers on the list, the Senate shall choose the Vice–President; a quorum for the purpose shall consist of two-thirds of the whole number of Senators, and a majority of the whole number shall be necessary to a choice.  But no person constitutionally ineligible to the office of President shall be eligible to that of Vice–President of the United States.

**AMENDMENT XIII   [1865]**

Section 1.   Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

Section 2.   Congress shall have power to enforce this article by appropriate legislation.

**AMENDMENT XIV   [1868]**

Section 1.   All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Section 2.   Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

Section 3.   No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or

**UNITED STATES CONSTITUTION**                                                                1648

given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

Section 4. The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

## AMENDMENT XV [1870]

Section 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

Section 2. The Congress shall have power to enforce this article by appropriate legislation.

## AMENDMENT XVI [1913]

The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration.

## AMENDMENT XVII [1913]

[1] The Senate of the United States shall be composed of two Senators from each State, elected by the people thereof, for six years; and each Senator shall have one vote. The electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures.

[2] When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies: *Provided,* That the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct.

[3] This amendment shall not be so construed as to affect the election or term of any Senator chosen before it becomes valid as part of the Constitution.

## AMENDMENT XVIII [1919]

Section 1. After one year from the ratification of this article the manufacture, sale, or transportation of intoxicating liquors within, the importation thereof into, or the exportation thereof from the United States and all territory subject to the jurisdiction thereof for beverage purposes is hereby prohibited.

Section 2. The Congress and the several States shall have concurrent power to enforce this article by appropriate legislation.

Section 3. This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the legislatures of the several States, as provided in the Constitution, within seven years from the date of the submission hereof to the States by the Congress.

## AMENDMENT XIX [1920]

[1] The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex.

[2] Congress shall have power to enforce this article by appropriate legislation.

# Exhibit 2.

Contents:

a) John Chapter 8, verses 37-47

b) Isaiah Chapter 42, verses 1-9

c) Isaiah Chapter 49, verses 1-7

d) Isaiah Chapter 50, verses 4-11

e) John Chapter 16, verses 5-15

7 pages total

These exhibits submitted by the plaintiffs

and you will look for me, but you will die in your sin. Where I am going you cannot come." **22** *So the Jews said, "He is not going to kill himself, is he, because he said, 'Where I am going you cannot come'?" **23** ᵘHe said to them, "You belong to what is below, I belong to what is above. You belong to this world, but I do not belong to this world. **24** ᵛ*That is why I told you that you will die in your sins. For if you do not believe that I AM, you will die in your sins." **25** ʷ*So they said to him, "Who are you?" Jesus said to them, "What I told you from the beginning. **26** ˣI have much to say about you in condemnation. But the one who sent me is true, and what I heard from him I tell the world." **27** They did not realize that he was speaking to them of the Father. **28** ʸSo Jesus said [to them], "When you lift up the Son of Man, then you will realize that I AM, and that I do nothing on my own, but I say only what the Father taught me. **29** The one who sent me is with me. He has not left me alone, because I always do what is pleasing to him." **30** Because he spoke this way, many came to believe in him.

**Jesus and Abraham**    **31** *Jesus then said to those Jews who believed in him, "If you remain in my word, you will truly be my disciples, **32** ᶻand you will know the truth, and the truth will set you free." **33** ᵃ*They answered him, "We are descendants of Abraham and have never been enslaved to anyone. How can you say, 'You will become free'?" **34** ᵇJesus answered them, "Amen, amen, I say to you, everyone who commits sin is a slave of sin. **35** ᶜ*A slave does not remain in a household forever, but a son always remains. **36** So if a son frees you, then you will truly be free. **37** I know that you are descendants of Abraham. But you are trying to kill me, because my word has no room among you. **38** *I tell you what I have seen in the Father's presence; then do what you have heard from the Father."

**39** ᵈ*They answered and said to him, "Our father is Abraham." Jesus said to them, "If you were Abraham's children, you would be doing the works of Abraham. **40** But now you are trying to kill me, a man who has told you the truth that I heard from God; Abraham did not do this. **41** ᵉYou are doing the works of your father!" [So] they said to him, "We are not illegitimate. We have one Father, God." **42** ᶠJesus said to them, "If God were your Father, you would love me, for I came from God and am here; I did not come on my own, but he sent me. **43** Why do you not understand what I am saying? Because you cannot bear to hear my word. **44** ᵍYou belong to your father the devil and you willingly carry out your father's desires. He was a murderer from the beginning and does not

stand in truth, because there is no truth in him. When he tells a lie, he speaks in character, because he is a liar and the father of lies. **45** But because I speak the truth, you do not believe me. **46** ʰCan any of you charge me with sin? If I am telling the truth, why do you not believe me? **47** ⁱWhoever belongs to God hears the words of God; for this reason you do not listen, because you do not belong to God."

**48** *The Jews answered and said to him, "Are we not right in saying that you are a Samaritan and are possessed?" **49** Jesus answered, "I am not possessed; I honor my Father, but you dishonor me. **50** ʲI do not seek my own glory; there is one who seeks it and he is the one who judges. **51** ᵏAmen, amen, I say to you, whoever keeps my word will never see death." **52** [So] the Jews said to him, "Now we are sure that you are possessed. Abraham died, as did the prophets, yet you say, 'Whoever keeps my word will never taste death.' **53** ˡ*Are you greater than our father Abraham, who died? Or the prophets, who died? Who do

| | |
|---|---|
| u 3, 31; 17, 14; 18, 36. | e Mal 2, 10. |
| v Ex 3, 14; Dt 32, 39; Is 43, 10. | f 1 Jn 5, 1. |
| | g Gn 3, 4; Wis 1, 13; 2, 24; Acts 13, 10; 1 Jn 3, 8-15. |
| w 10, 24. | |
| x 12, 44-50. | |
| y 3, 14; 12, 32.34. | h Heb 4, 15; 1 Pt 2, 22; 1 Jn 3, 5. |
| z Is 42, 7; Gal 4, 31. | |
| a Mt 3, 9. | i 10, 26; 1 Jn 4, 6. |
| b Rom 6, 16-17. | j 7, 18. |
| c Gn 21, 10; Gal 4, 30; Heb 3, 5-6. | k 5, 24-29; 6, 40.47; 11, 25-26. |
| d Gn 26, 5; Rom 4, 11-17; Jas 2, 21-23. | l 4, 12. |

**8, 22:** The Jews suspect that he is referring to his death. Johannine irony is apparent here; Jesus' death will not be self-inflicted but destined by God.

**8, 24.28:** I AM: an expression that late Jewish tradition understood as Yahweh's own self-designation (Is 43, 10); see the note on 4, 26. Jesus is here placed on a par with Yahweh.

**8, 25:** What I told you from the beginning: this verse seems textually corrupt, with several other possible translations: "(I am) what I say to you"; "Why do I speak to you at all?" The earliest attested reading (Bodmer Papyrus P⁶⁶) has (in a second hand), "I told you at the beginning what I am also telling you (now)." The answer here (cf Prv 8, 22) seems to hinge on a misunderstanding of v 24 "that I AM" as "what I am."

**8, 31-59:** Jesus' origin ("before Abraham") and destiny are developed; the truth will free them from sin (34) and death (51).

**8, 31:** Those Jews who believed in him: a rough editorial suture, since in v 37 they are described as trying to kill Jesus.

**8, 33:** Have never been enslaved to anyone: since, historically, the Jews were enslaved almost continuously, this verse is probably Johannine irony, about slavery to sin.

**8, 35:** A slave . . . a son: an allusion to Ishmael and Isaac (Gn 16 and 21); or to the release of a slave after six years (Ex 21, 2; Dt 15, 12).

**8, 38:** The Father: i.e., God. It is also possible, however, to understand the second part of the verse as a sarcastic reference to descent of the Jews from the devil (44), "You do what you have heard from [your] father."

**8, 39:** The works of Abraham: Abraham believed; cf Rom 4, 11-17; Jas 2, 21-23.

**8, 48:** Samaritan: therefore interested in magical powers; cf Acts 7, 14-24.

**8, 53:** Are you greater than our father Abraham?: cf 4, 12.

Case 8:99-cv-01888-SCB  Document 1  Filed 08/19/99  Page 160 of 165 PageID 160

O maggot Israel;
I will help you, says the LORD;
    your redeemer* is the Holy One of Israel.
**15** I will make of you a threshing sledge,
    sharp, new, and double-edged,
To thresh the mountains and crush them,
    to make the hills like chaff.
**16** When you winnow them, the wind shall
    carry them off
    and the storm shall scatter them.
But you shall rejoice in the LORD,
    and glory in the Holy One of Israel.
**17** The afflicted and the needy seek water in
    vain,
    their tongues are parched with thirst.
I, the LORD, will answer them;
    I, the God of Israel, will not forsake
    them.
**18** I will open up rivers on the bare heights,
    and fountains in the broad valleys;
I will turn the desert into a marshland,
    and the dry ground into springs of water.
**19** I will plant in the desert the cedar,
    acacia, myrtle, and olive;
I will set in the wasteland the cypress,
    together with the plane tree and the pine,
**20** That all may see and know,
    observe and understand,
That the hand of the LORD has done this,
    the Holy One of Israel has created it.

**21** Present your case, says the LORD;*
    bring forward your reasons, says the King
    of Jacob.
**22** Let them come near and foretell to us
    what it is that shall happen!
What are the things of long ago?
    Tell us, that we may reflect on them
And know their outcome;
    or declare to us the things to come!
**23** Foretell the things that shall come afterward,
    that we may know that you are gods!
Do something, good or evil,
    that will put us in awe and in fear.
**24** Why, you are nothing and your work is
    nought!
    To choose you is an abomination.

**25** I have stirred up one from the north, and he
    comes;
    from the east I summon him* by name;
He shall trample the rulers down like red
    earth,
    as the potter treads the clay.
**26** Who announced this from the beginning,
    that we might know;
    beforehand, that we might say it is true?
Not one of you foretold it, not one spoke;
    no one heard you say,
**27** "The first news for Zion: they are coming
    now,"
    or, "For Jerusalem I will pick out a
    bearer of the glad tidings."
**28** When I look, there is not one,
    no one of them to give counsel,

to make an answer when I question them.
**29** Ah, all of them are nothing,
    their works are nought;
    their idols are empty wind!

# CHAPTER 42

## The Servant of the Lord

**1** Here is my servant* whom I uphold,
    my chosen one with whom I am pleased,
Upon whom I have put my spirit;
    he shall bring forth justice to the nations,[b]
**2** Not crying out, not shouting,
    not making his voice heard in the street.
**3** A bruised reed he shall not break;
    and a smoldering wick he shall not
    quench,*
**4** Until he establishes justice on the earth;
    the coastlands* will wait for his teaching.

**5** Thus says God, the LORD,
    who created the heavens and stretched
    them out,
    who spreads out the earth with its crops,
Who gives breath to its people
    and spirit to those who walk on it:
**6** I, the LORD, have called you for the victory
    of justice,
    I have grasped you by the hand;
I formed you, and set you
    as a covenant of the people,
    a light for the nations,[c]
**7** To open the eyes of the blind,
    to bring out prisoners from confinement,
    and from the dungeon, those who live in
    darkness.
**8** I am the LORD, this is my name;
    my glory I give to no other,
    nor my praise to idols.
**9** See, the earlier things have come to pass,
    new ones I now foretell;
Before they spring into being,
    I announce them to you.

## The Salvation of Israel despite Its Sins

**10** Sing to the LORD a new song,
    his praise from the end of the earth:
Let the sea and what fills it resound,

---

b Is 45, 6; 49, 6.    c Is 45, 13.

from slavery and avenges his sufferings; cf Lv 25, 48: Dt 19.
6. 12.
  41, 21–24:  An indictment of idols.
  41, 25:  I summon him: Cyrus.
  42, 1–4:  Servant: there are three other "Servant-of-the-
Lord" oracles, Is 49, 1–7; 50, 4–11; 52, 13—53, 12. Many
identifications have been proposed, e.g., historical Israel, ideal
Israel, an Old Testament historical character before or during
the lifetime of the prophet, the prophet himself. The New Tes-
tament and Christian tradition, however, have seen a fulfill-
ment of these prophecies in Jesus Christ.
  42, 3:  A reference to the mercy of Christ.
  42, 4:  Coastlands: the lands of the Mediterranean. In the
Old Testament the word often refers to the pagan lands of the
west.

and those born of your stock like its
   grains,
Their name never cut off
   or blotted out from my presence.
**20** Go forth from Babylon, flee from Chaldea!
   With shouts of joy proclaim this, make it
      known;
Publish it to the ends of the earth, and say,
   "The LORD has redeemed his servant
      Jacob.
**21** They did not thirst
   when he led them through dry lands;
Water from the rock he set flowing for
   them;
   he cleft the rock, and waters welled
      forth."[k]
**22** [There is no peace for the wicked,
   says the LORD.]

## II: Expiation of Sin, Spiritual
## Liberation of Israel

### CHAPTER 49

### The Servant of the Lord*

**1** Hear me, O coastlands,
   listen, O distant peoples.[l]
The LORD called me from birth,
   from my mother's womb he gave me my
      name.*
**2** He made of me a sharp-edged sword
   and concealed me in the shadow of his
      arm.
He made me a polished arrow,
   in his quiver he hid me.*
**3** You are my servant, he said to me,
   Israel,* through whom I show my glory.

**4** Though I thought I had toiled in vain,
   and for nothing, uselessly, spent my
      strength,
Yet my reward is with the LORD,
   my recompense is with my God.[m]
**5** For now the LORD has spoken
   who formed me as his servant from the
      womb,
That Jacob may be brought back to him
   and Israel gathered to him;
And I am made glorious in the sight of the
   LORD,·
   and my God is now my strength!
**6** It is too little, he says, for you to be my
      servant,
   to raise up the tribes of Jacob,
   and restore the survivors of Israel;[n]
I will make you a light to the nations,
   that my salvation may reach to the ends
      of the earth.*

**7** Thus says the LORD,
   the redeemer and the Holy One of Israel,
To the one despised, whom the nations
   abhor,

the slave of rulers:
When kings see you, they shall stand up,
   and princes shall prostrate themselves
Because of the LORD who is faithful,
   the Holy One of Israel who has chosen
      you.[o]

## The Liberation and Restoration of Zion

**8** Thus says the LORD:
In a time of favor I answer you,
   on the day of salvation I help you,
To restore the land
   and allot the desolate heritages,[p]
**9** Saying to the prisoners: Come out!
To those in darkness: Show yourselves!
Along the ways they shall find pasture,
   on every bare height shall their pastures
      be.[q]
**10** They shall not hunger or thirst,
   nor shall the scorching wind or the sun
      strike them;
For he who pities them leads them
   and guides them beside springs of water.[r]
**11** I will cut a road through all my mountains,
   and make my highways level.[s]
**12** See, some shall come from afar,
   others from the north and the west,
   and some from the land of Syene.*

**13** Sing out, O heavens, and rejoice, O earth,
   break forth into song, you mountains.
For the LORD comforts his people
   and shows mercy to his afflicted.

**14** But Zion said, "The LORD has forsaken me;
   my Lord has forgotten me."[t]
**15** Can a mother forget her infant,
   be without tenderness for the child of her
      womb?
Even should she forget,
   I will never forget you.[u]
**16** See, upon the palms of my hands I have
   written your name;*

| | |
|---|---|
| k Ex 17, 6; Nm 20, 11. | o Is 49, 23; 55, 5. |
| l Is 41, 9; 43, 1; 44, 2. | p 2 Cor 6, 2. |
| 24; 46, 3. | q Is 42, 7. 18ff. |
| m Is 40, 27. | r Is 51, 14; Rv 7, 16. |
| n Is 42, 1-6; 44, 5; 45, | s Is 40, 3f. |
| 14; Lk 2, 32; Acts 13, | t Is 40, 27. |
| 46f. | u Is 43, 4; 44, 21; 46, 3f. |

*

49, 1–7: The second of the four "Servant-of-the-Lord" ora-
cles.

   49, 1: Gave me my name: designated me for a special
office (cf Jer 1, 5), or perhaps, made me renowned (cf Ps 45,
18).

   49, 2: The servant was made ready and fit for the preaching
of God's word.

   49, 3: Israel: the Servant is identified with the people of
Israel as their ideal representative; however, since vv 5f seem
to distinguish the Servant from Israel, some regard the word
Israel here as a gloss.

   49, 6: The Servant's vocation will be not only the restora-
tion of Israel but the conversion of the world; cf Lk 2, 32.

   49, 12: Syene: now called Aswan, at the first cataract of the
Nile in southern Egypt.

   49, 16: Upon the palms . . . name: for continual remem-

your walls are ever before me.
**17** Your rebuilders make haste,
  as those who tore you down and laid you
  waste
  go forth from you;
**18** Look about and see,
  they are all gathering and coming to you.
  As I live, says the LORD,
  you shall be arrayed with them all as with
  adornments,
  like a bride you shall fasten them on you.

**19** Though you were waste and desolate,
  a land of ruins,
  Now you shall be too small for your
  inhabitants,
  while those who swallowed you up will
  be far away.
**20** The children whom you had lost
  shall yet say to you,
  "This place is too small for me,
  make room for me to live in."
**21** You shall ask yourself:
  "Who has borne me these?
  I was bereft and barren
  [exiled and repudiated];
  who has reared them?
  I was left all alone;
  where then do these come from?" [v]

**22**   Thus says the LORD GOD:
  See, I will lift up my hand to the nations,
  and raise my signal to the peoples;
  They shall bring your sons in their arms,
  and your daughters shall be carried on
  their shoulders. [w]
**23** Kings shall be your foster fathers,
  their princesses your nurses;
  Bowing to the ground, they shall worship
  you
  and lick the dust at your feet.
  Then you shall know that I am the LORD,
  and those who hope in me shall never be
  disappointed.

**24**   Thus says the LORD:
  Can booty be taken from a warrior?
  or captives be rescued from a tyrant?
**25** Yes, captives can be taken from a warrior,
  and booty be rescued from a tyrant;
  Those who oppose you I will oppose,
  and your sons I will save.
**26** I will make your oppressors eat their own
  flesh,
  and they shall be drunk with their own
  blood
  as with the juice of the grape.
  All mankind shall know
  that I, the LORD, am your savior,
  your redeemer, the mighty one of Jacob. [x]

# CHAPTER 50

## Salvation Only through the Lord's Servant

**1**   Thus says the LORD:
  Where is the bill of divorce
  with which I dismissed your mother?*
  Or to which of my creditors
  have I sold you?
  It was for your sins that you were sold,
  for your crimes that your mother was
  dismissed. [y]

**2** Why was no one there when I came?
  Why did no one answer when I called?*
  Is my hand too short to ransom?
  Have I not the strength to deliver?
  Lo, with my rebuke I dry up the sea,
  I turn rivers into a desert;
  Their fish rot for lack of water,
  and die of thirst. [z]
**3** I clothe the heavens in mourning,
  and make sackcloth their vesture.

**4** The Lord GOD has given me*
  a well-trained tongue,
  That I might know how to speak to the
  weary
  a word that will rouse them.
  Morning after morning
  he opens my ear that I may hear;
**5** And I have not rebelled,
  have not turned back.*
**6** I gave my back to those who beat me,
  my cheeks to those who plucked my
  beard;*
  My face I did not shield
  from buffets and spitting. [a]

**7** The Lord GOD is my help,
  therefore I am not disgraced;
  I have set my face like flint,
  knowing that I shall not be put to shame. [b]
**8** He is near who upholds my right;
  if anyone wishes to oppose me,
  let us appear together.

---

v Is 54, 1ff.
w Is 5, 26; 13, 2.
x Is 19, 2; Ez 38, 21;
  Zec 14, 13.
y Dt 24, 1-4; Mt 19, 3;

Mk 10, 2ff; Is 54, 6ff.
z Ex 7, 18; Ps 105, 29.
a 2 Sm 10, 4ff; Mt 26, 67;
  27, 30.
b Ez 3, 9.

brance; cf Ex 13, 9. 16; Dt 6, 6–9.

**50, 1:** Responding to the people's complaint of utter abandonment by God, the prophet shows that their sins were responsible for their banishment. Since there was no bill of divorce, the bond between the Lord and his people still exists and he will ultimately save them.

**50, 2:** Israel's faith in God is weak; she does not answer his call, nor believe in his promises of deliverance.

**50, 4–11:** The third of the four "Servant-of-the-Lord" oracles; in vv 4–9 the Servant speaks; in vv 10f God reproves the people for not following the Servant.

**50, 5:** The Servant does not refuse the divine vocation.

**50, 6:** He willingly submits to insults and beatings. Plucked my beard: a grave insult.

Case 8:99-cv-01888-SCB   Document 1   Filed 08/19/99   Page 163 of 165 PageID 163

Who disputes my right?
Let him confront me.
9 See, the Lord GOD is my help;
who will prove me wrong?
Lo, they will all wear out like cloth,
the moth will eat them up. *c*

10 Who among you fears the LORD,*
heeds his servant's voice,
And walks in darkness
without any light,
Trusting in the name of the LORD
and relying on his God? *d*
11 All of you kindle flames
and carry about you fiery darts;
Walk by the light of your own fire
and by the flares you have burnt!
This is your fate from my hand:
you shall lie down in a place of pain.

# CHAPTER 51

## Exhortation To Trust In the Lord

1 Listen to me, you who pursue justice,
who seek the LORD;
Look to the rock from which you were
hewn,
to the pit* from which you were
quarried; *e*
2 Look to Abraham, your father,
and to Sarah, who gave you birth;
When he was but one I called him,
I blessed him and made him many. *f*
3 Yes, the LORD shall comfort Zion
and have pity on all her ruins;
Her deserts he shall make like Eden,
her wasteland like the garden of the LORD;
Joy and gladness shall be found in her,
thanksgiving and the sound of song.

4 Be attentive to me, my people;*
my folk, give ear to me.
For law shall go forth from my presence,
and my judgment, as the light of the
peoples. *g*
5 I will make my justice come speedily;
my salvation shall go forth
[and my arm shall judge the nations];
In me shall the coastlands hope,
and my arm they shall await.

6 Raise your eyes to the heavens,
and look at the earth below;
Though the heavens grow thin like smoke,
the earth wears out like a garment
and its inhabitants die like flies,
My salvation shall remain forever
and my justice shall never be dismayed.*
7 Hear me, you who know justice,
you people who have my teaching at
heart:
Fear not the reproach of men,
be not dismayed at their revilings.

8 They shall be like a garment eaten by
moths,
like wool consumed by grubs;
But my justice shall remain forever
and my salvation, for all generations. *h*

9 Awake, awake, put on strength,
O arm of the LORD!
Awake as in the days of old,
in ages long ago!
Was it not you who crushed Rahab,*
you who pierced the dragon? *i*
10 Was it not you who dried up the sea,
the waters of the great deep,*
Who made the depths of the sea into a way
for the redeemed to pass over?
11 Those whom the LORD has ransomed will
return
and enter Zion singing,
crowned with everlasting joy;
They will meet with joy and gladness,
sorrow and mourning will flee.
12 I, it is I who comfort you.
Can you then fear mortal man,
who is human only, to be looked upon as
grass,
13 And forget the LORD, your maker,
who stretched out the heavens
and laid the foundations of the earth?
All the day you are in constant dread
of the fury of the oppressor;
But when he sets himself to destroy,
what is there of the oppressor's fury?

14 The oppressed shall soon be released;
they shall not die and go down into the
pit,
nor shall they want for bread.
15 For I am the LORD, your God,
who stirs up the sea so that its waves
roar;
the LORD of hosts by name.
16 I have put my words into your mouth
and shielded you in the shadow of my
hand,
I, who stretched out the heavens,
who laid the foundations of the earth,
who say to Zion: You are my people.

---

*c* Is 51, 6-8; Ps 102, 27.
*d* Is 43, 1f; 44, 1f.
*e* Rom 9, 30f.
*f* Ez 33, 24; Gn 12, 2ff;
22, 17.
*g* Is 2, 3.
*h* Is 50, 9.
*i* Ex 15, 16; Jb 9, 13; 26,
12; Pss 74, 13; 89, 11.
*j* Jer 31, 35.

---

50, 10f:  Instead of trusting in the Lord and his Servant, the people rely on their own devices, to their own destruction.

51, 1:  Rock . . . pit: your glorious ancestry.

51, 4f:  The conversion of the Gentiles.

51, 6:  God's salvation and justice are eternal, in contrast to the impermanence of the heavens and the earth: cf Mt 24, 35.

51, 9:  Rahab: see note on Is 30, 7. The dragon: see notes on Is 27, 1; Ps 74, 13.

51, 10:  Great deep: another reference to the primeval chaos of Gn 1, 2.

Remain in my love. 10 *p*If you keep my commandments, you will remain in my love, just as I have kept my Father's commandments and remain in his love.

11 *q*"I have told you this so that my joy might be in you and your joy might be complete. 12 *r*This is my commandment: love one another as I love you. 13 *s*No one has greater love than this, to lay down one's life for one's friends. 14 You are my friends if you do what I command you. 15 *t*I no longer call you slaves, because a slave does not know what his master is doing. I have called you friends, because I have told you everything I have heard from my Father. 16 *u*It was not you who chose me, but I who chose you and appointed you to go and bear fruit that will remain, so that whatever you ask the Father in my name he may give you. 17 *v*This I command you: love one another.

## The World's Hatred

18 *w*"If the world hates you, realize that it hated me first. 19 *x*If you belonged to the world, the world would love its own; but because you do not belong to the world, and I have chosen you out of the world, the world hates you. 20 *y*Remember the word I spoke to you, 'No slave is greater than his master.' If they persecuted me, they will also persecute you. If they kept my word, they will also keep yours. 21 *z*And they will do all these things to you on account of my name, because they do not know the one who sent me. 22 *a*If I had not come and spoken to them, they would have no sin; but as it is they have no excuse for their sin. 23 *b*Whoever hates me also hates my Father. 24 *c*If I had not done works among them that no one else ever did, they would not have sin; but as it is, they have seen and hated both me and my Father. 25 *d*But in order that the word written in their law might be fulfilled, 'They hated me without cause.'

26 *e*"When the Advocate comes whom I will send you from the Father, the Spirit of truth that proceeds from the Father, he will testify to me. 27 *f*And you also testify, because you have been with me from the beginning.

## CHAPTER 16

1 "I have told you this so that you may not fall away. 2 *g*They will expel you from the synagogues; in fact, the hour is coming when everyone who kills you will think he is offering worship to God. 3 *h*They will do this because they have not known either the Father or me. 4 *i*I have told you this so that when their hour comes you may remember that I told you.

## Jesus' Departure; Coming of the Advocate

"I did not tell you this from the beginning, because I was with you. 5 *j*But now I am going to the one who sent me, and not one of you asks me, 'Where are you going?' 6 But because I told you this, grief has filled your hearts. 7 *k*But I tell you the truth, it is better for you that I go. For if I do not go, the Advocate will not come to you. But if I go, I will send him to you. 8 *And when he comes he will convict

p 8, 29; 14, 15.
q 16, 22; 17, 13.
r 13, 34.
s Rom 5, 6-8; 1 Jn 3, 16.
t Dt 34, 5; Jos 24, 29; 2 Chr 20, 7; Ps 89, 21; Is 41, 8; Rom 8, 15; Gal 4, 7; Jas 2, 23.
u 14, 13; Dt 7, 6.
v 13, 34; 1 Jn 3, 23; 4, 21.
w 7, 7; 14, 17; Mt 10, 22; 24, 9; Mk 13, 13; Lk 6, 22; 1 Jn 3, 13.
x 17, 14-16; 1 Jn 4, 5.
y 13, 16; Mt 10, 24.
z 8, 19; 16, 3.

a 8, 21.24; 9, 41.
b 5, 23; Lk 10, 16; 1 Jn 2, 23.
c 3, 2; 9, 32; Dt 4, 32-33.
d Ps 35, 19; 69, 4.
e 14, 16.26; Mt 10, 19-20.
f Lk 1, 2; Acts 1, 8.
g 9, 22; 12, 42; Mt 10, 17; Lk 21, 12; Acts 26, 11.
h 15, 21.
i 13, 19; 14, 29.
j 7, 33; 13, 36; 14, 5.
k 7, 39; 14, 16-17.26; 15, 26.

*

15, 13: *For one's friends:* or: "those whom one loves." In 9–13a, the words for love are related to the Greek *agapaō*. In 13b–15, the words for love are related to the Greek *phileō*. For John, the two roots seem synonymous and mean "to love"; cf also 21, 15–17. The word *philos* is used here.

15, 15: *Slaves . . . friends:* in the Old Testament, Moses (Dt 34, 5), Joshua (Jos 24, 29), and David (Ps 89, 21) were called "servants" or "slaves of Yahweh"; only Abraham (Is 41, 8; 2 Chr 20, 7; cf Jas 2, 23) was called a "friend of God."

15, 18—16, 4: The hostile reaction of the world. There are synoptic parallels, predicting persecution, especially at Mt 10, 17–25; 24, 9–10.

15, 20: *The word I spoke to you:* a reference to 13, 16.

15, 21: *On account of my name:* the idea of persecution for Jesus' name is frequent in the New Testament (Mt 10, 22; 24, 9; Acts 9, 14). For John, association with Jesus' name implies union with Jesus.

15, 22.24: Jesus' words (*spoken*) and deeds (*works*) are the great motives of credibility. *They have seen and hated:* probably means that they have seen his works and still have hated; but the Greek can be read: "have seen both me and my Father and still have hated both me and my Father." *Works . . . that no one else ever did:* so Yahweh in Dt 4, 32–33.

15, 25: *In their law:* law is here used as a larger concept than the Pentateuch, for the reference is to Ps 35, 19 or 69, 5. See the notes on 10, 34; 12, 34. *Their law* reflects the argument of the church with the synagogue.

15, 26: *Whom I will send:* in 14, 16.26, the Paraclete is to be sent by the Father, at the request of Jesus. Here the Spirit comes from both Jesus and the Father in mission; there is no reference here to the eternal procession of the Spirit.

16, 2: *Hour:* of persecution, not Jesus' "hour" (see the note on 2, 4).

16, 4b–33: A duplicate of 14, 1–31 on departure and return.

16, 5: *Not one of you asks me:* the difficulty of reconciling this with Simon Peter's question in 13, 36 and Thomas' words in 14, 5 strengthens the supposition that the last discourse has been made up of several collections of Johannine material.

16, 8–11: These verses illustrate the forensic character of the Paraclete's role: in the forum of the disciples' conscience he prosecutes the world. He leads believers to see (a) that the basic sin was and is refusal to believe in Jesus; (b) that, although Jesus was found guilty and apparently died in disgrace, in reality righteousness has triumphed, for Jesus has returned to his Father; (c) finally, that it is *the ruler of this world,* Satan, who has been condemned through Jesus' death (12, 32).

Case 8:99-cv-91888-SCB   Document 1   Filed 08/19/99   Page 165 of 165 PageID 165

the world in regard to sin and righteousness and condemnation: **9** [l]sin, because they do not believe in me; **10** righteousness, because I am going to the Father and you will no longer see me; **11** [m]condemnation, because the ruler of this world has been condemned.

**12** "I have much more to tell you, but you cannot bear it now. **13** [n]*But when he comes, the Spirit of truth, he will guide you to all truth. He will not speak on his own, but he will speak what he hears, and will declare to you the things that are coming. **14** He will glorify me, because he will take from what is mine and declare it to you. **15** Everything that the Father has is mine; for this reason I told you that he will take from what is mine and declare it to you.

**16** [o]"A little while and you will no longer see me, and again a little while later and you will see me." **17** So some of his disciples said to one another, "What does this mean that he is saying to us, 'A little while and you will not see me, and again a little while and you will see me,' and 'Because I am going to the Father'? **18** So they said, "What is this 'little while' [of which he speaks]? We do not know what he means." **19** Jesus knew that they wanted to ask him, so he said to them, "Are you discussing with one another what I said, 'A little while and you will not see me, and again a little while and you will see me'? **20** [p]Amen, amen, I say to you, you will weep and mourn, while the world rejoices; you will grieve, but your grief will become joy. **21** [q]When a woman is in labor, she is in anguish because her hour has arrived; but when she has given birth to a child, she no longer remembers the pain because of her joy that a child has been born into the world. **22** [r]So you also are now in anguish. But I will see you again, and your hearts will rejoice, and no one will take your joy away from you. **23** [s]On that day you will not question me about anything. Amen, amen, I say to you, whatever you ask the Father in my name he will give you. **24** Until now you have not asked anything in my name; ask and you will receive, so that your joy may be complete.

**25** [t]*"I have told you this in figures of speech. The hour is coming when I will no longer speak to you in figures but I will tell you clearly about the Father. **26** [u]On that day you will ask in my name, and I do not tell you that I will ask the Father for you. **27** For the Father himself loves you, because you have loved me and have come to believe that I came from God. **28** [v]I came from the Father and have come into the world. Now I am leaving the world and going back to the Father." **29** His disciples said, "Now you are talking plainly, and not in any figure of speech. **30** *Now we realize that you know everything and that you do not need to have anyone question you. Because of this we

believe that you came from God." **31** Jesus answered them, "Do you believe now? **32** [w]*Behold, the hour is coming and has arrived when each of you will be scattered to his own home and you will leave me alone. But I am not alone, because the Father is with me. **33** [x]I have told you this so that you might have peace in me. In the world you will have trouble, but take courage, I have conquered the world."

# CHAPTER 17

**The Prayer of Jesus**    **1** [y]*When Jesus had said this, he raised his eyes to heaven and said, "Father, the hour has come. Give glory to your son, so that your son may glorify you, **2** [z]*just as you gave him authority over all people, so that he may give eternal life to all you gave him. **3** [a]*Now this is eternal life, that they should know you, the only true God, and the one whom you sent, Jesus Christ. **4** I glorified you on earth by accomplishing the work that you gave me to do. **5** [b]Now glorify me, Father, with you,

---

l 8, 21-24; 15, 22.
m 12, 31.
n 14, 17.26; 15, 26; Pss 25, 5; 143, 10; 1 Jn 2, 27; Rv 7, 17.
o 7, 33; 14, 19.
p Ps 126, 6.
q Is 26, 17-18; Jer 31, 13; Mic 4, 9.
r 14, 19; 15, 11; 20, 20.
s 14, 13.
t Mt 13, 34-35.

u 14, 13.
v 1, 1.
w 8, 29; Zec 13, 7; Mt 26, 31; Mk 14, 27.
x 14, 27.
y 13, 31.
z 3, 35; Mt 28, 18.
a 1, 17; Wis 14, 7; 15, 3; 1 Jn 5, 20.
b 1, 1.2; 12, 28; Phil 2, 6.9-11.

---

**16, 13:** *Declare to you the things that are coming:* not a reference to new predictions about the future, but interpretation of what has already occurred or been said.

**16, 25:** See the note on 10, 6. Here, possibly a reference to 15, 1–16 or 16, 21.

**16, 30:** The reference is seemingly to the fact that Jesus could anticipate their question in v 19. The disciples naively think they have the full understanding that is the climax of "the hour" of Jesus' death, resurrection, and ascension (25), but the only part of the hour that is at hand for them is their share in the passion (32).

**16, 32:** *You will be scattered:* cf Mk 14, 27 and Mt 26, 31, where both cite Zec 13, 7 about the sheep being dispersed.

**17, 1–26:** Climax of the last discourse(s). Since the sixteenth century, this chapter has been called the "high priestly prayer" of Jesus. He speaks as intercessor, with words addressed directly to the Father and not to the disciples, who supposedly only overhear. Yet the prayer is one of petition, for immediate (6–19) and future (20–21) disciples. Many phrases reminiscent of the Lord's Prayer occur. Although still in the world (13), Jesus looks on his earthly ministry as a thing of the past (4.12). Whereas Jesus has up to this time stated that the disciples could follow him (13, 33.36), now he wishes them to be with him in union with the Father (12–14).

**17, 1:** The action of looking up to heaven and the address *Father* are typical of Jesus at prayer; cf 11, 41 and Lk 11, 2.

**17, 2:** Another possible interpretation is to treat the first line of the verse as parenthetical and the second as an appositive to the clause that ends v 1: *so that your son may glorify you (just as . . . all people), so that he may give eternal life. . . .*

**17, 3:** This verse was clearly added in the editing of the gospel as a reflection on the preceding verse; Jesus nowhere else refers to himself as Jesus Christ.